# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

JARROD STRINGER, et al.,  )
                          )
    Plaintiffs,           )
                          )
vs.                       )CIVIL NO. 5:16-cv-00257
                          )
ROLANDO PABLOS, IN HIS    )
OFFICIAL CAPACITY AS THE  )
TEXAS SECRETARY OF STATE, )
AND STEVEN C. McCRAW, IN  )
HIS OFFICIAL CAPACITY AS  )
THE DIRECTOR OF THE TEXAS )
DEPARTMENT OF PUBLIC      )
SAFETY,                   )
                          )
    Defendants.           )

ORAL/VIDEOTAPED DEPOSITION OF

EITAN HERSH

Tuesday, May 23, 2017

DEPOSITION OF EITAN HERSH, produced as a

witness at the instance of the Defendants, and duly

sworn, was taken in the above-styled and numbered cause

on Tuesday, May 23, 2017, from 9:00 a.m. to 1:49 p.m.,

before Debbie D. Cunningham, CSR, in and for the State

of Texas, reported via Machine Shorthand at of Office of

the Attorney General of Texas, 300 West 15th Street, 9th

Floor, Austin, Texas 78701, pursuant to the Federal

Rules of Civil Procedure.

--oOo--

2

1                         APPEARANCES

2

3    FOR PLAINTIFFS:

4         WATERS & KRAUS, LLP
          3141 Hood Street, Suite 700
5         Dallas, Texas  75219
          (T) 214.357.6244
6         (F) 214.357.7252

7         By:  Peter A. Kraus, Esq.
               kraus@waterskraus.com
8
                    AND
9
          TEXAS CIVIL RIGHTS PROJECT
10        1405 Montopolis Drive
          Austin, Texas  78741
11        (T) 512.474.5073
          (F) 512.853.0374
12
          By:  Cassandra Champion, Esq.
13             champion@texascivilrightsproject.org

14
     FOR DEFENDANTS:
15
          OFFICE OF THE ATTORNEY GENERAL OF TEXAS
16        General Litigation Division
          P.O. Box 12548
17        Austin, Texas  78711-2548
          (T) 512.475.4054
18        (F) 512.320.0667

19        By:  Esteban Soto, Esq.
               esteban.soto@oag.texas.gov
20                   AND
               Rola Daaboul, Esq.
21

22   VIDEOGRAPHER:  Bill Burns

23

     ALSO PRESENT:  Beth Stevens
24                   Lindsey Aston
                     Jill Bliss
25

3

1                          INDEX

2      APPEARANCES                            2

3

4    EXAMINATION OF EITAN HERSH:

5      BY MR. SOTO                            4

6

7

8      REPORTER'S CERTIFICATION            138

9

10

11                     EXHIBIT INDEX

12   Exhibit Number      Description             Page

13     Exhibit 1    Deposition Notice            4

14     Exhibit 2    LexisNexis document          14

15     Exhibit 3    Curriculum Vitae             19

16     Exhibit 4    4/15/17 Professor Eitan D. Hersh    36
                    expert report entitled Report on
17                  Updating Voter Registration
                    Records with Data from Online
18                  Motor Vehicle Transactions

19     Exhibit 5    4/28/17 Dr. Eitan D. Hersh          38
                    invoice addressed to
20                  Attorney Peter Kraus

21     Exhibit 6    Texas Election Code, Chapter 20    58

22     Exhibit 7    NVRA excerpt                 53

23     Exhibit 8    Plaintiffs' Original Complaint    96

24     Exhibit 9    Texas Election Code, Chapter 15   106

25

4

1          (Tuesday, May 23, 2017, 9:00 a.m.)

2                    P R O C E E D I N G S

3              THE VIDEOGRAPHER:  This is the videotaped

4     deposition of the Eitan Hersh.  This is the beginning of

5     Tape 1.  Today's date is May 23rd, 2017; and we're on

6     the record at approximately 9:00 o'clock.

7                    EITAN HERSH,

8     having taken an oath to tell the truth, the whole truth,

9     and nothing but the truth, was examined and testified as

10    follows:

11                    EXAMINATION

12    BY MR. SOTO:

13         Q.   Good morning, Mr. Hersh.

14         A.   Good morning.

15         Q.   Could you please state and spell your name for

16    the record?

17         A.   Sure.  My name is Eitan Hersh, first name,

18    E-I-T-A-N, last name, H-E-R-S-H.

19         Q.   And you understand that you're here today to

20    testify as an expert in a case, Jarrod Stringer versus

21    Rolando Pablos in the Western District of Texas?

22         A.   Yes.

23              (Exhibit 1 marked.)

24         Q.   (BY MR. SOTO)  And I'm handing you what I've

25    entitled Exhibit Number 1, which is the Notice of

5

1    today's deposition.  Have you ever seen this before?

2        A.   I don't think so.

3        Q.   But you understand you're here to testify

4    pursuant to the case identified here?

5        A.   Yes.

6        Q.   Okay.  Have you ever been deposed before?

7        A.   Yes.

8        Q.   How many times, approximately?

9        A.   This is my third deposition.

10       Q.   Okay.  So I'm going to want to start with

11   going over some of the ground rules that are going to

12   govern today's deposition.  You might be familiar with

13   them.  You understand that you have sworn an oath today?

14       A.   Yes.

15       Q.   And that that oath is the same oath that you

16   would swear if you were to testify in court?

17       A.   Yes.

18       Q.   So one of the things that's important here

19   today is creating a clean record of what's said and what

20   you testify to.  Do you understand that?

21       A.   Yes.

22       Q.   And do you understand that your testimony here

23   today may be used as evidence later on in this case?

24       A.   Yes.

25       Q.   So a couple of things with that.  First, it's

Eitan Hersh - 5/23/2017

6

1    important that we don't talk over each other.  Is that

2    okay?

3         A.    That's okay.

4         Q.    And I will try not to cut off your answers if

5    you promise not to try to cut off my questions.  Is that

6    okay?

7         A.    That's great.

8         Q.    Another thing:  It's important that we get

9    clear answers to the questions.  A lot of times in just

10   normal conversations, people may nod their heads or say

11   "uh-huh" our "huh-uh."  That's not entirely clear in a

12   transcript.  Do you understand that?

13        A.    Yes.

14        Q.    And if -- everyone does it; so if I kind of

15   say something, I'm not trying to be rude.  I just want

16   to get a clean record.  Okay?

17        A.    Sounds good.

18        Q.    If for whatever reason you don't understand

19   one of my questions, will you let me know?

20        A.    I will.

21        Q.    And I'll try to rephrase.  If you answer, I'm

22   going to assume that you understand the question.  Is

23   that okay?

24        A.    That's okay.

25        Q.    So I understand that you may be flying home

1    today, so we'll try to get through this as quick as

2    possible.  We'll probably need to take breaks to

3    accommodate the video recordings; but if at any time

4    during the deposition you need to go to the restroom or

5    need a break, will you let me or your Counsel know?

6         A.   I will.

7         Q.   And we'll take a break.  The one caveat to

8    that is if there's a question pending, I'd ask that you

9    answer that question before we take a break.  Is that

10   okay?

11        A.   That's okay.

12        Q.   Is there any reason here today that you will

13   not be able to understand my questions or give a

14   truthful answer?

15        A.   If the answers [sic.] are clear and I

16   understand them, I'll be able to answer them.

17        Q.   Fair enough.  You're not on any medication or

18   anything that would affect your ability to understand my

19   questions?

20        A.   I'm not on medication, no.

21        Q.   Did you do anything to prepare for today's

22   deposition?

23        A.   Yes.

24        Q.   What did you do to prepare?

25        A.   Over the weekend, I reviewed my expert report

8

1  and some of the documents that went into that report.

2  Yesterday, I met with Counsel; and this morning I did as

3  well.

4      Q.   Okay.  Did you review any documentation to

5  prepare for today's deposition besides your expert

6  report?

7      A.   Some of the documents, again, that went into

8  the report.

9      Q.   That are referenced in the report?

10     A.   Yes.

11     Q.   Any documents that were not referenced in the

12  report?

13     A.   No.

14     Q.   Okay.  So you testified before that you've

15  been deposed before.  Was that in conjunction with you

16  being a fact witness or an expert witness?

17     A.   Both times expert witness.

18     Q.   Okay.  And what cases were those?

19     A.   They're listed in that report.  The first one

20  was the Indiana Voter NVRA case.  I was working for the

21  Attorney General of Louisiana in that case.  And the

22  other case was another NVRA case in the state of Kansas,

23  and I was working for a plaintiff in that case.

24     Q.   So the Indiana case, that's the Judicial Watch

25  versus King case?

Eitan Hersh - 5/23/2017

9

1        A.    Correct.

2        Q.    **And what opinions did you offer in that case?**

3        A.    So I wrote a report about -- focused mostly on

4    the number of dead people on the rolls in the state of

5    Indiana and how that rate compared with other states;

6    and my claim in that report, based on the evidence, was

7    essentially that Indiana had a similar rate of deceased

8    records on the voter registration records compared to

9    other states.

10        Q.    **Fair enough.  Did you testify in that case?**

11        A.    No.

12        Q.    **Okay.  Do you know what the ultimate**

13   **conclusion of that case was?**

14        A.    I know it was settled.  I don't know exactly

15   what happened.

16        Q.    **Okay.  So you also were deposed in Fish versus**

17   **Kobach?**

18        A.    It's "Kobach," yeah.

19        Q.    **"Kobach."  And that's that Kansas case?**

20        A.    Correct.

21        Q.    **And you were an expert on behalf of the**

22   **plaintiffs in that case?**

23        A.    That's right.

24        Q.    **And what was the opinion you offered in that**

25   **case?**

Eitan Hersh - 5/23/2017

10

1     A.   In that case, the question was:  How many

2  noncitizens are on the voter registration records and

3  how many noncitizens have voted?  And in that case I had

4  linked a DMV database of noncitizens to voter

5  registration databases; and I had made an assessment of

6  the number of noncitizens registered, whether that

7  number was big or small relative to other problems on

8  voter registration records.

9     Q.   Okay.  Is that case still going on?

10    A.   It's still going on.

11    Q.   What's the status of it, do you know?

12    A.   So I was deposed only a couple of weeks ago.

13  I think I sent my lawyers the transcript as soon as I

14  got it, and I honestly don't know where -- I know it

15  hasn't gone to trial, but I don't know anything beyond

16  that.

17    Q.   And so in your opinions in this case have you

18  relied on your work in either of those two cases to form

19  your opinions here?

20    A.   Yes, insomuch as both those cases involved

21  linking information, some from the DMV to voter

22  registration records; and a lot of my own academic

23  research also has the flavor of connecting records,

24  whether they're from the DMV or from other public or

25  private sources to voter registration records.

1    Q.    But neither of those cases dealt with Texas
2    law?
3    A.    Those cases did not deal with Texas law.
4    Q.    And they didn't deal with Texas voter
5    registration?
6    A.    That's right.  They both dealt with the
7    National Voter Registration Act.
8    Q.    Okay.  So you also mention in there that
9    you've been a consulting expert in two cases, Texas v.
10   Holder and Veasey v. Perry; is that right?
11   A.    That's right.
12         MR. KRAUS:  It's "Veasey."
13         MR. SOTO:  "Veasey."  I'm sorry.
14   Q.    (BY MR. SOTO) And those both deal with voter
15   ID?
16   A.    That's right.
17   Q.    Have you ever had any expert report be
18   precluded because it's unreliable before?
19   A.    No.
20   Q.    Have you ever had any of your expert reports
21   or opinions adopted by a Court or relied upon by a
22   Court?
23         MR. KRAUS:  Object to the form of the
24   question.
25         You can answer to your knowledge.

Eitan Hersh - 5/23/2017

12

1    A.   So as far as I know, the Indiana report I

2 wrote, that case was settled -- I don't know the

3 circumstances under which that settlement happened --

4 and, as I said, the Kansas case is still ongoing.  I

5 think the answer to your question is "no."

6    **Q.   (BY MR. SOTO)  So I was reviewing your**

7 **transcript from your last deposition; and you mentioned**

8 **that in the Texas v. Holder case, some of your opinions**

9 **or your work was produced in an extra report in that**

10 **case.  Is that fair?**

11    A.   So I did a lot of the background data work

12 that went into Professor Ansolabehere's expert report.

13 He was the testifying witness.

14    **Q.   And you've got to help me with that.  Can you**

15 **pronounce the name again?**

16    A.   Sure.  "Ansolabehere" is the pronunciation.

17    **Q.   "Ansolabehere."  Okay.  And he's a Harvard**

18 **professor, as well?**

19    A.   That's right.  He's a Harvard professor; I'm

20 not.  I was just interpreting the "as well."

21    **Q.   You have a Ph.D. from Harvard, though?**

22    A.   I have a Ph.D. from Harvard.

23    **Q.   So for that professor's report in that case,**

24 **what did that deal with?**

25    A.   So that dealt with this question of how many

1   currently registered voters in the state of Texas at

2   that time did and did not have a viable form of ID,

3   photo ID, under the Texas Voter ID Law and what the

4   racial composition of that group is.

5        Q.   And did your work also deal with that same

6   question?

7        A.   Yes, my work dealt with that question.

8        Q.   Okay.  Do you know if the Court relied upon

9   the professor's expert report in that case?

10       A.   There were two cases there.  The Section 5

11  case was the first one, and the Section 2 case was the

12  most recent one.  And, to be honest with you, I remember

13  reading the Court's -- the Appellate Court's ruling in

14  the first case and the District Court's ruling in the

15  second case; but I can't remember exactly what the

16  Judges relied on.

17       Q.   Do you know if any Court ever found the

18  professor's report unreliable?

19       A.   In the Section 5 case, there was an ambiguity

20  about how many people count as not being -- as being a

21  registered voter who doesn't appear on an ID database

22  because of a slightly different threshold of exactness.

23  So there was a big question about whether if someone has

24  a nickname or if someone has a hyphenated last name or

25  if there's a typo in a name and for that reason they

Eitan Hersh - 5/23/2017

14

```
 1   don't appear to have a driver's license that matches, if
 2   I remember correctly, the Court found that the standard
 3   we used for exactness in that case -- not "we," but that
 4   Professor Ansolabehere used, I think, if I remember
 5   correctly, that the judge -- the judges thought that
 6   that wasn't right; but we did a much different thing for
 7   the Section 2 case.
 8        Q.   So did you contribute to the report in the
 9   Section 5 case?
10        A.   I mean, I did a lot of the statistical work
11   behind it.  I didn't write it.
12                  (Exhibit 2 marked.)
13        Q.   (BY MR. SOTO)  And if you could take a look at
14   this -- and you can take your time -- and I've
15   highlighted some sections in here on page, I believe,
16   18.  Can you let me know when you've had a chance to
17   review this document.
18                  MR. KRAUS:  Do you want him to read the
19   whole opinion?
20                  MR. SOTO:  No, I don't.
21        Q.   (BY MR. SOTO)  Essentially my question is
22   going to be:  Is this a Section 5 case, and is this the
23   same Professor Ansolabehere that you referenced earlier
24   in your testimony?
25        A.   Yeah, so without having seen this document
```

1    before, or recently, and just reviewing your

2    highlighted part in section -- on page 18, if this is

3    the Court's ruling, then it makes sense to me that

4    there's this question of the language here of

5    substantially similar that went into that case.

6              And then I do believe it's also true

7    that, you know, I think -- if I remember correctly, the

8    Section 2 case, which is the most recent one, we used, I

9    think ten -- we were able to link the Texas Voter

10   Registration records to ten ID databases, the driver's

11   license, the concealed carry handgun, passports,

12   Veteran's health benefits, a number of things.  And if

13   my memory serves me, maybe there were fewer Federal IDs

14   that were able to match that.

15              The racial classification algorithm here

16   refers to -- and I remember in the Section 2 case,

17   because it was more recently, we -- as you know, Texas

18   is different from some of the other states in the south

19   where it doesn't provide race on the voter file as a

20   public record.  And so there was a question:  How do you

21   know whether someone is of a different race because that

22   was, obviously, an important question in this voting

23   rights case.

24              And I remember in the Section 2 case, we

25   used both a name-matching algorithm supplied by this

Eitan Hersh - 5/23/2017

16

1   firm Catalyst and we also used -- which is probably a

2   better way to do it -- and then we used a way that's

3   more traditional in the courts, which is to use

4   geographic data, Census blocks that you get from the

5   Census, which gives you, say, the rate of Blacks or

6   Spanish or Whites in a particular place.

7                    And so I don't really recall the

8   Section 5 case in detail, but my guess is maybe we only

9   used one of those forms or another or the judges in that

10  case had more questions about the Catalyst algorithm

11  than the judges in the Section 2 case.

12       Q.   Sure.  And thanks for explaining that.  I

13  don't have a lot of familiarity with these cases because

14  I wasn't involved.  So I just want to make sure that I

15  understand.

16                    So this document, at least, this is a

17  Section 5 case, correct, an opinion from a Section 5

18  case?

19       A.   This is a Section 5 case, that's right.

20       Q.   And this professor identified here on page 18

21  in the highlighted portion, you contributed to the study

22  and the expert report in this case, correct?

23       A.   That's right.

24       Q.   Okay.  So for these two cases where you were

25  working as a consulting expert, have you relied upon

Eitan Hersh - 5/23/2017

17

1   that work in reaching your conclusions in this case?

2        A.   The only sense in which I rely on it is in

3   that I worked intimately with the Texas DPS file and

4   with the voter registration file.  So that gives me, I

5   think, some familiarity with those databases.  I know,

6   you know, what they contain and so forth from having

7   learned about them in that case.

8        Q.   Did that case deal with -- again, I'm not

9   familiar with that case.  Did that case deal at all with

10  voter registration when a registrant updates his

11  driver's license online?

12       A.   Not specifically online, no.  You know, it

13  does have to deal with the connection, the link, between

14  two dynamic databases, right?  You have a DPS database

15  of drivers that are dynamic because people are updating

16  it for a number of reasons, for renewals, for changes of

17  addresses, for changes of names; and the fact that that

18  database is dynamic presents some challenges to linking

19  it to another dynamic database, which is the voter

20  registration records.

21       Q.   But in that case and in this case we're not

22  dealing with the same statutes and the same exact law,

23  correct, the portions of the statutes, correct?

24       A.   That's right, although I think the Fourteenth

25  Amendment applies to both of them.

Eitan Hersh - 5/23/2017

18

1      Q.    How does the Fourteenth Amendment apply to
2  both of them?

3      A.    Well, you know, my understanding of the first
4  case, the Section 2 case, is that Section 2 itself is a
5  Federal statute that is constitutional because of the
6  Fourteenth Amendment; that is, Congress' role in
7  implementing vehicle protection laws, essentially; and
8  here, too, my understanding of reading the Original
9  Complaint is that the Plaintiffs consider, as far I --
10  if I remember this right from the Complaint -- the
11  Plaintiffs consider Texas' policy here both an NVRA
12  violation and potentially a violation of the Equal
13  Protection Law.

14      Q.    You mentioned that you work with DPS files in
15  voter ID cases, and that experience helped inform your
16  opinions here.  Did I state that correctly?

17      A.    It certainly helped inform my knowledge of the
18  issues here.

19      Q.    Fair enough.  What do you mean by "DPS file"
20  or "files"?

21      A.    So, again, in that case, my role was to assist
22  the testifying expert and the Justice Department in
23  understanding how many photo ID holders are not
24  registered to vote -- or, sorry; the other way around --
25  how many registered voters do not have photo IDs.  And,

19

1    of course, the main photo ID that people have is a

2    driver's license; and so the link between the driver's

3    license database, specifically, and the voter file is

4    really important to that case.

5                In fact, you know, there's a -- I listed

6    this on my CV.  There's a working paper that's under

7    review for publication, under peer review, where

8    Dr. Ansolabehere and I coauthor a report of how we did

9    this linkage between the two databases for that case and

10   what we found.  And so you can see that on my CV.  And

11   we explained some of the complications in linking these

12   two databases.  It's all more or less derivative from

13   his expert report and testimony.

14       Q.   **And since you mentioned it, let me give you --**

15   **I'm going do mark your CV, and this is Exhibit 1 to your**

16   **expert report.**

17                (Exhibit 3 marked.)

18       Q.   **(BY MR. SOTO)  Can you take a look at that and**

19   **just make sure that's correct?**

20       A.   Yes.

21                MR. KRAUS:  It's Exhibit 1 to the expert

22   report --

23                MR. SOTO:  It's Exhibit 1 to the expert

24   report, Exhibit 3 here.

25                MR. KRAUS:  Okay.

20

1          MR. SOTO:  I just want to make sure:

2  Have we been doing, like, a rolling identification of

3  exhibits so far?

4          MS. CHAMPION:  No, we started over every

5  time.

6          MR. SOTO:  Okay.  I should have asked

7  that before.

8     A.  Actually the piece that I'm referring to I

9  don't think is in here because it's not -- it's still

10 under review, but it's available on my website.  You can

11 look at it.  There's always kind of a churning of what's

12 under review and what's not, what's being edited.

13          So in any case, there is a working paper

14 that Dr. Ansolabehere I wrote together which goes into

15 how we connected these two databases.  And, again -- you

16 know, again, the most important database, we linked the

17 voter file to ten different databases; but the driver's

18 license database is the most important because it's the

19 ID database that contains the most number of people; and

20 so that -- I have familiarity, again, with that DPS file

21 from that case.

22     Q.  **So did you specifically rely on that working**

23 **paper to reach any conclusions in this case?**

24     A.  Again, I'm not exactly clear on the language

25 of "rely on."  I mean, I learned about -- I learned

Eitan Hersh - 5/23/2017

1    about that file from that case.  Although, the questions

2    that were presented in this particular case are

3    different; and so I don't know exactly how to translate

4    that.  I mean, this is part -- the past work and work in

5    other states on voter files and on driver's license

6    databases gives me familiarity with the process of

7    linking DPS data or driver's license data to voter data;

8    and that link is important to this case because part of

9    the question here is:  How do you, again, update one

10   file with the other file?  At the same time, the

11   questions that -- I think the core questions presented

12   in this case are different.

13        **Q.   And that working paper, you said, is still**

14   **under peer -- still being submitted for peer review?**

15        A.   It's under peer review.

16        **Q.   Under peer review.**

17        A.   These things take, like, a year.

18        **Q.   Do you have any expectation of when that might**

19   **be concluded?**

20        A.   No.  It's gone to the second stage of peer

21   review called "revise and resubmit."  So my guess is

22   it's another six months before it gets published, but

23   there is a version of it on my website now.

24        **Q.   And just for background information, what is**

25   **"peer review"?**

Eitan Hersh - 5/23/2017

22

1      A.   Peer review is the process by which academic

2 scientific papers are published where we submit a paper

3 to a journal.  It's usually either single blind or

4 double blind, which means that -- what the journal does

5 is they send it out to peers, other experts in the

6 field, who review the paper for its integrity, for its

7 science, whether they think it ought to be published.

8 And those reviewers give reports to the editor, and the

9 editor then makes a decision, in part, based on the

10 reviewers about whether that should be published.  So in

11 a single blind review, the authors don't know who the

12 reviewers are.  In a double blind review, neither the

13 authors nor the reviewers know who one another is.

14      **Q.   Okay.  Have you ever submitted an article, a**

15 **paper, to a journal that's been rejected?**

16      A.   Yes.  I can't imagine there's a single

17 academic that has not.

18      **Q.   Is that common, or how common is that?**

19      A.   It's very common.  I mean, it's something

20 like, you know, the top journal in political science

21 might include maybe ten papers a year on American

22 politics broadly; and they probably see hundreds of

23 submissions.

24      **Q.   How many -- I mean, just approximately how**

25 **many times have you submitted a paper or an article to a**

Eitan Hersh - 5/23/2017

23

1  journal and had it rejected?

2      A.   I do not know the answer to that.  Some of

3  these papers that were accepted, the place we sent them

4  was the first place; and sometimes it's the fourth time

5  that we submit to a journal that it gets accepted, the

6  fourth journal.

7      Q.   Fair enough.

8           So when you mentioned that you reviewed

9  DPS files and specifically voter registration

10  information, when exactly was that?  What date was that?

11      A.   I'm sorry.  I didn't hear.

12      Q.   What date was that that you reviewed that

13  database?

14           MR. KRAUS:  Object to form of the

15  question.

16      Q.   (BY MR. SOTO)  Or those databases?

17      A.   I don't really remember.  I mean, both cases

18  were pretty lengthy periods of time, over, you know,

19  months preceding the expert reports.

20      Q.   So the date in that case that I handed you,

21  the Holder case, I think it was 2012.  So is it fair to

22  say that you, at least for the Holder case, any database

23  or each DPS file that you reviewed occurred before 2012?

24      A.   For this first case, right.  And then the

25  second case, I don't exactly -- don't know when the date

Eitan Hersh - 5/23/2017

24

1     of that case was.

2         Q.    Okay.  And you were -- for both of those voter

3     ID cases, you were hired by the Plaintiffs in that case?

4         A.    Yes.

5         Q.    Or by the Department of Justice?

6         A.    Essentially the Department of Justice.

7         Q.    So the Section 2 case, is that still going on?

8         A.    I don't know.  It might be.  It's gone back

9     and forth between appeals court, the district court.  I

10    think the Supreme Court, as well.  I really don't know.

11        Q.    My understanding is the Department of Justice

12    may have at least withdrawn or moved to dismiss at least

13    in relation to their discriminatory impact claim?

14        A.    Yeah --

15              MR. KRAUS:  Excuse me.  Object to the

16    form of the question.

17              Go ahead.  You can answer.

18              THE WITNESS:  Oh.

19        A.    Yeah, I don't -- you know, I think that

20    Attorney General Sessions has probably different

21    priorities than Attorney General Holder had at the

22    beginning of that case and the Justice Department had

23    under Obama, President Obama.  So I don't know what the

24    priorities of the Justice Department are.

25        Q.    (BY MR. SOTO)  So do you know why they

Eitan Hersh - 5/23/2017

25

1  withdrew from the case or moved to dismiss that claim?

2      A.   I certainly wouldn't want to opine on the

3  motivations of Attorney General Sessions.

4      Q.   But any report that you worked on or in

5  conjunction in that case happened years ago; is that

6  fair to say?

7      A.   The Section 2 case, if I had to guess, I would

8  guess it happened around 2014, maybe.

9      Q.   So since 2014, have you reviewed any DPS files

10  or databases?

11      A.   In Texas?

12      Q.   Yes.

13      A.   No.

14      Q.   So going just to your background, I see that

15  you went to Tufts.  That's in Boston, correct?

16      A.   That's right.

17      Q.   What was your major at Tufts?

18      A.   Philosophy.

19      Q.   Okay.  And then you got a Master's and a Ph.D.

20  from Harvard?

21      A.   That's right.

22      Q.   What was your thesis on?

23      A.   My thesis was basically a version of my book

24  about how laws, like, about voter registration and

25  Census data, how those contribute to campaign strategy

Eitan Hersh - 5/23/2017

26

1    through microtargeting strategies.

2         Q.   And that's the book you list in Exhibit 3 on

3    your CV?

4         A.   That's correct.

5         Q.   So are you from Boston?

6         A.   No.

7         Q.   Okay.  I wanted to ask you that because you

8    went there and then you had an article on the Red

9    Sox/Yankees rivalry, so I thought it was a safe

10   assumption you were from --

11        A.   I live in Boston now.  I come from Providence,

12   Rhode Island.

13        Q.   So a Yankees or a Red Sox fan?

14        A.   Red Sox, for sure.  On the record, under oath

15   a Red Sox fan.

16        Q.   So have you ever lived in Texas?

17        A.   No.

18        Q.   Okay.  So I assume you've never voted in

19   Texas?

20        A.   I have not.

21        Q.   Never registered to vote in Texas?

22        A.   Correct.

23        Q.   Never got a driver's license in Texas?

24        A.   Correct.

25        Q.   Never personally had any experience dealing

1  **with interacting with the Texas Voter Registration**

2  **System?**

3      A.    That's correct, as a citizen.

4      **Q.    So how did you go from philosophy in undergrad**

5  **to political science in your graduate studies?**

6      A.    That's a good question.  I guess when I

7  thought about what my profession would be, I was

8  interested in science and how to answer and ask careful

9  questions that can be answered with data.  And as much

10  as I like philosophy, it didn't seem like -- I thought I

11  could make incremental progress on scientific questions

12  through being a social scientist.

13      **Q.    What would you consider your expertise in?**

14      A.    So I would generally describe my expertise

15  first as about American politics, then specifically

16  about questions of mass behavior and how institutions of

17  government affect mass behavior.

18              A lot of my work has a methodological

19  focus on public records, voter registration data.  A lot

20  of my research is not particularly about the voter

21  registration system but uses that system to help us

22  understand a number of aspects of human behavior.

23              And then I have some work on political

24  campaigns.  Obviously, my book is about both voter

25  registration systems and political campaigns in general.

1  But the one-liner is American politics.

2       Q.   And I'm just going to go through a series of

3  questions, just to kind of focus on what your expertise

4  is.

5       A.   Sure.

6       Q.   You're not a legal scholar, correct?

7       A.   I'm not a lawyer, so I'm not a legal scholar

8  in that sense; but I am a scholar on how laws affect

9  stuff.

10      Q.   Do you consider yourself a legal expert?

11      A.   No.

12      Q.   And you didn't go to law school?

13      A.   No.

14      Q.   I take it -- have you ever taken any classes

15 dealing with statutory construction or how to interpret

16 statutes?

17      A.   No.

18      Q.   Any classes or experience focused on IT or

19 computer science?

20      A.   Well, a lot of the background of my Ph.D. in

21 political science is focused on statistics; and, you

22 know, anyone studying statistics now is also learning

23 programming.  So I've learned those things.

24      Q.   What type of programming have you learned?

25      A.   So the programming is mostly programming for

Eitan Hersh - 5/23/2017

29

```
1    statistical software, so R, Stata, and then some use of

2    SQL, just another language.

3         Q.   You're not an accounting expert, correct,

4    accounting?

5         A.   About the topic of accounting?

6         Q.   Yes.

7         A.   No.

8         Q.   Never taken accounting classes?

9         A.   No.

10        Q.   Okay.  What about economics?

11        A.   Yeah, I've taken economics classes.

12        Q.   Like intro?

13        A.   Undergraduate econ classes, that's right.

14        Q.   What about engineering?

15        A.   Econometrics, which is a synonym for

16   statistics, basically.

17        Q.   Engineering?

18        A.   No.

19        Q.   Okay.  What was your first job out of graduate

20   school?

21        A.   My first job out of graduate school has been

22   this professorship at Yale.

23        Q.   And you're an Assistant Professor?

24        A.   That's right.

25        Q.   What classes do you teach?
```

1      A.   I teach three -- I've taught regularly three

2  classes at Yale one about Information Technology and

3  politics.  I think it's called Information Technology

4  and Political Power, a class on U.S. election rules and

5  campaigns, and then an upper-level seminar on U.S.

6  elections.

7      **Q.   Do any of those classes deal specifically with**

8  **Texas law or Texas voting registration systems?**

9      A.   Well, they deal with -- the two elections

10 classes deal with election systems in general across

11 states.

12     **Q.   Have you taught at all about specifically the**

13 **Texas election system in those classes?**

14     A.   I've talked about -- I've lectured about the

15 voter ID cases.

16     **Q.   And what specifically was encompassed by that**

17 **lecture on the voter ID cases?**

18     A.   Throughout a lecture course I use examples.

19 So, you know, I talk about the redistricting rules in

20 Florida.  I've taught Florida has an interesting

21 constitutional amendment about redistricting.  And

22 students are really interested in the topic of voter ID,

23 so I use the Texas Voter ID Law as an illustration of

24 voter ID laws; how to -- I think the main purpose of my

25 lecture on voter ID law was trying to help students

31

1   understand how you answer a difficult question.

2              So in this question, it's a difficult

3   question to know how many people might be affected by

4   this law and what the racial composition of that group

5   is.  It's a specific question, but it's very hard to

6   answer.  And trying to answer it was the goal of this

7   trial.  So I kind of walk students through that process

8   and help them understand how to answer difficult

9   questions.

10      **Q.   So besides that voter ID lecture, have you**

11  **ever lectured or taught specifically on anything else**

12  **dealing with Texas election laws specifically?**

13      A.   Yes.  I mean, you know, one of the great

14  things about American politics is that we have 50

15  states; and so when we learn about something like voter

16  registration or voter registration data, we get to

17  compare states.

18              So, in fact, in my book, which I do teach

19  in, I think, all of my classes, a key part of the book

20  is understanding how campaigning might be different,

21  say, in Texas from a state that collects party

22  registration, which Texas does not collect, or for a

23  state that collects racial registration, which, again,

24  other states in the south do collect; Texas does not.

25              So, you know, Texas is always part of the

32

1    mix of 50 states; and in that sense, we're learning

2    about how Texas laws affect outcomes in Texas relative

3    to other states.

4        **Q.    Have you ever taught specifically about the**

5    **motor voter provisions in the National Voter**

6    **Registration Act?**

7        A.   Yes, they're contained in my book.  I talk a

8    little bit about them in the book.

9        **Q.    Specifically dealing with Texas, or is there**

10   **anything about Texas an motor voter --**

11       A.   Again, Texas is a subset of the United States.

12   I talk about the United States in general.

13       **Q.    So did you rely on anything contained in your**

14   **book in coming to the conclusions in this case?**

15       A.   I would say that I relied on, you know, a

16   basic understanding of the NVRA, which I learned from

17   working on my book.

18       **Q.    Have you ever worked with a state or local or**

19   **even the Federal Government in developing a voter**

20   **registration system?**

21       A.   I have been part of conversations of academics

22   and some state election officials about electoral

23   reform.  So, you know, whether a jurisdiction is going

24   to adopt some new rule, there's been sort of -- there's

25   regular academic meetings for things like this.  You

Eitan Hersh - 5/23/2017

33

1  know, automatic voter registration is something that

2  comes to mind where I think some people in government

3  and some people from organizations and some people from

4  universities are trying to understand some potentially

5  new reform.  So I've been part of those conversations.

6      Q.   **Have any of those conversations led to any**

7  **regulation or law being adopted by a state or local**

8  **government?**

9      A.   That's a good question.  I'm not sure directly

10  cause and effect for those things.  I mean, most of

11  these have been in Boston, different towns in Boston,

12  near where I live, where we've talked to city officials.

13  I'm not sure exactly the direct cause and effect between

14  conversations in these kinds of informal settings.

15      Q.   **So you're not aware of any regulation or law**

16  **that went into effect as a result of your conversations?**

17      A.   Correct.

18      Q.   **Have you ever worked with a state or local**

19  **government in administering a voter registration system?**

20      A.   No.

21      Q.   **What is your understanding about what this**

22  **case is about?**

23      A.   My broad understanding of what this case is

24  about is Texas has made a decision to not automatically

25  update or provide the opportunity for people to update

Eitan Hersh - 5/23/2017

34

1   their voter registration information when they change

2   address or renew a license online; and there is a

3   disagreement between the State of Texas and the

4   Plaintiffs about whether Texas ought to do that, as

5   other states do, around Federal law.

6        **Q.   And how did you become involved in this case?**

7        A.   Someone who knew me and my work on voter

8   registration connected me with the Plaintiffs.

9        **Q.   When did you first learn about this case?**

10       A.   I don't remember.  Months ago definitely.

11       **Q.   Months ago.  Okay.**

12            **And can you summarize the opinions you've**

13  **reached in this case?**

14       A.   Sure.  My goal is to try to help solve a

15  mystery, which is:  Why does Texas do what it does in

16  this particular context?  And there could be a number of

17  reasons why Texas doesn't update or allow individuals to

18  update their voter registration data when they perform a

19  transaction online.

20            And my opinion is that there are no

21  obvious substantial technical reasons why Texas does not

22  do that or financial situations why Texas does not do

23  that, but the -- what the decision boils down to, the

24  mystery is solved, because it's not a technical or a

25  financial barrier but an interpretation of the law.  In

1  some ways I think my goal here or what I accomplished is

2  helped to set aside what is a plausible but not relevant

3  consideration from the more relevant considerations.

4      Q.   Do you know if the Defendants in this case

5  have ever argued that there's a technological barrier to

6  doing what the Plaintiffs asked us to do?

7      A.   Yes.

8      Q.   What's your basis for understanding that?

9      A.   So my understanding in an early report from, I

10  believe, the Texas Election Director, there was a claim

11  that Texas didn't have the capacity to do this, that it

12  would cost a lot of money to do it; and, to me, that

13  sounded like, oh, there's a technical problem.  There's

14  a technical reason.

15     Q.   I understand that may be a financial reason,

16  but you inferred from that -- who's the Texas Election

17  Director?

18     A.   I believe Mr. Ingram.

19     Q.   Mr. Ingram.  And he works for DPS; is that

20  right?

21     A.   I believe he works for the Secretary of State.

22     Q.   I'm sorry.  The Secretary of State.

23              And Mr. Ingram has testified or stated,

24  you're asserting, that there's financial reasons or

25  financial costs associated with this, correct?

Eitan Hersh - 5/23/2017

36

1      A.    Well, not just cost but technical reasons.

2  For example, the claim that Texas would need to gather

3  signature information from people logging in online and

4  they do not have the technical capacity to do that, then

5  doing so would cost a lot of money.  I'm kind of bending

6  all those rationales into a technical set of rationales.

7      **Q.    So do you recall when you reached those**

8  **conclusions in this case?  And I will -- let me**

9  **introduce your expert report.**

10     A.    Thank you.  Helpful for me to see it.

11            (Exhibit 4 marked.)

12     **Q    (BY MR. SOTO)   So this is dated April 15th.**

13 **Do you know when you reached your conclusions in this**

14 **case?**

15     A.    No, not specifically.

16     **Q.    Before April 15th, right?**

17     A.    Before April 15th.

18            MR. KRAUS:  For the record, this is

19 Professor Hersh's report which you've marked as Exhibit

20 Number 4; is that correct, Counsel?

21            MR. SOTO:  That's correct.

22     **Q    (BY MR. SOTO)   So I asked you before when you**

23 **were first engaged in this case.  Did you sign a**

24 **contract for your services?**

25     A.    Yes.

1      Q.   Okay.  Has that been produced, do you know?

2      A.   I don't know.

3           MS. CHAMPION:  Yes, we have produced that

4    in a redacted form.  I think it was only responsive in

5    terms of the compensation portions.

6      Q   (BY MR. SOTO)  And do you know when you

7    entered into that agreement?

8      A.   I don't remember.

9      Q.   Can you approximate when you first got

10   involved with this case?

11     A.   I really don't remember.  It could have been

12   the fall.  I'm not sure.

13     Q.   It could have been last year?

14     A.   Yeah, I'm not sure.  Yeah.

15     Q.   Okay.  Did you do any work in this case before

16   April?

17     A.   Yes.

18     Q.   How many total hours have you spent reviewing

19   documents to come to conclusions in this case?

20     A.   I don't recall, but I believe the Plaintiffs

21   have produced all contracts -- or, I'm sorry -- all the

22   invoices that explain exactly the hours I've spent.

23     Q.   And can you estimate -- do you know off the

24   top of your head how many hours that is?

25     A.   Twenty hours, I guess.  I'm not sure.

1          (Exhibit 5 marked.)

2      **Q     (BY MR. SOTO)   I'm handing you what's been**

3  **marked as Exhibit 5.  Can you tell me if this is the**

4  **invoice you were referring to?**

5      A.    This is one of the invoices.  I believe there

6  are may be three, total; so January, February, April,

7  maybe.  Maybe some months were combined on one of the

8  invoices.

9      **Q.    So in total you've spent about 20 hours**

10 **related to this matter?**

11     A.    I'm guessing.  It looks like it might not be

12 the exact answer; but if I were to guess, something like

13 that.

14     **Q.    Somewhere around there?**

15     A.    Yes.

16     **Q.    So this references work you did October 1st**

17 **through April 28th -- I'm sorry -- April 1st through**

18 **April 28th of this year; is that correct?**

19     A.    That's correct.

20     **Q.    Your report was done -- was dated April 15th.**

21 **Have you done any work since April 15th in this case?**

22     A.    I might have.  I don't know.  This case has

23 been kind of a slow trickle of depositions that were

24 transcribed and so forth.  So I'm not sure if there's

25 anything that I was looking at after that.

Eitan Hersh - 5/23/2017

39

1      Q.      So you might have reviewed some documents

2  after you wrote your report?

3      A.   I certainly reviewed them to prepare for the

4  deposition.  I don't know if I was reviewing anything

5  new.

6      Q.      Has anything you've reviewed since April 15th

7  changed any opinions or facts that you stated in this

8  report?

9      A.   No.

10     Q.      How much are you being compensated for your

11 work in this case?

12     A.   $200 an hour.

13     Q.      And is that for all the work you do in this

14 case?

15     A.   I believe there's a slightly different system

16 of compensation for the deposition and travel days; but

17 otherwise, yes.

18     Q.      Do you know how much you're being compensated

19 for testifying here today?

20     A.   I don't.  I know that -- I think per

21 deposition day was listed as something like a thousand

22 dollars, and then I don't know about the travel.

23     Q.      What about testimony at trial?

24     A.   I can remember the contract said that would be

25 worked if that would come to be.

Eitan Hersh - 5/23/2017

40

1      Q.   So if you look at your report, which I think

2   is Exhibit 4; is that right?

3      A.   Four.

4      Q.   You attached your CV to the report.  You also

5   attached Exhibit B, which, from my understanding, is the

6   documents you've reviewed and relied on in coming to

7   this, your conclusions in this report; is that correct?

8      A.   Yes.  Some of them -- these are the things

9   that were provided to me by the Plaintiffs.  I reviewed

10  everything; although, some of it, upon review, was

11  clearly not focused on the questions that I dealt with

12  in the report.  So I wouldn't say that all of it was a

13  basis for the report, but this was all provided to me.

14     Q.   All right.  Do you recall what specifically

15  was not related to the focus of your report?

16     A.   I don't recall specifically.

17     Q.   Is there anything -- is there any document or

18  information that you thought would be germane or helpful

19  to the questions you researched and the opinions you

20  reached but were not able to access?

21     A.   Can you repeat the question?

22     Q.   Sure.  Are there any documents or information

23  that you believe would be germane to forming your

24  opinions that you did not have access to?

25     A.   That's a good question.  You mean if there is

Eitan Hersh - 5/23/2017

41

1  some document that the State of Texas had that would

2  help me decide my views on this?  I don't know.  I mean

3  if there was an unlimited resource of relevant data, my

4  opinion would probably become -- I would probably

5  benefit from that; but I can't think of anything

6  specifically.

7      **Q.   Is there anything you tried to access that you**

8  **couldn't that you thought would be germane to the**

9  **questions you looked at?**

10     A.   No.

11     **Q.   Did you speak to the Plaintiffs in this case**

12 **about their experience with the Texas voter registration**

13 **system?**

14     A.   I'll amend my previous answer if that's okay.

15     **Q.   Sure.**

16     A.   There was a question -- there was some

17 uncertainty of certain aspects of implementation, for

18 example, the number of complaints that -- even reviewing

19 relevant information, it wasn't clear to me exactly how

20 many complaints were specifically about this issue.  I'm

21 not sure that the State collects data specific enough to

22 answer that.

23            There's also a real lack of clarity for

24 me about how much people use different modes.  So there

25 was a document produced about use of, say, mail renewal

Eitan Hersh - 5/23/2017

42

1   forms versus online renewal forms; mail change of

2   address versus online change of address, but I didn't

3   quite -- those weren't very detailed, so if we could get

4   more detail about those things.

5       Q.   Sure.  Take a step back.  So by "mode," what

6   do you mean exactly?

7       A.   "Mode" is, say, you want to do a task, like

8   renewing your driver's license, then you can do that by

9   one of three mode:  In person, by mail, or online -- or

10  by telephone.  Those are all modes.

11      Q.   So how would having more detailed access to

12  what different modes were used have impacted your

13  decision in this case?

14      A.   I would say that there is -- it would help me

15  understand a little bit the scope of the problem.  So

16  you might imagine that with any technical upgrade in the

17  world how much participation in that upgrade would

18  affect how important it is.  So, you know, maybe when

19  e-mail first came out and, I don't know, .5 percent of

20  the public was using e-mail or 25 percent of government

21  officials were using e-mail, we might not be all that

22  concerned about the FOIA laws related to e-mail; but if

23  a hundred percent of people are using e-mail, then the

24  Federal Freedom of Information Act, for example, is more

25  important in how it deals with questions like e-mail.

Eitan Hersh - 5/23/2017

43

1              In this case, it's relative to mail or in

2     person, almost nobody is using online versus almost

3     everybody is and what exactly that number is can help, I

4     think, affect one's judgment about how important this is

5     as an issue.

6          Q.   So is one of the opinions you were asked to

7     offer that you are offering how important this issue is?

8          A.   No.

9          Q.   You testified -- and let me make sure I don't

10    misstate anything.  Let me take a step back.

11              So if there's ever a time during this

12    deposition you remember something or want to amend your

13    answer, please feel free to do that.

14         A.   Thank you.  I will.

15         Q.   So I'm going to try to summarize what I think

16    you testified earlier to about your opinions.  Let me

17    know if I get it wrong.  Is it true that one of the

18    opinions you reached in this case is that there is no

19    technological barrier to implementing the system that

20    Plaintiffs are requesting for us to implement?

21         A.   There don't seem to be any serious technical

22    barriers.  In other words, there are technical things

23    that one would need to do; and the question is:  Are

24    those easy things to do or hard things to do?

25         Q.   So would having more detailed analysis of the

44

1    modes used in voter registration impact your decision --

2    your opinion on whether there are technological

3    barriers?

4              MR. KRAUS:  Object to the form of

5    question.

6       Q.   (BY MR. SOTO)  You can answer if you

7    understand it.

8       A.   Yeah, I mean -- so I guess not specifically.

9    I guess I would say that there are -- as a scholar,

10   there are things about this question that I would like

11   to have more clarity on; but I don't think -- to

12   specifically answer your question, I don't think,

13   actually, upon reflection, having perfect answers to

14   those questions would affect my judgment.

15      Q.   You also testified, I believe, that you're

16   offering an opinion as to the financial barriers.  Would

17   having more detailed data related to the various modes

18   of voter registration impact that opinion?

19      A.   Sorry.  About the mode now?

20      Q.   The financial barriers.  Would having more

21   detailed access to the various modes used by Texas

22   voters impact your opinion regarding the financial

23   barriers?

24      A.   Yes, I think it would in the sense that,

25   again, one of the reasons why the financial question is

Eitan Hersh - 5/23/2017

45

1   important, even though it's not something that's really

2   detailed very much in the report; but to the extent I do

3   talk about financial barriers, what Texas is doing, it

4   seems is you have lots of people renewing online or

5   changing their address online and then, those people, if

6   they want to update their voter registration record, in

7   some cases or many cases are producing a new document

8   which has to be keyed in by state officials or county

9   officials, which takes time and money.  And so if nobody

10  was using the online system, then -- and, therefore,

11  what the Plaintiffs were suggesting or were asking was:

12  Do some technical fix that's going to affect almost

13  nobody versus this is a technical fix that's going to

14  affect a lot of people, i think that would contribute to

15  this question of is there a substantial kind of

16  technical or financial barrier.

17        **Q.   Has anyone in this lawsuit, any party, alleged**

18  **that there's no or almost no people using the online**

19  **system to change their driver's license?**

20        A.   I don't know if anyone has alleged that or

21  not.  I mean I think that -- but, again, the rate of the

22  behavior is relevant to that question.  I think that you

23  could -- one, you could do a better job; I could.  I

24  wasn't asked to do that specific thing; but if I had

25  perfect information about the number of people doing

46

1    this online transaction, I might be -- and the cost

2    associated with keying in one registration form at a

3    time, then I or the Plaintiffs or you could do a better

4    job, I think, articulating what the scope of the cost

5    would be.

6         Q.   Final question:  You also offer an opinion

7    that this is essentially a legal dispute over what the

8    law requires.  Is that fair?

9         A.   In my expert report?  I think the way I would

10   put it is that a legal dispute is what is left because

11   it does not appear to be a dispute about -- or it does

12   not seem to be a question about whether this is a

13   difficult thing to do or a technically feasible thing to

14   do or a financially feasible thing to do.

15             You know, I think -- when I think about

16   my own role and my own expertise in voter registration,

17   when I was hired by the Plaintiffs, it wasn't clear at

18   that time, before folks were deposed on the State's

19   side, whether there was a technical issue, whether the

20   things that I had to do, for example, in the voter ID

21   case of linking DPS data to voter registration data,

22   maybe that was going to be the same kind of problem that

23   Texas was going to articulate as its reason for not

24   doing this thing.  And I think what I've learned from

25   reading the depositions as they've come through from the

Eitan Hersh - 5/23/2017

47

1   Texas side is that those kinds of technical questions

2   are really not in dispute, and so what's left is what

3   seems to be a legal dispute between Texas and the

4   Plaintiffs.

5       **Q.   And you're not offering any opinion over who's**

6   **correct in that legal dispute; is that right?**

7       A.   I guess I have a personal view about that; but

8   I -- it seems to me that, as I read the NVRA language in

9   Section 5 of the NVRA, it does seem to me that the State

10  is not complying with that.  So in that sense, I think

11  the State is incorrect.

12      **Q.   So you have a personal opinion.  I'm not**

13  **asking about your personal opinion.  What I'm asking is:**

14  **Do you intend to offer an opinion regarding whether**

15  **Texas is violating the NVRA?**

16      A.   I'm not sure what the difference is there.

17  I'm someone who has studied the voter registration

18  system and I can read the NVRA and I can see now, having

19  read this case, what Texas' behavior is with respect to

20  the NVRA.  And although I'm not a lawyer, but I just am

21  your everyday expert on the voter registration system,

22  it seems to me that Texas is not complying.

23      **Q.   So is it -- I just want to make sure I**

24  **understand.  So are you offering an opinion that Texas**

25  **is violating the NVRA?**

48

1              MR. KRAUS:  Objection, asked and

2      answered.

3          A.   I want to be careful here because I'm posing

4      as an expert in voter registration.  I'm not posing as

5      an expert -- as a lawyer, and I am not going to -- I do

6      not want to suggest that I am acting as a lawyer when I

7      am not a lawyer.

8          **Q    (BY MR. SOTO)  Fair.  So is it fair to say**

9      **that you would not be qualified to give a legal opinion?**

10             MR. KRAUS:  Object to form of the

11     question.

12         A.   I can give the -- it's an unusual question for

13     me just because, you know, this is now my third

14     deposition; and I inform my opinions based on data

15     analysis and my familiarity with the systems that I

16     study.  And so it's from that position which I can offer

17     this opinion about compliance; but if you're asking

18     something like am I posing to be a lawyer, the answer is

19     no.

20         **Q.   (BY MR. SOTO)  Okay.  I thought my question**

21     **was more of a yes-or-no question, but let me ask**

22     **something else.**

23             **You've testified earlier that you've**

24     **never taken a class dealing with statutory construction**

25     **or how to legally interpret a statute, correct?**

Eitan Hersh - 5/23/2017

49

1      A.   I've taken an election law class at Harvard

2  Law School where we learned about statutes related to

3  election law and we learned about how Courts and experts

4  in the field have interpreted that law.  Now, that was

5  an election law class taught by an election law scholar

6  at Harvard Law School.  It wasn't a class about how to

7  be a lawyer.

8           And so, you know, I just don't know what.

9           -- I'm answering this way because I think

10  there's some gray area to this question, and I'm trying

11  to just be very specific about what I have learned and

12  what I'm an expert in and also be clear about what I'm

13  not an expert in.

14      Q.   **How many law school classes have you taken?**

15      A.   I have taken one law school class.

16      Q.   **What year was that?**

17      A.   Probably 2010, maybe, around then.

18      Q.   **I take it, you didn't get a JD from Harvard**

19  **Law School?**

20      A.   I did not, unfortunately, get a JD from

21  Harvard Law.

22      Q.   **You're not licensed to practice law anywhere?**

23      A.   Right.  That's what I've been trying to say.

24      Q.   **You've never practiced law anywhere?**

25      A.   Correct.

1      Q.     Are you an expert in the NVRA?

2      A.     I would consider myself the expert in voter

3  registration.

4      Q.     Are you an expert in the NVRA?

5      A.     In the sense that the NVRA touches upon a lot

6  of my work, I'm an expert in the NVRA.  Now, I would not

7  consider myself an expert in all aspects of the NVRA;

8  but a lot of my academic scholarly research relies on

9  the NVRA and relies on the consequences of the NVRA.

10     Q.     What about NVRA compliance, do you consider

11  yourself an expert in NVRA compliance?

12     A.     No, I would not consider myself an expert in

13  NVRA compliance.

14     Q.     In coming to your opinions in this case -- I'm

15  sorry -- so in Exhibit B of your expert report, which is

16  listed as Part 4, is this the complete list of documents

17  and sources that you specifically reviewed and/or relied

18  on in coming to your opinions in this report?

19     A.     Yes.

20     Q.     Is there anything that you -- I know you

21  talked about the working paper, and that's under peer

22  review.  Setting that aside for a moment, is there

23  anything else, any other documents or source that you

24  reviewed and relied on in coming to your opinions in

25  this report that are not listed here in Exhibit B to

51

1  your report?

2       A.   Look, I would put it like this:  I mean, there

3  is a whole body of work that informed me about our voter

4  registration system in the country that informed me

5  about Texas, that having reviewed, worked on, produced,

6  published, makes me, I think, a relevant expert here;

7  and then there are specific documents about this

8  specific question, this specific case.  I think what's

9  listed in Exhibit B is the latter, not the former.

10      Q.   **And so in addition to all this, you relied**

11 **upon your general base of knowledge; is that fair to**

12 **say?**

13      A.   That's right.  And some of it is, like,

14 between basic knowledge and specific knowledge.  I think

15 the Texas ID case, this is very specific knowledge about

16 Texas; but it's not quite the specific information that

17 was the focus of this trial -- or, this case.

18      Q.   **So this -- and tell me if I'm wrong.  This**

19 **lists certain statutes.  So Number 18 lists a provision**

20 **of the Texas Government Code; is that correct?**

21      A.   That's correct.

22      Q.   **So I don't see anywhere in here where it lists**

23 **that you reviewed the NVRA in coming to your**

24 **conclusions; is that right?**

25      A.   Well, I would say that, you know, the NVRA is

52

```
 1   a topic within -- and discussed within these other
 2   documents.  As you see, one of them says "National Voter
 3   Registration Act and Voter Registration Applications
 4   PowerPoint," which is something that, I believe, Texas
 5   has; and I did read part of the statute of the NVRA,
 6   also as part of my...
 7        Q.   What part of the statute did you read?
 8        A.   The Section 5 part that I cite.
 9        Q.   Any other part of the statute that you read in
10   conjunction with this report?
11        A.   In conjunction with this report, no.
12        Q.   Have you ever reviewed Section 8?
13        A.   At some point in my scholarship, I read the
14   whole NVRA; but I don't remember.
15        Q.   What is Section 8?
16        A.   I don't know.
17             MR. KRAUS:  If you want to ask him about
18   the NVRA, Counsel, feel free to put a copy of the
19   statute in front of him; and he'll answer whatever
20   questions you have.
21             MR. SOTO:  Well, it doesn't look like he
22   reviewed it here.
23             MR. KRAUS:  Well, that's not his
24   testimony.  Because we didn't provide him a copy of the
25   NVRA does not mean he did not review it, does not know
```

53

1  it, is not an expert in it.

2          MR. SOTO:  I think his report will speak

3  for itself.

4          MR. KRAUS:  Correct.

5     **Q    (BY MR. SOTO)  So how would an expert in your**

6  **field determine what the legal interpretation of a**

7  **statute is?**

8     A.  It really depends on the question.  You know,

9  there are -- there's a question, say, about

10  gerrymandering, you know, a question that there is

11  ambiguity in the law; and what people in my field

12  generally do is try to provide -- bring to bear evidence

13  about, say, whether, you know, in a voting rights case

14  whether there was defective discrimination.

15          And in this case, you know, or in any

16  voter registration case, the question is:  What evidence

17  can we help provide?  You know, I think in the NVRA case

18  in Kansas, which you've reviewed, the question there is

19  about the burdens on registration and whether asking

20  people to show proof of citizenship is a burden; and

21  these legal questions tend to often be ambiguous.  And

22  if we can provide data or insights about the law to help

23  reduce that ambiguity, I see that as the role of

24  scholarly experts.

25          (Exhibit 7 marked.)

Eitan Hersh - 5/23/2017

54

1      Q.   (BY MR. SOTO)  So, actually, I'm going to hand

2   you a portion of the NVRA.  This is what I've marked as

3   Exhibit 7.  Can you take a look at it and let me know

4   when you finish reviewing it?

5      A.   (Witness silently reading document.)

6                Okay.  I've read it.

7      Q.   Have you ever seen these provisions before?

8      A.   Yes.

9      Q.   So for Subsection (a)(1) it says that each

10   motor vehicle driver's license application, including

11   any renewal application, submitted to the appropriate

12   State motor vehicle authority under State law shall

13   serve as an application for voter registration with

14   respect to elections for Federal office unless the

15   applicant fails to sign the voter registration

16   application.

17                Have you ever -- did I read that

18   correctly?

19      A.   You read that correctly.

20      Q.   And have you ever reviewed this provision

21   before?

22      A.   Yes.

23      Q.   So what do you understand this provision to

24   mean when it says that each motor vehicle license

25   application submitted to the appropriate State motor

1    vehicle authority under State law shall serve as an

2    application for voter registration?  What's the

3    significance of that "submitted under State law"

4    provision or phrase?

5        A.   Well, I -- motor vehicle drivers' applications

6    are, as far as I know, administered by States; and so

7    state law governs the general motor vehicle behavior.

8        Q.   So is the provision in this statute here

9    premised on a voter submitting -- first submitting an

10   application to the appropriate state motor vehicle

11   authority under state law?

12       A.   Yeah, I mean, in the sense that that's the

13   target of the NVRA.  Yes.

14       Q.   So in dealing with the question of whether

15   Texas complies with the NVRA, the state law in question

16   is Texas law, correct?

17       A.   The state law here is Texas law, right.  The

18   national law is NVRA.

19       Q.   Sure.  And where would one find relevant state

20   law dealing with driver's license applications?

21               MR. KRAUS:  Object to the form of the

22   question.  That's beyond the scope of his expertise or

23   opinions in this case.

24       A.   I believe I could Google it and find the state

25   code.

1      Q.   (BY MR. SOTO)  Did you review any Texas law in

2  coming to your conclusions in this matter?

3      A.   Yes.

4      Q.   What Texas laws specifically did you review?

5      A.   I reviewed the Texas state law about the Texas

6  online authentication system, which allows in some

7  settings for Texans to provide information in lieu of a

8  signature when dealing with online transactions.

9      Q.   And do you cite that Texas statute in your

10  report?

11      A.   Yes.

12      Q.   And I'm going to direct your attention to

13  page 13 of your report, specifically Paragraph 29.  And

14  in parentheticals on the first sentence it says a legal

15  cite (see it again Texas Code 2054.27.)  Do you see

16  that?

17      A.   I do see that.

18      Q.   What is Texas Code?

19      A.   What is Texas Code?  It's the laws that govern

20  the State of Texas.

21      Q.   So do you believe that there is a, quote,

22  "Texas Code," unquote?

23      A.   I believe there's a body of laws that have

24  been compiled into the Texas Code, yes.

25      Q.   So what's contained in the Texas Code, to your

57

1   knowledge?

2       A.   I assume that it contains a compilation of

3   statutes that govern various state agencies.

4       Q.   **And you reviewed this Texas Code in coming to**

5   **your opinion?**

6       A.   This particular one, I notice that it cites a

7   previous citation on page 5 and that is Section

8   2054.271, where there's information about this online

9   authentication system.

10      Q.   **What's your understanding about whether Texas**

11  **law allows for -- strike that.**

12               **Besides this Texas Code 2054, did you**

13  **look at any other Texas statute or regulation in coming**

14  **to the conclusions and opinions in this report?**

15      A.   Only insomuch as they were referenced by the

16  documents I did read.

17      Q.   **Did you review Chapter 20 of the Election**

18  **Code?**

19      A.   I don't remember.  Not that I recall.

20      Q.   **And you would -- if we go back to Exhibit B of**

21  **your report, this doesn't cite to Chapter 20 of the**

22  **Election Code, correct?**

23      A.   It does not.

24      Q.   **Did you review Chapter 13 of the Election**

25  **Code?**

1     A.   Again, not specifically.  Some of these

2  sections might have been mentioned in these various

3  documents, but I don't recall separately reviewing these

4  Texas Election Code chapters.

5     Q.   Just to conclude:  You don't recall reviewing

6  specifically any provision of the Election Code?

7     A.   Right.  Correct.

8     Q.   Did I skip over an Exhibit 6?

9     A.   You might have.  One, two, three, four, five.

10  Yep.

11     Q.   I apologize for that.  I'm going to mark this

12  as Exhibit 6.

13            (Exhibit 6 marked.)

14     Q.   (BY MR. SOTO)  And I'll represent to you this

15  is Chapter 20 of the Texas Education Code [sic.]  You

16  can take a while to review it if you need to; but can

17  you tell me if you ever reviewed this statute before?

18            MR. KRAUS:  I think you misspoke.  This

19  purports to be the Election Code, not the Education

20  Code.

21            MR. SOTO:  I'm sorry.  I apologize.

22     Q.   (BY MR. SOTO)  I'll represent this is

23  Chapter 20 of the Texas Election Code.  Can you please

24  take a second and let me know whether you've ever seen

25  this statute before?

Eitan Hersh - 5/23/2017

59

1      A.   I don't recall, but I'm happy to review it now

2   if you'd like.

3      Q.   Sure.

4             (Witness silently reading document.)

5             MR. SOTO:  Do you want to take a break,

6   and we could answer this in five or ten minutes?

7             THE WITNESS:  If you want, sure.

8             MR. SOTO:  He needs to change...

9             THE WITNESS:  Okay.

10            THE VIDEOGRAPHER:  Going off at 10:16.

11            (Off the record from 10:16 to 10:35 a.m.)

12            THE VIDEOGRAPHER:  We're back on the

13   record.  It's 10:35.  This is the beginning of Disc 2.

14      Q.   (BY MR. SOTO)  Dr. Hersh, I think when we left

15   off you were reviewing, I believe it was Exhibit 6,

16   which is the Texas Education Code, Chapter 20?

17      A.   That's right.

18            MR. KRAUS:  Election.

19            MR. SOTO:  Texas Election Code.  I am so

20   sorry.

21      Q.   (BY MR. SOTO)  Texas Election Code,

22   Chapter 20; is that correct?

23      A.   Correct.

24      Q.   Have you seen this -- have you ever reviewed

25   this statute before?

Eitan Hersh - 5/23/2017

60

1          A.    I honestly don't remember reviewing it.

2          Q.    **And let me take a step back and direct your**

3   **attention to your report on Exhibit 4, Paragraph 10.  So**

4   **I believe -- and tell me if this is incorrect -- that**

5   **you state in your report that 38 states either have**

6   **online registration or are in the process of adopting**

7   **statutes or rules that would allow online registration;**

8   **is that fair?**

9          A.    Correct.

10          Q.    **Do you know how many states actually allow**

11   **online registration at this point?**

12          A.    I can't remember.  It's in that citation to

13   the National Conference of State Legislatures.  They

14   have it there.  Maybe there are five or so that aren't

15   doing it but are in development, something like that.

16          Q.    **And --**

17          A.    Certainly the majority of states already have

18   it.

19          Q.    **And there's twelve, at least at this point,**

20   **that do not have it or are not in the process of**

21   **enacting laws or rules to allow online registration,**

22   **correct?**

23          A.    That's right.

24          Q.    **So is it true that the mere fact that a State**

25   **does not offer online registration doesn't necessarily**

1    mean that it's violating the NVRA?

2         A.   That really would depend on whether the State

3    is offering assistant services and DMV transactions

4    online.

5         Q.   But you're not -- so the fact that the other

6    twelve states -- that there's twelve states in existence

7    now that do not offer online registration doesn't, by

8    that mere fact, mean that they are violating the NVRA?

9         A.   Correct in the sense that I give an example of

10   a state like North Carolina, which does not have online

11   registration.  They do offer online transactions, and

12   they do offer the opportunity to seamlessly update voter

13   registration with those DMV transactions.  So that looks

14   something like compliance.  They are offering this

15   assistant service or DMV service online, and they are

16   offering the opportunity to update that information in

17   the same process.  So that's what, I think, compliance

18   online looks like without online voter registration.

19        Q.   If we go back to Exhibit 6, I'm going to

20   direct your attention to page 7 of 10; and I'm going to

21   direct your attention to Section 20.063, Registration

22   Procedures.  Can you tell me if you've ever reviewed

23   this specific section before?

24        A.   I just read it.

25        Q.   Before just a minute ago?

Eitan Hersh - 5/23/2017

62

1        A.    I don't remember whether I have or have not.

2        Q.    Okay.  So going to Subsection (c) of this

3   section, it reads -- at least the first sentence reads,

4   "A change of address that relates to a license or card

5   and that is submitted to the department in person or by

6   mail serves as a change of address for voter

7   registration unless the licensee or cardholder indicates

8   that the change is not for voter registration purposes."

9              Did I read that correctly?

10       A.    Yes.

11       Q.    Does that section deal with online changes of

12  address?

13       A.    You know, I don't know.  "Mail" could be

14  interpreted different ways.  It doesn't say USPS snail

15  mail; but it doesn't specifically say "online."

16       Q.    Do you interpret "mail" to encompass online --

17  do you interpret the phrase "mail" in this statute to

18  encompass online voter change of address forms?

19       A.    It's possible that one could interpret that.

20  If at the time the statute was written, "in person or by

21  mail" incorporated all the ways one could register and,

22  therefore, the intent of the law was to incorporate all

23  forms of registration, it's possible.

24       Q.    Do you have an opinion in this case whether

25  the phrase "by mail" in this statute encompasses voter

Eitan Hersh - 5/23/2017

63

1  **online change of address forms?**

2      A.   All I can say is that it seems to me that the

3  State of Texas doesn't think that that is incorporated

4  here.

5      **Q.   So you don't have an opinion as to that?**

6      A.   I don't really have an opinion about that,

7  right.

8      **Q.   So do experts in your field consider the plain**

9  **language of a statute in determining what the legal**

10  **effect of a statute is?**

11      A.   Sure.  We can look at what the statute says.

12  In the sense that it says "mail," if that's how it's

13  generally interpreted and that's how States are

14  interpreting it, we take that as a fact:  Here's how

15  people are interpreting it.

16      **Q.   So the plain meaning of a statute is something**

17  **that an expert in your field can rely on when doing**

18  **statutory construction?**

19      A.   Sure.

20      **Q.   What else do experts in your field rely on**

21  **when doing statutory construction?**

22          MR. KRAUS:  Object to form of the

23  question.

24      A.   So, again, I mean, if I'm trying to assess how

25  States are behaving and make an assessment of whether

Eitan Hersh - 5/23/2017

64

1   that seems to be complying with the law, the plain

2   language makes sense to look at; so does the behavior of

3   actors.  There are a whole bunch of laws where the way

4   people are engaging in the law doesn't comport with the

5   language of the law.  So, for example, if Texas

6   requires -- if the state election officials require a

7   signature concurrent with a change of address form under

8   the state law; but Texas is behaving in such a way where

9   it interpreted the law in certain way where it doesn't

10  actually transmit a signature to the Secretary of

11  State's office when a person registers or updates an

12  address by mail, then that's interesting to note.

13          Sometimes there's ambiguity in the law.

14  Of course, you know that; that's why we have lawyers.

15  And there's different interpretations and interactions

16  with the law based on those ambiguities.

17      **Q.   Does Legislative intent play a factor in how**

18  **an expert in your field may interpret a statute or do**

19  **statutory construction regarding a provision in a**

20  **statute?**

21      A.   Again, you know, in my field, political

22  science -- I don't know if you mean my field, political

23  science, or anyone who is a scholar of American politics

24  or American law -- they would treat things differently

25  in differ situations.  What I am trying to do or what I

1    understand that my role is, is to understand what Texas

2    is doing and how that relates to the language of the

3    NVRA.

4         **Q.    So have you ever tried to look into the**

5    **Legislative history of the Election Code?**

6         A.    No.   Just to be clear, you know, if the Texas

7    Election Code is not compliant with the NVRA, it's

8    really irrelevant to the NVRA.

9         **Q.    That's your opinion.**

10        A.    In my opinion Federal law supercedes State

11   law, yeah.   I think that's a pretty well-known opinion.

12        **Q.    And if Federal law encompasses state law,**

13   **incorporates State law, then would that change your**

14   **opinion?**

15        A.    It depends.   I mean, there are ambiguities and

16   conflicts all the time between Federal and State law.

17        **Q.    So if the NVRA says you have -- for this to be**

18   **optimal, you have to first comply with State law, then**

19   **State law would be incorporated into the NVRA, correct?**

20             MR. KRAUS:   Object to form of the

21   question.

22        **Q.    (BY MR. SOTO)   If you understand it, you can**

23   **answer.**

24        A.    That's not how I understand the plain language

25   of the NVRA.

1      Q.    Okay.  So you've looked at the plain language

2  of the NVRA, correct?

3      A.    Yes.

4      Q.    Have you looked at the Legislative history

5  behind the NVRA?

6      A.    Not too much of it; some of it.

7      Q.    Have you looked to any case law

8  interpreting -- besides Judge Garcia's opinion in this

9  case, have you looked to any case law interpreting

10  either the NVRA or the Texas Election Code?

11      A.    You know, on background for the two NVRA

12  trials I've already participated in, in Texas and

13  Kansas, I've looked at different questions surrounding

14  state implementation of the NVRA, sure.

15      Q.    So is case law a reliable source that experts

16  in your field use to determine the legal meaning of a

17  statute?

18      A.    As a political scientist, I'm interested in

19  case law, sure, as well as statute.

20      Q.    So you understand that a case, a judge

21  deciding a case, could have some legal effect into how

22  future Courts determine the statutory meaning of a

23  particular State Law or Federal law, correct?

24      A.    Correct.

25      Q.    Okay.  What about Texas Attorney General

1   opinions, do Courts or legal scholars consider that a

2   reliable source to determine the statutory construction

3   of a state law?

4          A.   Again, it's not something -- I would say it's

5   not something that I've particularly -- in understanding

6   the kind of things that I study and teach about, I don't

7   normally -- I don't know that I've ever looked at the

8   Attorney General's opinion before.

9          Q.   Do you know what kind of deference a Federal

10  Court or a State Court would give an Attorney General

11  opinion as to the meaning of some state law?

12         A.   I've never looked into that question before.

13         Q.   So is it fair to say in coming to your

14  construction of the NVRA in this case, you've only dealt

15  with the plain meaning of -- your reading of the plain

16  meaning of the statute?

17         A.   And also the common behavior in the country.

18  All right?  I mean, if Texas is doing something

19  different and we can see it's different from other

20  States, then I think that also plays into my

21  understanding of how States are complying with law.

22         Q.   And you believe -- and you're offering an

23  opinion that Defendants in this case -- are you offering

24  the opinion that state law that Defendants have cited to

25  in this case conflicts with the NVRA motor voter

Eitan Hersh - 5/23/2017

68

1    **provision?**

2                    MR. KRAUS:  Object to the form of the

3    question.

4        **Q.   (BY MR. SOTO)  Are you -- do you have an**

5    **opinion -- have you reached an opinion in this case on**

6    **whether state law conflicts with the NVRA?**

7                    MR. KRAUS:  Which state law?

8                    MR. SOTO:  Any state law.

9                    MR. KRAUS:  Object to the form of the

10   question.

11       A.   This state law that you've put in front of me

12   doesn't specifically mention online DMV transactions,

13   online transactions of any kind.  It seems to not speak

14   to that.  And so, again, it seems not particularly

15   relevant to complying with the Federal NVRA law.  It

16   seems to me that these laws talk past one another.

17       **Q.   (BY MR. SOTO)  So there's nothing in the plain**

18   **meaning of the provision of Chapter 20 that you just**

19   **read that conflicts with the plain -- your understanding**

20   **of the plain meaning of the NVRA?**

21       A.   Only insomuch as the Texas Code seems an

22   incomplete -- if Chapter 20 governs all the behavior

23   surrounding voter registration, all of the interactions

24   that Governments have -- that Government agencies have

25   with voters, then it's noncompliant because it doesn't

69

1  cover this very important part of NVRA compliance.

2      **Q.    Does the NVRA require that a State enact laws**

3  **or regulations that allow for the simultaneous voter**

4  **registration when a voter changes their address for the**

5  **driver's license online?**

6      A.    The plain language of the NVRA does not

7  specify.  So one would suggest that all of the

8  interactions one has with the DM -- with a driver's

9  license agency would be covered by it.

10     **Q.    Okay.  Maybe -- so let me re-ask my question.**

11  **So does any provision of the NVRA that you're aware of**

12  **require a State to develop online voter registration?**

13     A.    Yes, I mean, in the following sense:  If a

14  State decided from now on all interactions with the DMV

15  are going to be by virtual reality interaction between a

16  state official hologram and a person and that's the only

17  way to do it, I would say that just because the statute

18  doesn't mention holograms and virtual reality doesn't

19  mean that the State doesn't any longer have to comply

20  with the NVRA.  And online is just another technology

21  like that.  It's a way that the State wants people to

22  interact with the Government.

23          The State wants people to interact with

24  the Government online.  It has advertisements to do so.

25  It encourages it to do so.  It's expecting massive

1 increases in online participation; and in so doing, it

2 wants to shift this Government function to online; and

3 surely the NVRA is trying to govern that relationship as

4 relates to voter registration.

5     **Q.  So if tomorrow the Texas Legislature passed a**

6 **law saying that Texas could not do online driver's**

7 **license change of address forms or renewal, would that**

8 **be out of compliance with the NVRA?**

9     A.  If Texas said, "We're no longer doing online

10 interactions such that all of our interactions will be

11 compliant with the NVRA," then that would be compliant

12 with the NVRA.

13     **Q.  So there's no requirement that a State adopt**

14 **policies for online voter registration?**

15     A.  I don't think there's any reason that the

16 State has to do that; again, so long as the State's not

17 asking people or encouraging people to do these

18 functions of government that are covered by the NVRA.

19     **Q.  Does Texas law require that applicants that**

20 **are changing their voter registration submit a physical**

21 **signature?**

22     A.  Could you repeat the question?

23     **Q.  Does Texas law require a physical signature on**

24 **any change of voter registration?**

25     A.  It depends on your definition of "physical."

1    Q.    What's your definition of "physical"?

2    A.    Well, I mean, it could be a pen on paper kind

3  of physical or that's different than maybe a digital

4  signature captured or an authentication process that

5  serves the function of a signature.

6    Q.    What's your understanding of Texas law

7  requirements dealing with physical signature in changes

8  to voter registration?

9    A.    My understanding is that Texas requires --

10  now, it could be that the Texas Election Division

11  requires a signature on an application form.

12    Q.    What's the Texas Election Division?

13    A.    Meaning the Secretary of State, but they seem

14  noncompliant with that requirement in certain settings.

15    Q.    What settings are those?

16    A.    The mail change of address forms.

17          And on that note, I would just like to

18  make a comment on my report.  In Chapter 27 of the

19  report, I meant to describe a process related to mail

20  change of address forms, and I accidentally confused the

21  mail change of address forms with the mail renewal form.

22  So the current paragraph talks about mail renewal forms

23  and intends to talk about mail change of address forms.

24  And in that setting, mail change of address forms, Texas

25  DMV collects a signature which it does not transmit to

Eitan Hersh - 5/23/2017

72

1    the Secretary of State.  In fact, it uses an old

2    signature, instead, that it transmits to the Secretary

3    of State.  So in that setting it's not clear that Texas

4    is -- that the Election Division and the Election

5    Division that's following statute about the voter

6    registration system is complying with the law that

7    requires a signature.  And by "signature," I mean an

8    actual signature.

9         Q.   A physical signature?

10        A.   A physical signature.

11        Q.   Is there any other portion of your report that

12   you want to amend or that you believe is inaccurate?

13        A.   I think that's the only thing that jumped out

14   at me.  As I previously mentioned, it looked like there

15   was a third number left out of the reference to the

16   Texas Election Code; but this Paragraph 27 is the one

17   where there seemed to be a mistake.

18        Q.   I think I might have asked this question but

19   we went on a different tangent and I'm not sure I ever

20   got an answer to it.  In coming to your opinions in this

21   case, did you ever speak to any of the Plaintiffs?

22        A.   The actual Plaintiffs?

23        Q.   Yes.

24        A.   No, only the Plaintiffs' attorneys.

25        Q.   Do you think speaking to them about their

1    experience would have been relevant to the issues you

2    were looking at?

3         A.   No.  I've worked now on four cases and never

4    spoke to any Plaintiffs.

5         Q.   Have you ever -- forgetting the Plaintiffs,

6    have you ever spoken to any Texas voter about their

7    experience with online change of address forms or

8    renewals?

9         A.   No.

10        Q.   So besides your experience with the voter ID

11   cases, have you ever worked with Texas voter

12   registration systems before?

13        A.   Sure.  You know, the voter files that I've

14   worked with that campaigns use include Texas.  I do a

15   lot with National Voter Registration data, and that's

16   just a compilation of state election data.

17        Q.   So with campaigns, what do you mean by that?

18   Do you work on campaigns?

19        A.   I don't work on campaigns, no; but my book is

20   about -- my first book was about how campaigns use state

21   voter registration data and other data from state

22   agencies to microtarget voters.

23             But in other work, you know, listed on my

24   CV, it often involves looking at state voter

25   registration data.  So, for example, the first article

Eitan Hersh - 5/23/2017

74

1    there, "Do Democrat and Republican Physicians Provide

2    Different Care on Politicized Health Issues," the way

3    that -- which is obviously about a topic totally

4    unrelated; but the first part of that process was

5    linking physician records, which is a public record

6    provided by the Federal Government Center for Medicare

7    and Medicaid Services, to all these physicians' voter

8    registration records.  And so there again, in all of the

9    studies that are like that, I'm using voter registration

10   data as part of my research.

11       Q.   Have you ever worked specifically with Texas'

12   online change of address system in regards to changing

13   driver's licenses or renewing driver's licenses online?

14       A.   No.  You mean separate from the research of

15   this case?  No.

16       Q.   That's correct.

17       A.   Right.

18       Q.   So going back to your report, at the end of

19   Paragraph 1, you state that you've been asked to review

20   depositions and offer an assessment of the logistical

21   challenges that may explain Texas's policy decisions in

22   this matter; is that correct?

23       A.   Correct.

24       Q.   What do you mean by "policy decision"?

25       A.   Well, both the State and the Federal law have

1  ambiguity; and through that ambiguity, Texas is

2  interpreting what it should do in this situation.

3  Obviously, Texas made a decision that when engaging in

4  online DMV transactions, voters aren't given the

5  opportunity to have their voter registration information

6  automatically updated.  So that's a policy decision that

7  Texas made and to comply with State and Federal law and

8  my task was to figure out why.

9      Q.   Is the simple answer to that because it's a

10  legal decision?  Texas understands the statute and the

11  NVRA to require one thing, and that's different than the

12  Plaintiffs?

13            MR. KRAUS:  Object to the form of the

14  question.

15            You can answer if you can.

16      A.   I think it's more complicated than that.  For

17  example, again, back to Mr. Ingram's statement, there's

18  a whole bunch of rationale that Texas gave for this

19  policy decision.

20      Q.   (BY MR. SOTO)  Who sets Texas' policies?

21      A.   What's that?

22      Q.   Who sets Texas' policies?

23      A.   The Courts, Legislatures, Attorney General,

24  lots of people.

25      Q.   You believe the Courts set Texas' policies?

Eitan Hersh - 5/23/2017

76

 1          A.    I think Courts interpret Texas' decisions and

 2    sometimes can affect policy decisions, sure.

 3          **Q.    They interpret Texas' laws, correct?**

 4          A.    Yes.  And not just laws, right, the

 5    interpretation of those laws.

 6          **Q.    What's the Truth in Mileage Act?**

 7          A.    The Truth in Mileage Act is a Federal statute

 8    that requires, in the sale of vehicles, that one

 9    confirms the odometer reading.

10          **Q.    Does that have anything to do with -- does**

11    **anything in the statute govern -- in that statute,**

12    **govern Texas' requirements under the NVRA?**

13          A.    No.  It's an analogous situation.

14          **Q.    Is there any state law that you learned in**

15    **your research that deals with the Truth in Mileage Act,**

16    **any state law?**

17          A.    Not that I'm aware of -- sorry.  That's not

18    true.  I mean, there's a state -- not exactly a state

19    law; but the State of Texas asked for permission to

20    follow that law through a different process.

21          **Q.    Is that pursuant to a statute?**

22          A.    I don't believe that's pursuant to a statute.

23          **Q.    Is that pursuant to a regulation?**

24          A.    To a regulation, yes.

25          **Q.    Where is that regulation found?**

Eitan Hersh - 5/23/2017

77

1      A.   Well, it's pursuant to a -- no, not to a State

2  regulation; in compliance with a Federal regulation.

3      **Q.   Do you know of any state law or regulation**

4  **that requires a physical signature in conjunction with**

5  **whatever requirements Texas has on the Truth in Mileage**

6  **Act?**

7      A.   I'm not aware of that.

8      **Q.   Has the Federal Government ever issued an**

9  **opinion allowing Texas to authenticate a voter's**

10 **identification by any means other than physical**

11 **signature?**

12     A.   Has the Federal Government -- I'm sorry.  Can

13 you repeat the question?

14     **Q.   Sure.  Has the Federal Government ever issued**

15 **an opinion allowing -- opinion or waiver allowing Texas**

16 **to authenticate a voter's identification by any means**

17 **other than a physical signature?**

18     A.   I'm not sure if the Federal Government itself,

19 through, you know, Congress or an agency of the

20 bureaucracy has made a decision about that; although,

21 there has been a -- as far as I know, the Federal

22 Government hasn't found a problem in Texas' signature

23 policy for its mail change of address form.

24     **Q.   The Federal Government has not?**

25     A.   Has not.

Eitan Hersh - 5/23/2017

78

1      Q.    So if you go to page 6 of your report, so you

2   allege in the first sentence in this paragraph that the

3   NVRA requires state agencies to incorporate voter

4   registration into their services; is that correct?

5      A.    Correct.

6      Q.    And in Texas, when a voter changes their

7   driver's license address online, they're given an option

8   to change their voter registration; is that correct?

9      A.    As far as I know, they are sent to a different

10  agency where they have to populate new information into

11  a form.

12     Q.    So they are given an option to change the

13  registration; is that correct?

14     A.    I think that's sort of correct.  That's

15  partially correct in the sense that if I tell you:  If

16  you'd like to use the bathroom, a building across the

17  street has a bathroom, I'm giving you an opportunity to

18  use the bathroom in this facility.  Am I, or am I not?

19  I think there's an ambiguity there.

20     Q.    But you're not denying that voters when they

21  change or renew there addresses online can also send in

22  an application with a physical signature to update their

23  voter registration, correct?

24     A.    At any time, whether they're filling out

25  information in the DMV online or whether they are

Eitan Hersh - 5/23/2017

79

```
1   Googling sports statistics or whether they're looking up
2   a recipe, they always have the option to go to a
3   different state agency and download a document.  There's
4   no -- you know, the Internet is not controlling their
5   path there.  It can come from any source.
6        Q.   So by saying "anytime," that means when --
7   specifically when they change their online voter
8   registration, they can also do a link provided at that
9   moment:  Go mail in an application with a physical
10  signature, correct?
11       A.   I'm sorry.  I think you mean something else.
12  Do you mean that when they fill out their DMV
13  information?
14       Q.   When they go online to change their driver's
15  license information or renewals, they can at that moment
16  access an application and do a physical signature to
17  update voter registration?
18       A.   Again, sort of.  I mean, you don't need half
19  that sentence.  When everyone has online access, they
20  can go to the Election Division and download an
21  application and send it in.
22       Q.   So you say "download."  What do you understand
23  the word "download" to mean?
24       A.   It could be -- it depends.  A PDF file might
25  download, or it might open in a browser.  A download
```

Eitan Hersh - 5/23/2017

80

1  could be just data coming onto a web browser in HTML

2  form.

3      Q.    So it doesn't mean they have to save something

4  to there computer?

5      A.    Access.

6      Q.    They could access the website?

7      A.    Access, sure.

8      Q.    So on page 7, Paragraph 16, you talk about

9  Michigan and North Carolina; is that correct?

10      A.    Correct.

11      Q.    Does Michigan have any state law that governs

12  whether physical signatures are required when a voter

13  changes their voter registration?

14      A.    I'm not aware of whether they do or not.

15      Q.    Did you research, in coming to your opinions

16  in this case, whether there's any analogous statute or

17  regulations in Michigan that deal with physical the

18  signature in the changing voter registrations?

19      A.    No.  And the reason not is, again, I don't

20  think that the state statutes are particularly relevant.

21      Q.    Okay.  So you didn't even attempt to look at

22  that?

23      A.    No.  I'm looking at whether they're complying

24  with NVRA.

25      Q.    Okay.  So you're not looking at whether

Eitan Hersh - 5/23/2017

81

1  they're complying with state law?

2      A.   In this regard, if there's a conflict between

3  the State law and the Federal law, the Federal Law

4  supercedes the State law.

5      Q.   So you're not looking at whether Michigan is

6  complying with Michigan law?

7      A.   Right, I'm looking at whether Michigan is

8  complying with the National Voter Registration Act.

9      Q.   Did you look at whether there's any analogous

10  State statutes or regulations in North Carolina?

11      A.   No, for the same reason.

12      Q.   So you can't offer an opinion whether the

13  situation there between State law and Federal law is an

14  analogous situation in Texas?

15      A.   I think it's analogous in the sense that all

16  States have to comply with the Federal law by offering

17  the opportunity to register without filling out new

18  information at the motor vehicle interactions.

19      Q.   But they're not analogous in the sense that

20  you don't know whether there's any state law in Michigan

21  or North Carolina dealing with the requirements for a

22  physical signature and a change of address for a voter

23  registration?

24      A.   Right, I don't find that particularly

25  relevant.

Eitan Hersh - 5/23/2017

82

1      Q.    Do you know if any state besides Texas that

2    has a requirement dealing -- a state law requirement or

3    regulation dealing with physical signatures and voter

4    registration change of addresses?

5      A.    What I can tell you is, as we already know,

6    most states -- all but twelve -- are already doing an

7    online voter registration process.  I've now cited two

8    of the remaining twelve that have this process.  So,

9    now, we're down to only a handful of States that may or

10   may not be interpreting what they're doing, some of

11   which I actually know for sure are not offering online

12   registration.  So Texas might be a one-of-a-kind state

13   in trying to offer people opportunity to do DMV

14   exchanges online and encouraging that behavior while

15   simultaneously not offering this process.

16     Q.    But you don't know that, correct?

17     A.    I've looked at those twelve other states; and

18   if I recall, the majority of them don't have online DMV

19   transactions.  And now we see two others that have them

20   and do it this way.  So, actually, I don't know for sure

21   whether -- we're down to maybe a couple of states that

22   even have this problem that Texas has.  It's a very

23   unusual situation Texas seems to be in.

24     Q.    So do you know in any of the other 49 states

25   whether there's any analogous state law or regulation

83

1  **dealing with physical signatures and voter registration**

2  **updates?**

3      A.   Well, again, all I know is that -- I don't

4  know that; but what I see is the behavior of these

5  different states.  And what I can see is that Texas

6  jumps out as a very unusual kind of state if it's

7  suggesting that lots of people should be engaging in

8  online updates through a DMV process but not updating

9  their voter registration data.  I don't know if it's

10 exactly one of a kind, but it's close to that.

11     **Q.   And you haven't sought to research whether**

12 **there's any state law in any other state that's**

13 **analogous with the Texas Election Law?**

14     A.   Again, I was looking at what the state policy

15 is and that state policy is about compliance with the

16 NVRA as far as I'm concerned; and so that's what I was

17 looking at.

18     **Q.   Has the Federal Government ever found Texas to**

19 **not be compliant with the motor voter provisions of the**

20 **NVRA?**

21     A.   I don't know.  I haven't looked into that.

22     **Q.   What is your understanding of if the NVRA has**

23 **a signature requirement?**

24     A.   My understanding is that the NVRA does have a

25 signature requirement for initial registrations and I'm

Eitan Hersh - 5/23/2017

84

1   not sure -- I think there's ambiguity about whether

2   there's a signature requirement for updates and changes.

3   And I also think there is an ambiguity about what it

4   means to have a signature.  Does it mean that they have

5   to have a signature on record, a new signature, a

6   digital signature, a form of authentication, that

7   there's identifiers in the form of a signature but not a

8   physical signature.  There are a lot of questions about

9   what that could mean.

10      Q.   Is that what you mean by "ambiguity"?

11      A.   Yes.

12      Q.   So is it your understanding that there are

13  people who disagree with your statutory construction of

14  the NVRA and the Texas law?

15      A.   I don't know what that means.

16      Q.   I don't either.

17          MR. KRAUS:  Besides you or your boss?

18          MR. SOTO:  And some other people.

19      Q   (BY MR. SOTO)  So I want to talk a little bit

20  about when a voter changes their driver's license

21  information online.  Do you agree when that happens that

22  they are given an option to click "yes" about wanting to

23  update their voter registration information?

24      A.   They are given an option that says that.  I'm

25  not sure that they are given that option.

Eitan Hersh - 5/23/2017

85

1      Q.   They can click "yes."  They are given

2   instruction whether they want to change their voter

3   registration information; and are allowed to click "yes"

4   or "no," correct?

5      A.   That's right.

6      Q.   And if they click "yes," then the website

7   automatically presents them with a link to the online

8   Voter Registration Application; is that correct?

9      A.   It provides them that link with an unpopulated

10   form, yes.

11      Q.   And that link happens simultaneous with them

12   completing the online change of address registration or

13   renewal of driver's license, correct?

14           MR. KRAUS:  Object to the form of the

15   question.

16      Q.   (BY MR. SOTO)  And that link happens

17   simultaneous to their completing the voter

18   registration -- the driver's license change of address/

19   renewal form online, correct?

20      A.   I wouldn't call that --

21           MR. KRAUS:  Same objection.

22      A.   I would not call that simultaneous.  It

23   happens at the receipt page.  So that's after the

24   transaction's over, and no information is populated in

25   that external form.  Again, you can go to an external

Eitan Hersh - 5/23/2017

86

1    website anytime you want.  Texas could provide -- which

2    I'm sure it does -- a link to its voter registration

3    form for all to see at any moment.

4         **Q.   (BY MR. SOTO)  So the reason you say it's not**

5    **simultaneous -- and tell me if this is wrong -- is that**

6    **it happens after the conclusion of the driver's license**

7    **renewal or change of address form is being completed?**

8         A.   And no information is carried over from the

9    application for a change of address or renewal to that

10   form.

11        **Q.   But at the conclusion of them -- of the voter**

12   **submitting their online change of address form for the**

13   **driver's license, there's no significant delay when they**

14   **are given the link to change their voter registration,**

15   **correct?**

16             MR. KRAUS:  Object to the form of the

17   question.

18        A.   I don't know.  It happens after the process.

19   I mean, I don't know whether it happens -- whether --

20   you know, how long it takes to get to that receipt page.

21   I don't know how long it takes to open that link.  What

22   I do know is that that information's not populated,

23   right.

24        **Q.   (BY MR. SOTO)  Okay.  Does it -- do you think**

25   **it's pertinent to your opinion how long that takes to**

Eitan Hersh - 5/23/2017

87

1   get to that linked page?

2      A.   The fact that it happens after the transaction

3   is over and that the information's not populated leads

4   me to believe that it's not simultaneous.

5      Q.   Okay.

6      A.   If, you know --

7      Q.   Any other reason to believe it's not

8   simultaneous besides what you just articulated?

9      A.   Not that I can think of right now.  I think of

10  an analogous situation is if someone says, you know,

11  when you fill out your State -- when you fill out your

12  Federal tax return, tax form, your State tax return is

13  populated with the same information.  I think that a

14  common person would say that it's very different if a

15  new form open ups for your State tax form and nothing's

16  populated -- it just happens to open up -- versus all

17  the information you wrote about your taxes and your

18  address and your name and your Social Security number

19  was automatically populated.  Those seem like really

20  different scenarios.

21     Q.   Does anything in the plain meaning of the NVRA

22  address automatic population on the Voter Registration

23  Form?

24     A.   I think it does, yes.

25     Q.   What provision?

Eitan Hersh - 5/23/2017

88

1      A.   The statute explains that, quote, "The Voter

2  Registration Application portion of the application for

3  a state motor vehicle license may not require any

4  information that duplicates information required in the

5  driver's license portion of the form."

6      **Q.   And you believe that supports your contention**

7  **that by not automatically populating the Voter**

8  **Registration Application, it's not simultaneous?**

9      A.   Correct.

10     **Q.   Is there anything else you contend in the NVRA**

11 **that supports that contention?**

12     A.   Again, you know, as I continue on in the

13 document here, in the report, the statute states, "Any

14 change of address form submitted in accordance with

15 State law for the purposes of a State motor vehicle

16 driver's license shall serve as a notification of a

17 change of address for voter registration."

18          It doesn't seem to appear to me the way

19 that Texas is processing online change of address that

20 it's doing that.  It's not serving as identification of

21 change.

22     **Q.   And the first part of that sentence says, "A**

23 **Voter Registration Application filed in accordance to**

24 **State law," correct?**

25     A.   That's right.

Eitan Hersh - 5/23/2017

89

1      Q.    So the NVRA directly references State law?

2      A.    Correct.

3      Q.    But you never looked at any State law in

4 coming to your conclusions in this case?

5      A.    But, you know, I think what the statute is

6 saying about State law is that I can't process a change

7 of address form with any old agency, non-government

8 agency.  I have to process a change of address with the

9 State; and when I do that, I have to -- I, as a citizen,

10 am entitled to this voter registration update.

11      Q.    As long as it's in accordance with State law?

12      A.    Right.  I think there is obviously some

13 ambiguity about what that State law clause is doing in

14 that sentence.

15      Q.    So if you go to Paragraph 17, you discuss what

16 a voter going through the driver's license change of

17 address transaction system experiences, correct?

18      A.    Correct.

19      Q.    Have you ever personally tried to change your

20 driver's license through the DPS's online system?

21      A.    Not in the state of Texas.

22      Q.    Have you ever observed someone trying to

23 change their driver's license in Texas?

24      A.    No.

25      Q.    In this case there are three -- currently

Eitan Hersh - 5/23/2017

90

1  **three; there were four -- Plaintiffs who sought to do**

2  **that.  You didn't talk to them to get their experience**

3  **doing this?**

4       A.   Correct.

5       **Q.   How did you come to your information about**

6  **what the voter experiences when they access the driver's**

7  **license change of address online system?**

8       A.   Well, I read the depositions and the

9  documentation that the State provides to its customer

10  service reps contained in Exhibit B that summarizes

11  that.

12      **Q.   So, in addition to the Plaintiffs, you**

13  **haven't -- have you talked to any Texas voter about**

14  **their personal experience accessing and completing the**

15  **driver's license change of address or renewal online**

16  **form?**

17      A.   No.

18      **Q.   Do you think that would have been helpful in**

19  **reaching your conclusions in this case?**

20      A.   Not particularly.  Most of my work is in

21  quantitative social science.  I look at numbers, rather

22  than -- I'm not a journalist; and so most of the

23  conclusions in all of the cases I've ever worked on are

24  based on data and documents provided by States and the

25  Federal Government.  As I've said, I've, you know,

Eitan Hersh - 5/23/2017

91

1  reached all my conclusions without talking to

2  plaintiffs.

3       Q.   So if we go to Paragraph 20, the last sentence

4  says, "Moreover, the process has generated confusion

5  among Texans, with hundreds or thousands of inquiries or

6  complaints recorded with DPS."

7            Did I read that correctly?

8       A.   Correct.

9       Q.   But you've never talked to any Texan about

10  their experience or confusion with the driver's license

11  change of address or renewal online form, correct?

12       A.   Correct.  I don't think that would have been a

13  wise use of my time.

14       Q.   So going back to Paragraph 19, you state in

15  here that, when a voter -- that "The Texas online portal

16  directs the user to an external website where he or she

17  can download an unpopulated registration application and

18  mail it to the election" officials [sic.] "themselves."

19            Did I read that correctly?

20       A.   Correct.

21       Q.   I think we talked about this earlier:  But I

22  want to ask you specifically in this context:  What do

23  you mean by "download"?

24       A.   You know, "download" can mean -- again, if

25  it's a PDF document, often it's downloaded within a

1    browser or external to a browser; or when any website is

2    accessed, it's downloading information, often in HTML,

3    on the browser.

4         **Q.   So how, in your -- what is your understanding**

5    **of how that information is downloaded in this specific**

6    **instance when a user clicks "yes"?**

7         A.   I can't recall whether it's a PDF or in some

8    other form.

9         **Q.   Okay.  So let's go to Paragraph 21.  The first**

10   **sentence of the paragraph reads, "Even though the Texas**

11   **DPS does not share information with the SOS about a**

12   **voter's new address, the DPS does inform election**

13   **officials on a nightly basis that voters are no longer**

14   **at their old addresses (if they registered a change of**

15   **address.)"**

16              **There's no cite in support of this**

17   **sentence.  Where are you getting that information from?**

18        A.   I believe Sheri Gipson, in her deposition,

19   talked about -- explained the difference between the

20   daily update file that the State provides and the daily

21   voter registration file.  And so the daily update file

22   is a transmission of data from DPS to the Voter

23   Registration Division of the Secretary of State's

24   Office.  No signature is required by the voter for that

25   information to be sent, and it alerts the Secretary of

Eitan Hersh - 5/23/2017

93

1 State to changes in information that the State can use

2 for State purposes and Counties for County purposes.

3 What exactly they do with it is a little bit unclear to

4 me; but that's the daily update file, based on my

5 understanding of Sheri Gipson's testimony in her

6 deposition.

7     **Q.  So Sheri Gipson's deposition testimony is the**

8 **sole source of your understanding in support of that**

9 **contention?**

10     A.  A number of the depositions referred to these

11 two files.  I think Betsy Schonoff -- is that the right

12 pronunciation -- also mentions this, as well as John

13 Crawford.  I can't remember exactly which depositions

14 other than Ms. Gipson's; but this was a topic of

15 conversation in multiple depositions, I believe.

16     **Q.  And if your contention about this was wrong**

17 **and the Secretary of State did receive information from**

18 **DPS about a voter's registration access and that DPS**

19 **does not inform the Secretary of State that voters are**

20 **no longer at their old address, would that change your**

21 **opinions in this case?**

22            MR. KRAUS:  Object to the form of the

23 question.

24     A.  Yeah, that was too many steps for me to keep

25 track of there.

Eitan Hersh - 5/23/2017

94

1      Q    (BY MR. SOTO)  Let's take it step by step.  So

2  if you were to receive information that the Secretary of

3  State does receive information from DPS about a

4  registered voter's new address, would that change any of

5  your opinions in this case?

6      A.   So my understanding is that they do receive

7  information about the voter's new address.  It just

8  doesn't count for an updated Voter Registration

9  Application.  It's not used as the basis for a voter to

10  be able to vote there.

11      Q.   But this says, "Texas DPS does not share

12  information with the Secretary of State about a voter's

13  address"?

14      A.   Oh, I see.  So my understanding, to be clear

15  about it, is they don't share information about that to

16  be used for the voter to vote in that context; but they

17  share information that notes a change.  So my

18  understanding at this time might have been that they are

19  notified that the old address is no longer associated

20  with that voter; but I wasn't sure if a new address was

21  associated with the voter.  If I learned that the

22  Secretary of State does receive both the new address and

23  the old address; but the voter doesn't get to vote at

24  the new address unless the voter takes affirmative

25  action, that would help me clarify that first sentence

Eitan Hersh - 5/23/2017

95

1  of Paragraph 21, but it wouldn't change anything about

2  my understanding of the case.

3              MR. KRAUS:  Counselor, just for planning

4  purposes her --

5              MR. SOTO:  Sure.

6              MR. KRAUS:  -- are we going to take a

7  lunch break and come back and finish; or are you going

8  to try to finish the whole deposition?  What's your

9  scheduling?

10             MR. SOTO:  So my guess is we probably

11 have an hour, hour and a half.  So I will leave it up to

12 you if you want to have a lunch break.

13             THE WITNESS:  I prefer a lunch break

14 first unless it's a massive inconvenience.

15             MR. SOTO:  I'll defer to you.

16             MR. KRAUS:  Are you hungry yet?

17             THE WITNESS:  I'm always hungry, yeah.

18             MR. SOTO:  How about this:  Do you want

19 to take 45 minutes or an hour and then we'll finish up?

20             MR. KRAUS:  Okay.  That will be good for

21 me.

22             THE WITNESS:  Is that okay?

23             MR. KRAUS:  Yeah.

24             Let's go off the record.

25             THE WITNESS:  I mean, I could push

1   through and have a snack.

2            MR. KRAUS:  No, no.  Let's --

3            THE VIDEOGRAPHER:  We're off at 11:31.

4            (Lunch break, 11:31 a.m. to 12:37 p.m.)

5            THE VIDEOGRAPHER:  We're back on the

6   record.  This is the beginning of Disc 3.  It's 12:37.

7      **Q**   **(BY MR. SOTO)  Good afternoon.**

8      A.   Good afternoon.

9      **Q.   Dr. Hersh, you realize you're still under**

10  **oath, correct?**

11      A.   Right, I do.

12            (Exhibit 8 marked.)

13      **Q.   (BY MR. SOTO)  I'm handing you a document that**

14  **I've marked as Exhibit 8.**

15      A.   Okay.

16      **Q.   Have you seen this document before?**

17      A.   Is this the Judge's?  No.

18      **Q.   This should be the Plaintiffs' Original**

19  **Complaint.**

20      A.   Oh, yes.  Okay.  Yes.

21      **Q.   And you reviewed this in conjunction with your**

22  **expert report, correct?**

23      A.   Yes.

24      **Q.   I think we spoke earlier at the beginning of**

25  **the deposition whether you would be giving any opinion**

1    as to whether Texas is in violation of the NVRA,

2    correct?

3         A.   Correct.

4         Q.   And I think you stated that you would be

5    offering that opinion?

6         A.   I'm offering that opinion, yes, as a scholar

7    of the voter registration system.

8         Q.   Okay.  Could you turn to page 17 of Exhibit 8.

9    Under a section called Request for Relief, can you read

10   subparagraph little "i"?

11        A.   Sure.  "Plaintiffs respectfully request for

12   the Court to enter an order:  i.  Declaring, pursuant

13   to" U.S. Code "that Defendants have violated the NVRA by

14   failing to provide for simultaneous voter registration

15   with online driver's license renewal."

16        Q.   And those two statutes are 28 U.S.C.

17   Section 2201 and 52 U.S.C. Section 2510,

18   Subsection (b)(2); is that correct?

19        A.   That's correct.

20        Q.   Are you offering the opinion in this case that

21   Defendants have violated NVRA by failing to provide

22   simultaneous voter registration with online driver's

23   license renewal specifically to those two statutes?

24        A.   So, again, just to reiterate:  My main task in

25   my report and here is to try to understand why Texas

Eitan Hersh - 5/23/2017

98

1  does what it does with regard to online voter

2  registration and updating -- voter registration --

3  sorry -- what Texas does with respect to incorporating

4  voter registration into online DPS transactions; but as

5  part of my report, based on my understanding of the NVRA

6  and what Texas is doing, I've offered the view that it

7  does not seem to me to be compliant.  And assuming that

8  these two sections in the law referenced here are

9  representing the NVRA -- or referring to the NVRA, then,

10  yes.

11      Q.  So just --

12          MR. KRAUS:  And I'm going to object to

13  any questions about those statutes without putting them

14  in front of him.  He's already said he's not a lawyer or

15  a legal scholar.  So if you want to ask him questions

16  about the statutes, I'd suggest that you provide him

17  copies of the statutes.

18          MR. SOTO:  Okay.  I think he's testified

19  that he's an expert on the NVRA.

20      Q.  (BY MR. SOTO)  Is that correct?

21      A.  On certain aspects of it for sure.

22          MR. KRAUS:  That doesn't mean he's

23  memorized every word of the statutes.

24          MR. SOTO:  Fair enough.

25      Q.  (BY MR. SOTO)  So is it true that one of your

1  opinions is that Defendants have violated the NVRA?

2       A.   It seems to me that that is the truth, yes.

3       Q.   By failing to provide simultaneous voter

4  registration/driver's license renewal?

5       A.   Right.

6       Q.   Have any of the Plaintiffs in this case made

7  the allegations that they have made an online driver's

8  license renewal?

9       A.   I don't recall.

10      Q.   But regardless of that fact, you're still

11 offering that opinion?

12      A.   Yeah.  I'm just looking at what Texas does.  I

13 see what other states do.  I see what the law says, and

14 that's my judgment based on those factors.

15      Q.   Could you read the next paragraph?

16      A.   Sure.  "Declaring, pursuant to 28 U.S.C.

17 Section 2201 and 52 U.S.C. Section 20510(b)(2), that

18 Defendants have violated the NVRA by failing to provide

19 for simultaneous voter registration with online

20 change-of-address forms."

21      Q.   Are you alleging that Defendants have violated

22 the NVRA by failing to provide for simultaneous voter

23 registration with online change-of-address forms?

24      A.   Again, it appears to me that the State is not

25 compliant with the NVRA in these change-of-address forms

Eitan Hersh - 5/23/2017

100

1   online.

2        Q.   Is that a "yes"?

3        A.   Yes.

4        Q.   Would you agree with me that the Court,

5   Judge Garcia specifically, who's the judge in this case,

6   is qualified to make legal determinations?

7        A.   I think so, yes.

8        Q.   And you would agree with me that he would be a

9   legal expert?

10       A.   I would assume the judge is a legal expert.

11       Q.   Is there any opinions you're offering in this

12  report that Judge Garcia, or the Court, would not be

13  qualified to opine on?

14       A.   I would hope that --

15            MR. KRAUS:  Object to the form of the

16  question.  You're asking the witness to speculate.

17            Answer the question if you can.

18       A.   Yeah, I don't know what a judge is going to

19  opine on or not.  I would hope that the added value of

20  my report is providing some basis for helping to

21  understand, again why Texas might be doing this.

22  Whether it has to do with a technical problem or a

23  financial problem, a logistical problem, why is Texas

24  doing this curious thing that hardly any other state --

25  as far as I know, no other state is doing.  My expertise

1    is, hopefully, presenting this as:  Well, it's not for

2    these other reasons that Texas is doing this.  It's for,

3    again, their interpretation of the law, which doesn't

4    make a whole lot of sense to me as an interpretation of

5    the law; but it's not these other technical aspects.

6        Q.   (BY MR. SOTO)  And you came to the conclusion

7    that it doesn't make a lot of sense to you how Texas

8    interprets the law without previously reviewing Texas

9    law?

10       A.   It's not that I have not reviewed Texas law

11   and, therefore, can't make that decision.  It's that

12   Texas law is not particularly relevant here because --

13   you know, just because the NVRA mentions State law

14   doesn't mean that Texas can -- or any state -- can have

15   whatever kind of driver's license process it wants and

16   be in compliance automatically because the statute said

17   State law.  So it's not particularly relevant, again, as

18   I said before, what the State law says if the State's

19   not otherwise complying with the NVRA.

20       Q.   What specific experience or qualification do

21   you have that would give you the qualification to

22   determine what is or is not relevant to the

23   interpretation of a statute?

24       A.   Mostly common sense.

25       Q.   Anything else?

Eitan Hersh - 5/23/2017

102

1    A.   No.   Common sense based on my understanding of

2    what other states do, what the voter registration system

3    looks like, how DPS driver's license agencies interact

4    with agencies by, you know, reviewing important work;

5    for example, the Bipartisan Commission's Report on

6    Election Administration, where they say:  This is a real

7    problem that states sometimes fail to comply with the

8    NVRA.  That's their language.  They're saying States are

9    failing to comply with the NVRA when the States move to

10   online processes and don't incorporate it.

11        So it's not just common sense.  It's

12   common sense built on review of documents and a deep

13   knowledge of voter registration systems.

14   **Q.   Okay.  Is anything else specifically in your**

15   **experience, education, or qualifications that you**

16   **believe makes you qualified to determine whether**

17   **something is or is not legally relevant to the**

18   **interpretation of a statute?**

19   A.   Other than what I just said?

20   **Q.   Yes.**

21   A.   I guess that my experience -- yeah, my

22   experience with the laws and studies of the laws and

23   studies of the effects of the law what brings to bear on

24   that decision -- on that opinion.

25   **Q.   Anything else?**

Eitan Hersh - 5/23/2017

103

1        A.    Not that I can think of right now, yeah.

2        **Q.    What's your understanding of the Election**

3   **Code's -- what's your understanding about whether the**

4   **Texas Election Code requires a voter to physically sign**

5   **an application for voter registration?**

6        A.    My understanding is that the Code says that it

7   does require a signature.

8        **Q.    But you believe that to be irrelevant to**

9   **whether Texas complies with the NVRA?**

10        A.    Well, the NVRA also mentions signature

11   requirements.

12        **Q.    So the NVRA requires a signature requirement,**

13   **a physical signature, when a voter initially applies for**

14   **voter registration; is that correct?**

15        A.    Yeah.   I don't know if the term "physical" is

16   in there; but it requires signature.   Again, we often

17   referring to digital or non-physical signature versions

18   of authentication as a signature.   A unique identifier,

19   in a way, is a signature.

20              Just to add to that, of course, as I

21   think everyone knows, one is constantly agreeing to

22   online user agreements and so forth where they are told

23   to affirm that checking a box or entering information

24   works in lieu of signature for legal purposes.

25        **Q.    Do you know of any other State -- and I don't**

104

1  know the answer to this -- but do you know of any other

2  State that allows for digital signature when a voter

3  initially applies for voter registration?

4       A.   I think -- sorry.  What's the question?

5       Q.   Yeah, sorry.  Do you know of any other State

6  that allows in the initial voter application a voter to

7  sign the application digitally?

8       A.   I'm not certain how the States with online

9  voter registration handle that and how that varies by

10  state.

11       Q.   But off the top of your head, specifically,

12  you know of no other state?

13       A.   Nothing comes to mind specifically.

14       Q.   What is your understanding of how the voter's

15  signature is used?

16       A.   In Texas?

17       Q.   Yes.

18       A.   My understanding of how the voter's signature

19  is used in the Election Division is to maintain a

20  signature for all voters in the event that the signature

21  is needed.  For example, if there's a dispute at a

22  precinct or a ballot is disputed, whether the person

23  showing up to vote is the person they purport to be on

24  the voter registration record, there is some process by

25  which a County official could check whether that

105

1  signature matches the original signature of the voter.

2      Q.   It allows them to verify the voter's identity?

3      A.   Right.

4      Q.   So is the phrase "digital signature" used

5  anywhere in the NVRA, to your knowledge?

6      A.   I don't think the word "digital" is in the

7  NVRA.  It might be; but it was passed, what, '95 or

8  something like that.  Probably not.

9      Q.   Okay.  Is there anything in the NVRA that says

10  an online or digital signature satisfies the signature

11  requirement?

12      A.   As far as I know, it does not say that.

13      Q.   Is there anything that says a signature for

14  the purpose of NVRA can be a non-physical signature?

15      A.   I wouldn't be surprised if it doesn't say that

16  in the statute.  Of course, we do know that most other

17  States are obtaining update from -- allowing people to

18  do, for example, what North Carolina and Michigan do,

19  which allow people to update without providing an actual

20  signature at that time, whether -- but, you know, every

21  State would operate slightly differently on this regard.

22      Q.   But off the top of your head, you're not aware

23  of any requirement in the NVRA that allows for

24  non-physical signature, specifically?

25      A.   Not in the NVRA, itself, right.

1              (Exhibit 9 marked.)

2        Q.   (BY MR. SOTO)   Okay.   I'm handing you what

3    I've marked as Exhibit Number 9.   I'm going to try not

4    to say Education Code this time.

5        A.   Okay.

6        Q.   So I'll represent to you this is Chapter 15 of

7    Texas Election Code.

8        A.   Okay.

9        Q.   Have you ever reviewed this statute before?

10       A.   Not that I can remember.

11       Q.   And I'll direct you to Section 15.021, which

12   is on page 4 and 5 of this exhibit.

13       A.   Okay.

14       Q.   Can you take a second to read the subchapter?

15       A.   Subchapter (d)?

16       Q.   No.   Section 15.021, that section.

17       A.   I'm sorry.   I'm having trouble hearing you.

18       Q.   Section 15.021, and that is Notice of Change

19   in Registration Information by Voter.

20       A.   Right.   Okay.

21       Q.   Take a second to read it, and let me know when

22   you're done.

23              (Witness silently reading document.)

24       A.   Okay.

25       Q    (BY MR. SOTO)   Have you ever read this section

1  before?

2      A.    Not that I remember, but I might have.

3      Q.    **What's your understanding of what the section**

4  **covers?**

5      A.    This section is informing voters they need to

6  update this registration record if the registration

7  information changes and provides a process for a digital

8  transmission of information as long as the voter's still

9  within the original county of registration.

10      Q.    **And by its terms, this would not apply to**

11  **change of address outside the county, correct?**

12      A.    It would not apply to that, correct.

13      Q.    **So outside the county, do you know if Texas**

14  **law considers that to be a brand-new application for**

15  **voter registration purposes?**

16      A.    I don't know the language of that, but I would

17  suppose it might be.

18      Q.    **And the NVRA, I think you said earlier, at**

19  **least for initial voter applications, requires a**

20  **signature?**

21      A.    Some form of signature, right.

22      Q.    **And you said that the NVRA was passed in 1995?**

23      A.    Yeah, roughly.  Yeah, something like that.

24      Q.    **And I think you were saying it in the context**

25  **this was before online voter registration was as**

1   prevalent as it is today; is that correct?

2        A.   Certainly in 1995 it was, yeah.

3        Q.   At the time the NVRA was passed, are you aware

4   of any State that allowed for online voter registration

5   or change of address?

6        A.   I was not aware of that.

7        Q.   So in 1995 or when the NVRA was passed, a

8   voter would not have the option to use signature -- a

9   digital signature when changing their address --

10  changing their voter registration address?

11       A.   That's right.  I'd point out that that would

12  be true for all transactions, including DMV

13  transactions.

14       Q.   So I think I asked you earlier when -- if you

15  recalled when you were first engaged about being an

16  expert witness in this case; and I think you said you

17  weren't sure.  It was possibly the fall of last year; is

18  that correct?

19       A.   Something like that.  I don't really recall

20  when the first conversations happened, yeah.

21       Q.   Do you recall how long it took you to reach

22  your conclusions in this case?

23       A.   I would say that it took learning more and

24  more as the depositions trickled in.  It wasn't

25  something that was clear at the beginning.  Again, I was

Eitan Hersh - 5/23/2017

109

1  looking for information, data, depositions that could

2  help solve this puzzle of what the justification for

3  Texas' unusual behavior here is; and so it was an

4  over-time development, learning, to reach this

5  conclusion.

6       Q.   So you authored this report on April 15th;

7  that's correct, right.

8       A.   I think I filed it with the court, yeah, over

9  the previous few weeks.

10       Q.   And it was finalized on April 15th.

11       A.   Right.

12       Q.   I'm just trying to get a sense of how long

13  before that you actually reached your conclusions.  Was

14  it in March, February, January?  Do you have an

15  estimate, or do you recall what month it was that you

16  reached the conclusions?

17       A.   No.  I would guess it was, you know, a

18  slow-and-steady process of research; and that research

19  in this case was mostly reviewing the depositions.  So

20  the picture became clearer over time.

21       Q.   So I think most of the depositions in this

22  case happened this year.  So would it be fair to say

23  sometime this year?

24       A.   Yes, that makes sense.

25       Q.   So you said earlier -- and correct me if I'm

110

1  **wrong -- that one of your opinions in this case is that**

2  **there are no -- you might have said "significant" --**

3  **barrier, financial barriers, to implementing the system**

4  **that Plaintiffs are asking the Court to enjoin through a**

5  **permanent injunction.  Is that fair?**

6  　　　　A.　　Yeah.　　In fact, you know, I think a common-

7  sense interpretation of what Texas is doing now versus

8  what this would look like would lead anyone to conclude

9  it would be a massive cost savings.

10  　　　　**Q.　　So what would this exactly look like?**

11  　　　　A.　　This alternative procedure?

12  　　　　**Q.　　Yes.**

13  　　　　A.　　To briefly summarize it, Texas NIC, through

14  its operation of Texas.gov, has the ability and in some

15  ways does already track information about a voter who

16  wants to update their registration information.  They

17  can share that information straightforwardly with DPS;

18  and, in fact, their representative, who provided a

19  deposition, said that is something that they could do.

20  　　　　　　　　DPS could then transfer that information

21  to the Secretary of State's office, just as it transmits

22  information from in-person transactions or mail

23  transactions.  And, again, DPS has confirmed that if

24  they had discussions, if that was the conclusion that

25  they reached, they could easily do that; and then the

111

1   Secretary of State's Office would do what it does with

2   the in-person transactions as well, providing them to

3   Counties and updating individuals' voter registration

4   records.  In the process of doing that, of course, it

5   would transmit, just as it does now for mail and in-

6   person transactions, the previously-recorded digital

7   signature of the voter because everyone who is renewing

8   or changing their address online has a digital signature

9   stored at the DPS.

10      Q.   So your opinion is if this system was

11  implemented, Texas would -- I think you said it would

12  achieve financial savings?

13      A.   Sure, statewide.

14      Q.   What's your estimate of the amount of

15  financial savings Texas would achieve in the first five

16  years of this implementation?

17      A.   Again, this actually brings back our initial

18  conversation about why it would be important to get all

19  the information about exactly how people are using

20  online or not; but, you know, the analogy that I think

21  of is:  If I had a class that I was teaching at a

22  university with a hundred thousand students -- hopefully

23  I'll never have to face such a class -- and the students

24  were filling out some kind of Scantron tests, what would

25  be the cost savings of me, one by one, entering

Eitan Hersh - 5/23/2017

112

1   information from that test versus running it through a

2   Scantron machine.  And suppose I already had a Scantron

3   machine, which in this parallel example, Texas already

4   has a Scantron machine, right?

5                So you would have to estimate the costs

6   of what does it cost for Texas or the Counties to key in

7   individually voter registration applications and the

8   errors associated with that, dealing with those, and

9   having the paper routine that they do now for people who

10  transmit it online, do an online DPS transaction; and it

11  then goes through this external, non-simultaneous

12  process versus flow the information through the current

13  daily export that DPS already does.

14       **Q.   So you don't have that kind of detailed data**

15  **to make an estimate over what the estimated financial**

16  **savings would be over a certain period of time; is that**

17  **correct?**

18       A.   Right.  With a few pieces of information, I

19  think we could make that estimate.  I don't have it

20  right now.

21       **Q.   At least with any degree of scientific**

22  **certainty, right?**

23       A.   That's right.  I would want to know how many

24  people are doing this, how long it takes a Texas

25  elections clerk to key in information, how much they get

113

1  paid for doing so, all the costs associated with that,

2  and how much it costs to do the automatic transmission

3  of data.

4       Q.   What evidence have you reviewed as to what the

5  current costs of administrating the current system are?

6       A.   I'm not sure actually there's been a lot of

7  information about that except, again, in Mr. Ingram's

8  statements I think there were specific numbers or cost

9  estimates for doing something different.  I think there

10 was talk of what would it cost to go fully online voter

11 registration, to do some kind of digital signature at

12 home for users or something like this; but those are

13 very different kinds of costs than what I'm talking

14 about here, which this is just the cost of -- the cost

15 savings associated with not keying in individual

16 applications as Texas apparently does now, versus the

17 automatic transmission of this data.

18      Q.   So wouldn't it be important for you to know

19 what the financial costs are in this current system to

20 reach an opinion that there'd be cost savings if

21 something is changed?

22      A.   Not really, in the same way that I don't

23 know -- if I were grading 100,000 tests versus running

24 them through a Scantron, I don't know -- I'd have to

25 make some estimate of how much my time is worth and how

114

1    much I'd spend on each of those estimates; but I don't

2    have to retrieve more information than common sense to

3    know that it is cheaper for me to run those 100,000

4    tests through a Scantron machine than for me to grade

5    each one individually.

6        Q.    We're not talking about a Scantron machine

7    here, correct?

8        A.    It's just an equivalent efficiency gain.  It

9    just seems like an obvious efficiency gain is what I'm

10   trying to say.

11       Q.    Did anyone help you in coming to this

12   conclusion in your report, any of your colleagues at

13   Yale?

14       A.    No, I didn't talk to anyone about this.

15       Q.    Did you do any sort of calculations to come to

16   this conclusion?

17       A.    No.  Again, I kind of treat this as, like,

18   kind of a conventional wisdom, common-knowledge

19   expectation of what technology can do for efficiency.

20       Q.    Is there any particular source you relied on

21   in coming to this conclusion other than your common

22   sense and Mr. Ingram's deposition answers?

23       A.    I don't think so -- I will -- sorry.  Let me

24   amend that.  You know, I think that as someone deeply

25   knowledgeable about voter registration systems what is

1    really evident is that when you have people filling out

2    voter registration applications by hand; then you have

3    election officers keying in information one at a time,

4    you generate errors, lots of errors.  There's tons of

5    small typo kind of errors on voter registration

6    applications that cause problems down the line.  They

7    cause problems with people not being authenticated

8    properly at the polls; and those problems are, in large

9    part, the result of hand-keying work.  And so I think

10   one area of expertise that I have that brings to bear on

11   this question is:  How much of a problem is it when

12   election officials are doing a lot of stuff by hand and

13   how much better is it when they don't?  And I think we

14   see that here in this situation.

15       Q.   **You testified earlier Texas is not the only**

16   **state that has some form of driver's license renewal/**

17   **change-of-address process online, correct?**

18       A.   That's right.

19       Q.   **There's 38 other states that have some form**

20   **of online driver's license transactions, either**

21   **currently -- currently implemented or are being**

22   **implemented?**

23       A.   That wasn't referring to driver's license

24   transactions.  That was referring to online voter

25   registration.

Eitan Hersh - 5/23/2017

116

1      Q.    Fair enough.  For online voter registration.

2      A.    Yeah.  Most states have online voter

3  registration; and most of the States, as far as I

4  know -- as far as I know, the States that don't have

5  online voter registration either don't have online

6  driver's license transactions; or if they do, they

7  provide an automated way to get to update that

8  information.

9      **Q.    So online voter registration is a relatively**

10  **new thing.  I think you said earlier that at the time**

11  **the NVRA was implemented, you weren't aware of any State**

12  **that had online voter registration?**

13     A.    Yeah.  I was ten years old; but yeah, that's

14  right.

15     **Q.    So it seems to me that you have other decent**

16  **case studies to see what the financial cost to benefit**

17  **are.  Have you done any financial analysis as far as any**

18  **of these other states as far as cost savings or**

19  **increases in implementing an online voter registration**

20  **platform?**

21     A.    No.  But just to reiterate, the thing we're

22  talking about here is not online voter registration.

23  It's just these online transactions incorporating the

24  process.

25     **Q.    So have you ever looked at any other State**

117

1    **implementing online driver's registration, change of**

2    **address, or renewal and see what the cost to that were?**

3        A.   No.  And I'm also not aware of any studies

4    about that being published.

5        Q.   **Did you look for publications about that?**

6        A.   Yes, I looked for studies about that; and I

7    haven't come across any.

8        Q.   **Do you think that would be helpful in kind of**

9    **reaching your conclusions in this case?**

10       A.   Again, I really don't think that it would be a

11   highly-contested claim that not keying in tens of

12   thousands, hundreds of thousands of paper forms is more

13   expensive than the automated process that already is set

14   up and exists, right?  I mean, the thing is that -- the

15   unusual thing in this case in Texas is not that we're

16   comparing keyed-in records to a whole new process.  The

17   whole process already exists.

18            You know, I think the vision of what this

19   ought to look like from the Plaintiffs' side is

20   something that is switching a few lines of code that

21   treats these online transactions as Texas already treats

22   in-person transactions.  And so there's essentially

23   almost no cost, maybe a couple days of work for making

24   this change; and, then, therefore all the rest is

25   savings in terms of not hand processing these

Eitan Hersh - 5/23/2017

118

1    registration forms.

2        Q.   And you think it would only take a couple of

3    days to make those changes?

4        A.   I think the lawyers might make it more work;

5    but I think on a technical side, perspective, yeah.

6    Look, it's really just a few lines of code here.

7        Q.   Are you aware of any other State that's made

8    changes to their online voter registration system that

9    only took a couple of days to implement?

10       A.   I think to the extent that it takes a long

11   time, I don't think it's not coding or computer work

12   takes a long time.  I think that it's -- I think it's

13   policymaking.

14       Q.   And you already testified you're not an

15   engineer, and you don't have any background in

16   engineering?

17       A.   I am not an engineer.

18       Q.   You don't have any computer science degrees?

19       A.   That's right.

20       Q.   Is there any specific source listed in your

21   report that directly supports your opinion about

22   financial barriers?

23       A.   No.  I think I, you know, say in the report as

24   clearly as I can which is that automation, I think, is a

25   fairly widely-accepted method of cost savings.

Eitan Hersh - 5/23/2017

119

1    Q.   Is there any study or report not included in

2    your expert report that you could cite me to now that

3    would support your opinion about financial barriers and

4    automation?

5    A.   I mean, if there's a real conflict about this,

6    I think Googling "automation" could be very helpful.  I

7    mean, almost every industry and every branch of

8    Government uses automation to generate cost savings.

9    Q.   And did you do that Googling in response to --

10   in conjunction with this case?

11   A.   Did I specifically Google the relationship

12   between automation and cost savings?  No, I did not.

13   Q.   Okay.  So you don't know what that would bring

14   up, right?

15   A.   I guess I don't know what that would bring up

16   other than it's hard to imagine automation not

17   generating cost savings in this context.

18   Q.   When DPS uses a digitally-stored signature in

19   a database, that signature is not created by the

20   customer when they are updating their information

21   online; is that correct?

22   A.   That's correct.

23   Q.   A quick question:  If you go to 22 of your

24   expert report, Paragraph 22 on page 10, in the second-

25   to-the-last sentence of this paragraph, you state that

Eitan Hersh - 5/23/2017

120

1  currently only about 30 percent of eligible license

2  holders are utilizing the online system.  I don't see a

3  citation directly related to this sentence.  Where are

4  you getting that 30 percent number?

5       A.   Yes.  So that sentence, it looks like, and the

6  next sentence, both have a citation to Footnote 13, "See

7  Deposition of Sheri Gipson, January 31st, 2017," with

8  page numbers.

9       Q.   So you contend that 30 percent number is

10  within these deposition lines of Sheri Gipson's

11  testimony?

12       A.   I believe so.  There's two -- well, there are

13  two citations to Sheri Gipson's testimony in this

14  paragraph, one to her individual deposition and one to

15  her 30(b)6 deposition; and that 30 percent is somewhere

16  in one of those depositions.

17       Q.   Somewhere that's cited to somewhere in your

18  report?

19       A.   Yeah, I believe it's in that paragraph.

20       Q.   And there's no other basis that you're aware

21  of where you could have gotten that information?

22       A.   The 30 percent number?

23       Q.   Yes.

24       A.   I believe it was contained in one of those

25  depositions, yeah.

Eitan Hersh - 5/23/2017

121

1      Q.    So going to Paragraph 27, I want to talk about

2  the portion -- I think it's in sentence three -- where

3  you emphasize a previous-obtained digital signature; but

4  am I correct when I say that that previously-obtained

5  digital signature is not a physical signature given by

6  the voter with the voter application?

7      A.    It's given by the voter under previous

8  interaction that they've had with DPS.

9      Q.    Is it a physical signature?

10     A.    I think the way that you're describing

11 physical signature, it is.  It's a digitally-captured

12 physical signature.

13            And just to reiterate, this is the

14 paragraph I made that revision about, the renewal versus

15 change of address.

16     Q.    Fair enough.

17            So going to 29, in the first sentence you

18 reference a policy decision.  I think I've already asked

19 you about policy decisions.  What do you mean by a

20 policy decision is this context?

21     A.    In this context, I mean the policy -- hold on.

22 Hold, please.

23            In this case, I mean the policy decision

24 to not accept -- to not automate this process between

25 online DPS transactions and voter registration updates.

Eitan Hersh - 5/23/2017

122

1   And I reference it relation to other policy decisions,

2   for example, the policy decision about how Texas deals

3   with these mail change-of-address forms, you know, when

4   asked why the State does this; why does the State take

5   the previously-recorded digital signature in case of the

6   mail change-of-address forms.  That was a policy

7   decision.  That was a decision that was made in

8   conjunction with lawyers about how they were going to do

9   that particular thing.  And that's how Texas was

10  interpreting what to do in that situation and in this

11  other situation an online update Texas is interpreting

12  what their doing as something else; and, you know, as

13  I'm pointing out in this paragraph, different in this

14  context than in other similar context.

15       **Q.   So this will go back to your opening paragraph**

16  **where you talk about policy decisions:  Who specifically**

17  **are you alleging is making that policy decision in**

18  **relation to the allegations in this case?**

19       A.   I would say the Department of Public Safety.

20  In there depositions they say these are conversations

21  that happened in conjunction with the Secretary of

22  State, actually in conjunction with Texas NIC; but,

23  primarily, it's the decision, it seems to me, of DPS as

24  they've made other similar decisions about what to do in

25  this context.  For example, you know, when asked why

Eitan Hersh - 5/23/2017

123

1  they adjusted the language around the checkbox online, I

2  think it was Rebecca Hibbs who said, basically,

3  unilaterally, DPS felt like they could improve the

4  language about that checkbox; so they made that policy

5  decision.  I call it a policy decision.  The language

6  was unclear to a lot of voters, and they unilaterally

7  said:  Let's figure out a way to make it clearer.

8       **Q.   Do you believe that DPS or the Secretary of**

9  **State's Office can make a policy decision that violates**

10 **State law?**

11            MR. KRAUS:  Object to the form of the

12 question.

13      **Q.   (BY MR. SOTO)  Let me take a step back.**

14            **So if DPS believes that the changes that**

15 **Plaintiffs are asking us to make would be in violation**

16 **of State law, do you believe they have the authority to**

17 **make those changes without a change in State law?**

18            MR. KRAUS:  Object to the form of the

19 question.

20            Answer if you can.

21      A.   In my view, State Officers are required to

22 follow Federal law; and if a State law is inconsistent

23 with Federal law, they have to follow the Federal law.

24 I mean, if a State says that Black and White kids can't

25 be in school together; but the Federal Government says,

1  "That's a violation of Federal law," the State law is

2  really meaningless.

3      Q.   So your analogy in this case is desegregation?

4      A.   It's not an analogy.  It's an instance where

5  Federal law is very clear.  I would hope, you know,

6  everyone would agree that in that situation, State

7  Officials are supposed to comply with Federal law versus

8  State law; and that's true for any kind of law.

9      Q.   And what about if Federal and State laws don't

10 conflict?  Do State Officers, in making decisions, have

11 an obligation to follow State law in an instance where

12 it does not conflict with Federal law?

13     A.   If it doesn't conflict, you're obligated to

14 follow State law for sure.

15     Q.   Okay.

16          MR. KRAUS:  It looks like you're getting

17 towards the end of that outline.

18          MR. SOTO:  I think so.

19          MR. KRAUS:  Are you doing okay?

20          THE WITNESS:  I'm doing great.

21     Q    (BY MR. SOTO)  So in Paragraph 31, the

22 second-to-last paragraph, you cite to a quote from

23 Judge Garcia in an order.  What order are you referring

24 to specifically?

25     A.   I believe this was the order ruling on the

125

1  Motion to Dismiss.

2       Q.   So let me see if I have this straight.  You

3  are relying on Judge Garcia's order to reach an -- are

4  you relying on that language in any of your opinion?

5       A.   I wouldn't say I'm relying on it, no.  Let me

6  just re-read what I wrote here.

7            Yes, I think that the quote from

8  Judge Garcia is merely there to reinforce the view that

9  I have come to independently about what the signature is

10 for and what it's not for.

11      Q.   Your last sentence reads, "Indeed, the Texas

12 Secretary of State does not make use of an additional

13 signature in the case of mail forms or in-county online

14 forms."

15           Did I read that correctly?

16      A.   Correct.

17      Q.   And you don't provide a cite to this specific

18 sentence.  Can you tell me what the basis for this

19 contention is?

20      A.   Sure.  In the mail forms, I believe it was --

21 well, the question about these mail forms was asked in

22 multiple depositions; but I think it was in

23 Mr. Crawford's deposition where it was confirmed not

24 only that old signatures, previously-recorded signatures

25 are being transferred to the Secretary of State for

Eitan Hersh - 5/23/2017

126

1    these mail forms.  Not only that, but the Secretary of

2    State's Office would not really be able to tell the

3    difference between a digitally-recorded previous

4    signature and one that was new.

5         Q.   And what is that contention based on?

6         A.   Again, Mr. Crawford's deposition.

7         Q.   Any other deposition or any other source?

8         A.   I think that's where it was most clearly

9    articulated and asked and answered, but I do recall that

10   this question about "what's going on with these mail

11   forms" has come up in multiple depositions.

12        Q.   Any reason why you didn't provide a cite for

13   that contention?

14        A.   I think only because I'd already provided a

15   cite to it earlier in the report.

16        Q.   To that specific contention?

17        A.   I believe so, yeah.

18        Q.   Okay.  Can you tell me where exactly it is?

19        A.   Sure.

20             So I would point you to the Paragraph 27,

21   again, the end of page 12, "This process is described in

22   depositions by DPS's John Crawford and Sheri Gipson,

23   also acknowledged by Betsy Schonoff, the Voter

24   Registration Manager, and the Secretary of State."

25        Q.   I'm sorry.  What paragraph again?

Eitan Hersh - 5/23/2017

127

1      A.   It's 27, there on the top of page 13.  "In

2   fact, Mr. Crawford notes that the Secretary of State's

3   Office would not necessarily know if a signature

4   transmitted from DPS was signed concurrently when the

5   registration information was updated or signed in prior

6   years."  And that's -- there's a page citation to

7   Mr. Crawford's deposition.

8      Q.   So that citation is what you're relying on to

9   make this conclusion in Paragraph 31?

10      A.   That's right.  I mentioned in that paragraph,

11   again, that this was confirmed by Sheri Gipson and Betty

12   Schonoff.

13      Q.   Do you have an understanding of whether or not

14   that original signed mail form can be pulled or is

15   maintained?

16      A.   So it cannot be pulled by the Secretary of

17   State or a County Election Official without going

18   through DPS.  That's my understanding.

19      Q.   And what's the process for them pulling that

20   information?

21      A.   I don't know the process of them pulling that

22   information.  It seems like DPS retains that, but it's

23   not transmitted to the Secretary of State.

24      Q.   And what is your understanding of in what

25   instances is it pulled or can be pulled?

Eitan Hersh - 5/23/2017

128

1     A.   I don't think it was ever mentioned, the

2   instance in which it was pulled in these depositions.

3   It was just clearly stated that it wasn't used by the

4   Secretary of State for this purpose of changing the

5   information, right?  It says there the Secretary of

6   State's Office is changing, updating voter registration

7   form out of county, using a signature that was recorded

8   maybe six years prior to the transaction.  They are not

9   every time going back and digging up a paper form.

10     **Q.   And what is that based on?**

11     A.   Again, these same dispositions, Mr. Crawford's

12   depositions.

13     **Q.   Anything else?**

14     A.   The other depositions that mention it.

15     **Q.   Just the depositions?**

16     A.   Right.

17     **Q.   Besides the depositions that you reviewed,**

18   **have you conducted any other search into how Texas**

19   **administers its voter registration system and online**

20   **change-of-address -- driver's license change-of-address**

21   **systems related to this case?**

22     A.   Yeah, there are other documents in Exhibit B

23   that are not depositions that articulate parts of that

24   process.

25     **Q.   So, for instance, can you point me to any of**

Eitan Hersh - 5/23/2017

129

1  those?

2      A.   So I don't remember the exact contents of

3  these things; but maybe Number 7, the National Voter

4  Registration Act and Voter Registration Applications

5  PowerPoint, that might be what I'm referring to.  These

6  don't have the most elegant names.  Some of them are

7  just numbers.

8      Q.   **Is there anything else off the top of your**

9  **head that you can recall?**

10     A.   No.  I would just guess.  Items 4 through 7

11 here look like they're some of those big PDF documents

12 that articulate some of this process that are separate

13 from the depositions.

14     Q.   **Going back to the Truth in Mileage Act, are**

15 **you aware if there's a specific provision in that act**

16 **that allows a State to petition the Federal Government**

17 **for a waiver?**

18     A.   Well, that's what Texas did in this case.  So

19 I'm not sure what the process was by which, whether it's

20 in the statute or if it's just standard procedure as

21 operated by the, you know, the -- what is it called --

22 the American Procedures Act, or something like this.

23     Q.   **Okay.  So, in your expertise, do you know if**

24 **the NVRA contains a provision that allows a State to**

25 **petition the Federal Government for a waiver?**

130

1      A.   Again, I think, you know, some of these kinds

2   of waivers, as far as I'm understanding, are -- I think

3   it's called the Administrative Procedures Act, which

4   governs, in general, these kinds of procedures; and I

5   don't know whether they're contained specifically in the

6   act or they're covered in general other statutes that

7   govern how waivers and exemptions and procedures are

8   processed.

9      **Q.   So you believe that the State of Texas can**

10  **petition the Federal Government through the APA for a**

11  **waiver of some provision of the NVRA?**

12     A.   I don't know whether they can or cannot.  I

13  don't know whether the other States that followed this

14  process of not collecting signatures at the time of

15  transactions, whether they have or have not.  Clearly,

16  other states do this; and I don't know what their

17  procedure was, whether they interpreted the NVRA

18  differently or whether they got some form of waiver.

19     **Q.   So wouldn't that be important to know if**

20  **there's a procedure for that because Texas, regardless**

21  **of how you interpret the NVRA, certainly would not**

22  **permanently be in noncompliance with the NVRA if they**

23  **could petition for a waiver, right?**

24          MR. KRAUS:  Object to the form of the

25  question.

Eitan Hersh - 5/23/2017

131

1    Q.    (BY MR. SOTO)  So wouldn't it be important to

2  know if there was a waiver, an ability to get a waiver

3  through the APA?

4    A.    I don't know.  Not necessarily.  I mean, I

5  think the important point here is that, you know, as far

6  as I know, Texas is the only State that operates this

7  way.  So whatever the other states have done, whether

8  they've just interpreted it such that they do need to

9  follow the law by offering voter registration as part of

10  their online transactions or whether they talked to

11  anyone in bureaucracy about it first, I'm not sure.

12    Q.    Do you know if any other States got a waiver

13  through the APA of the NVRA?

14    A.    I do not know if they did or did not.

15    Q.    Have you ever researched the APA to figure out

16  if there's a waiver provision in there for the NVRA

17  specifically?

18    A.    Not for the NVRA specifically.

19    Q.    For any other Federal law?

20    A.    I've certainly read a lot of research on the

21  APA, but I don't know how it would apply in this case

22  off the stop of my head.

23            MR. SOTO:  Can we take a five-minute

24  break?  I think we may be close to being done.

25            MS. CHAMPION:  Sure.

1           MR. KRAUS:  Sure.

2           THE VIDEOGRAPHER:  We're going off at

3  1:32.

4           (Off the record from 1:32 to 1:42 p.m.)

5           THE VIDEOGRAPHER:  We're back on the

6  record.  It's 1:42.

7      Q    (BY MR. SOTO)  So, Dr. Hersh, thank you for

8  your time.  I just have a few more questions.

9           If we turn back to Exhibit 4, your

10 report, I want to direct you to Paragraph 21.  And the

11 second sentence of that paragraph reads, "By obtaining

12 daily information, an old address may no longer be valid

13 for a voter.  Election officials may be able to gain

14 insight into obsolete records on the voter rolls, which,

15 in turn, they may purge."

16           Did I read that correctly?

17     A.    Yes.

18     Q.    There's no -- again, there's no specific cite

19 to this sentence.  Can you tell us what the basis for

20 this contention is?

21     A.    Sure.  I think I mean generally.  There's a

22 couple of "mays" or "mights" in there because it's not

23 clear to me exactly what the procedure is; but what

24 seems to me to be happening is that -- well, what I know

25 to be happening is there's two forms of daily

Eitan Hersh - 5/23/2017

133

1   transactions between DPS and the Secretary of State's

2   Office.  One of them you might say works on behalf of

3   the voter in that the voter's records are updated so

4   that they can vote.  The other one, which is the one

5   that this is about, this daily update file, rather than

6   working on behalf of the voter, it works on behalf of

7   the State and County Governments to use for functions

8   that do not include updating a voter registration

9   record.

10          Now, there is a procedure in Texas, as in

11   all States, for removing obsolete records that often

12   starts with learning that someone has moved and then

13   sending mail and so forth.  There's a process that's

14   outlined.  And it's not clear to me exactly what that

15   information is used for; but it might be used for

16   gaining insight into obsolete records, which, of course

17   is an important Government function as well.

18      Q.   So by saying "purging records," you mean

19   removing obsolete records?

20      A.   That's right.

21      Q.   What provision allows or governs the State's

22   ability to remove obsolete records?

23      A.   The NVRA.

24      Q.   What section of the NVRA?

25      A.   I don't recall.

Eitan Hersh - 5/23/2017

134

1      Q.   If you go to Paragraph 18, talking about daily

2   voter registration files, when a user is completing a

3   registration transaction online for a driver's license,

4   they are given the option of either saying they want

5   that to also update their voter registration information

6   or not; is that correct?

7      A.   Online?

8      Q.   Yes.

9      A.   They check this box, right.

10     Q.   Right.  So they have the option of saying

11  "yes" or "no," correct?

12     A.   I think they have the option of saying "yes"

13  or "not yes," but -- is there a "yes" or a "no" or just

14  a "yes" that you can click?  In any case, there's an

15  action one can take.

16     Q.   So not all people who change their driver's

17  license information or address associated with that may

18  want to have their voter registration updated, correct?

19     A.   That's right, some people may not want to.

20     Q.   So not all voter registration updates will

21  necessarily be relevant to updated -- I'm sorry -- so

22  not all changes to a driver's license will necessarily

23  be relevant to voter registration, correct?

24     A.   That's correct -- well, let me change that.

25  It's not that it's not relevant; it's just that it might

1  be at the voter's discretion that the voter decides they

2  don't want to do that.  I don't know whether the

3  situation is something like someone is temporarily maybe

4  in college and is changing their driver's license to

5  reflect their college address, but they still consider

6  their home where they grew up.  A situation like that

7  make come up where one form is changed but not the

8  other, at the voter's discretion.

9      Q.   **So a voter may not want their voting**

10  **registration to be updated when they change their**

11  **driver's license?**

12      A.   It's possible, sure.

13      Q.   **Sure.  Are you familiar at all with the Live**

14  **Check Process?**

15          MR. KRAUS:  I'm sorry.  What process?

16          MR. SOTO:  The Live Check Process.

17      A.   It sounds familiar, but I can't remember

18  offhand.

19      Q.   **(BY MR. SOTO)  Do you know what the Help**

20  **America Vote Act is?**

21      A.   Yes.

22      Q.   **What is the Help America Vote Act?**

23      A.   The Help America Vote Act was an Act passed by

24  Congress, I think, in 2002 in some ways in response to

25  the Florida election problems in the 2000 election; and

Eitan Hersh - 5/23/2017

136

1    it had a number of provisions.  The most important one,

2    I think, is about States being required to maintain

3    regularly-updated digital voter registration databases.

4         Q.    And have you reviewed that Act before?

5         A.    Yes.

6         Q.    Have you used that Act in any of your

7    research?

8         A.    It's certainly referenced in several of my

9    publications.

10         Q.    Do you know if States conduct a Live Check

11    Process to help comply with the Help America Vote Act?

12         A.    That sounds familiar, yeah.  I would need to

13    brush up my memory about that.

14         Q.    Do you know what kind of data is used with

15    Live Check Process?

16         A.    I don't recall.

17         Q.    Have you ever made any personal contributions

18    to any political action groups in Texas?

19         A.    No.

20         Q.    Have you ever contributed to Battleground

21    Texas?

22         A.    No.

23         Q.    To the Texas Civil Rights Project?

24         A.    No.

25         Q.    I think that's all the questions I have at

Eitan Hersh - 5/23/2017

137

1    **this time.**

2              MR. SOTO:  I'll pass the witness.

3              MR. KRAUS:  No further questions.  We'll

4    reserve ours until the time of trial.

5              THE VIDEOGRAPHER:  Okay.  We'll go off at

6    1:49.

7              (Deposition adjourned at 1:49 p.m.)

8              (Signature waived.)

9                        --oOo--

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Eitan Hersh - 5/23/2017

138

1  STATE OF TEXAS)

2                    REPORTER'S CERTIFICATION

3           I, DEBBIE D. CUNNINGHAM, CSR, hereby

4  certify that the witness was duly sworn and that this

5  transcript is a true record of the testimony given by

6  the witness.

7           I further certify that I am neither

8  counsel for, related to, nor employed by any of the

9  parties or attorneys in the action in which this

10 proceeding was taken.  Further, I am not a relative or

11 employee of any attorney of record in this cause, nor am

12 I financially or otherwise interested in the outcome of

13 the action.

14           Subscribed and sworn to by me this day,

15 June 7, 2017.

16

17

18

19
   _____
20 Debbie D. Cunningham, CSR
   Texas CSR 2065
   Expiration:  12/31/2018
21 INTEGRITY LEGAL SUPPORT SOLUTIONS
   3100 West Slaughter Lane, Suite 101
22 Austin, Texas 78748
   www.integrity-texas.com
23 512-320-8690; FIRM # 528

24

25