Plaintiffs' Designations

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| JARROD STRINGER, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) CIVIL NO. 5:16-cv-00257 |
| | ) |
| ROLANDO PABLOS, IN HIS | ) |
| OFFICIAL CAPACITY AS THE | ) |
| TEXAS SECRETARY OF STATE, | ) |
| AND STEVEN C. McCRAW, IN | ) |
| HIS OFFICIAL CAPACITY AS | ) |
| THE DIRECTOR OF THE TEXAS | ) |
| DEPARTMENT OF PUBLIC | ) |
| SAFETY, | ) |
| | ) |
| Defendants. | ) |

ORAL/VIDEOTAPED DEPOSITION OF

EITAN HERSH

Tuesday, May 23, 2017

DEPOSITION OF EITAN HERSH, produced as a witness at the instance of the Defendants, and duly sworn, was taken in the above-styled and numbered cause on Tuesday, May 23, 2017, from 9:00 a.m. to 1:49 p.m., before Debbie D. Cunningham, CSR, in and for the State of Texas, reported via Machine Shorthand at of Office of the Attorney General of Texas, 300 West 15th Street, 9th Floor, Austin, Texas 78701, pursuant to the Federal Rules of Civil Procedure.

--oOo--

C-10

```
 1                         APPEARANCES

 2

 3   FOR PLAINTIFFS:

 4        WATERS & KRAUS, LLP
          3141 Hood Street, Suite 700
 5        Dallas, Texas   75219
          (T) 214.357.6244
 6        (F) 214.357.7252

 7        By:   Peter A. Kraus, Esq.
                kraus@waterskraus.com
 8
                        AND
 9
          TEXAS CIVIL RIGHTS PROJECT
10        1405 Montopolis Drive
          Austin, Texas   78741
11        (T) 512.474.5073
          (F) 512.853.0374
12
          By:   Cassandra Champion, Esq.
13              champion@texascivilrightsproject.org

14
     FOR DEFENDANTS:
15
          OFFICE OF THE ATTORNEY GENERAL OF TEXAS
16        General Litigation Division
          P.O. Box 12548
17        Austin, Texas   78711-2548
          (T) 512.475.4054
18        (F) 512.320.0667

19        By:   Esteban Soto, Esq.
                esteban.soto@oag.texas.gov
20                      AND
          Rola Daaboul, Esq.
21

22   VIDEOGRAPHER:    Bill Burns

23
     ALSO PRESENT:    Beth Stevens
24                    Lindsey Aston
                      Jill Bliss
25
```

INDEX

APPEARANCES                                                    2

EXAMINATION OF EITAN HERSH:

 BY MR. SOTO                                                   4

 REPORTER'S CERTIFICATION                                    138

EXHIBIT INDEX

| Exhibit Number | Description | Page |
|---|---|---|
| Exhibit 1 | Deposition Notice | 4 |
| Exhibit 2 | LexisNexis document | 14 |
| Exhibit 3 | Curriculum Vitae | 19 |
| Exhibit 4 | 4/15/17 Professor Eitan D. Hersh expert report entitled Report on Updating Voter Registration Records with Data from Online Motor Vehicle Transactions | 36 |
| Exhibit 5 | 4/28/17 Dr. Eitan D. Hersh invoice addressed to Attorney Peter Kraus | 38 |
| Exhibit 6 | Texas Election Code, Chapter 20 | 58 |
| Exhibit 7 | NVRA excerpt | 53 |
| Exhibit 8 | Plaintiffs' Original Complaint | 96 |
| Exhibit 9 | Texas Election Code, Chapter 15 | 106 |

1  their voter registration information when they change
2  address or renew a license online; and there is a
3  disagreement between the State of Texas and the
4  Plaintiffs about whether Texas ought to do that, as
5  other states do, around Federal law.
6      **Q.   And how did you become involved in this case?**
7      A.   Someone who knew me and my work on voter
8  registration connected me with the Plaintiffs.
9      **Q.   When did you first learn about this case?**
10     A.   I don't remember.  Months ago definitely.
11     **Q.   Months ago.  Okay.**
12          **And can you summarize the opinions you've**
13  **reached in this case?**
14     A.   Sure.  My goal is to try to help solve a
15  mystery, which is:  Why does Texas do what it does in
16  this particular context?  And there could be a number of
17  reasons why Texas doesn't update or allow individuals to
18  update their voter registration data when they perform a
19  transaction online.
20          And my opinion is that there are no
21  obvious substantial technical reasons why Texas does not
22  do that or financial situations why Texas does not do
23  that, but the -- what the decision boils down to, the
24  mystery is solved, because it's not a technical or a
25  financial barrier but an interpretation of the law.  In

1  some ways I think my goal here or what I accomplished is
2  helped to set aside what is a plausible but not relevant
3  consideration from the more relevant considerations.
4      Q.   Do you know if the Defendants in this case
5  have ever argued that there's a technological barrier to
6  doing what the Plaintiffs asked us to do?
7      A.   Yes.
8      Q.   What's your basis for understanding that?
9      A.   So my understanding in an early report from, I
10 believe, the Texas Election Director, there was a claim
11 that Texas didn't have the capacity to do this, that it
12 would cost a lot of money to do it; and, to me, that
13 sounded like, oh, there's a technical problem.  There's
14 a technical reason.
15     Q.   I understand that may be a financial reason,
16 but you inferred from that -- who's the Texas Election
17 Director?
18     A.   I believe Mr. Ingram.
19     Q.   Mr. Ingram.  And he works for DPS; is that
20 right?
21     A.   I believe he works for the Secretary of State.
22     Q.   I'm sorry.  The Secretary of State.
23          And Mr. Ingram has testified or stated,
24 you're asserting, that there's financial reasons or
25 financial costs associated with this, correct?

1  looking for information, data, depositions that could
2  help solve this puzzle of what the justification for
3  Texas' unusual behavior here is; and so it was an
4  over-time development, learning, to reach this
5  conclusion.
6      Q.   So you authored this report on April 15th;
7  that's correct, right.
8      A.   I think I filed it with the court, yeah, over
9  the previous few weeks.
10     Q.   And it was finalized on April 15th.
11     A.   Right.
12     Q.   I'm just trying to get a sense of how long
13 before that you actually reached your conclusions.  Was
14 it in March, February, January?  Do you have an
15 estimate, or do you recall what month it was that you
16 reached the conclusions?
17     A.   No.  I would guess it was, you know, a
18 slow-and-steady process of research; and that research
19 in this case was mostly reviewing the depositions.  So
20 the picture became clearer over time.
21     Q.   So I think most of the depositions in this
22 case happened this year.  So would it be fair to say
23 sometime this year?
24     A.   Yes, that makes sense.
25     Q.   So you said earlier -- and correct me if I'm

1  **wrong -- that one of your opinions in this case is that**
2  **there are no -- you might have said "significant" --**
3  **barrier, financial barriers, to implementing the system**
4  **that Plaintiffs are asking the Court to enjoin through a**
5  **permanent injunction.  Is that fair?**
6       A.   Yeah.  In fact, you know, I think a common-
7  sense interpretation of what Texas is doing now versus
8  what this would look like would lead anyone to conclude
9  it would be a massive cost savings.
10      **Q.   So what would this exactly look like?**
11      A.   This alternative procedure?
12      **Q.   Yes.**
13      A.   To briefly summarize it, Texas NIC, through
14 its operation of Texas.gov, has the ability and in some
15 ways does already track information about a voter who
16 wants to update their registration information.  They
17 can share that information straightforwardly with DPS;
18 and, in fact, their representative, who provided a
19 deposition, said that is something that they could do.
20           DPS could then transfer that information
21 to the Secretary of State's office, just as it transmits
22 information from in-person transactions or mail
23 transactions.  And, again, DPS has confirmed that if
24 they had discussions, if that was the conclusion that
25 they reached, they could easily do that; and then the

111

1  Secretary of State's Office would do what it does with
2  the in-person transactions as well, providing them to
3  Counties and updating individuals' voter registration
4  records.  In the process of doing that, of course, it
5  would transmit, just as it does now for mail and in-
6  person transactions, the previously-recorded digital
7  signature of the voter because everyone who is renewing
8  or changing their address online has a digital signature
9  stored at the DPS.
10      **Q.   So your opinion is if this system was**
11 **implemented, Texas would -- I think you said it would**
12 **achieve financial savings?**
13      A.   Sure, statewide.
14      **Q.   What's your estimate of the amount of**
15 **financial savings Texas would achieve in the first five**
16 **years of this implementation?**
17      A.   Again, this actually brings back our initial
18 conversation about why it would be important to get all
19 the information about exactly how people are using
20 online or not; but, you know, the analogy that I think
21 of is:  If I had a class that I was teaching at a
22 university with a hundred thousand students -- hopefully
23 I'll never have to face such a class -- and the students
24 were filling out some kind of Scantron tests, what would
25 be the cost savings of me, one by one, entering

112

1  information from that test versus running it through a
2  Scantron machine.  And suppose I already had a Scantron
3  machine, which in this parallel example, Texas already
4  has a Scantron machine, right?
5          So you would have to estimate the costs
6  of what does it cost for Texas or the Counties to key in
7  individually voter registration applications and the
8  errors associated with that, dealing with those, and
9  having the paper routine that they do now for people who
10 transmit it online, do an online DPS transaction; and it
11 then goes through this external, non-simultaneous
12 process versus flow the information through the current
13 daily export that DPS already does.
14     Q.   **So you don't have that kind of detailed data
15 to make an estimate over what the estimated financial
16 savings would be over a certain period of time; is that
17 correct?**
18     A.   Right.  With a few pieces of information, I
19 think we could make that estimate.  I don't have it
20 right now.
21     Q.   **At least with any degree of scientific
22 certainty, right?**
23     A.   That's right.  I would want to know how many
24 people are doing this, how long it takes a Texas
25 elections clerk to key in information, how much they get

1   much I'd spend on each of those estimates; but I don't
2   have to retrieve more information than common sense to
3   know that it is cheaper for me to run those 100,000
4   tests through a Scantron machine than for me to grade
5   each one individually.
6       Q.  We're not talking about a Scantron machine
7   here, correct?
8       A.  It's just an equivalent efficiency gain.  It
9   just seems like an obvious efficiency gain is what I'm
10  trying to say.
11      Q.  Did anyone help you in coming to this
12  conclusion in your report, any of your colleagues at
13  Yale?
14      A.  No, I didn't talk to anyone about this.
15      Q.  Did you do any sort of calculations to come to
16  this conclusion?
17      A.  No.  Again, I kind of treat this as, like,
18  kind of a conventional wisdom, common-knowledge
19  expectation of what technology can do for efficiency.
20      Q.  Is there any particular source you relied on
21  in coming to this conclusion other than your common
22  sense and Mr. Ingram's deposition answers?
23      A.  I don't think so -- I will -- sorry.  Let me
24  amend that.  You know, I think that as someone deeply
25  knowledgeable about voter registration systems what is

1  really evident is that when you have people filling out
2  voter registration applications by hand; then you have
3  election officers keying in information one at a time,
4  you generate errors, lots of errors.  There's tons of
5  small typo kind of errors on voter registration
6  applications that cause problems down the line.  They
7  cause problems with people not being authenticated
8  properly at the polls; and those problems are, in large
9  part, the result of hand-keying work.  And so I think
10 one area of expertise that I have that brings to bear on
11 this question is:  How much of a problem is it when
12 election officials are doing a lot of stuff by hand and
13 how much better is it when they don't?  And I think we
14 see that here in this situation.
15      Q.    You testified earlier Texas is not the only
16 state that has some form of driver's license renewal/
17 change-of-address process online, correct?
18      A.    That's right.
19      Q.    There's 38 other states that have some form
20 of online driver's license transactions, either
21 currently -- currently implemented or are being
22 implemented?
23      A.    That wasn't referring to driver's license
24 transactions.  That was referring to online voter
25 registration.

1     **Q. So going to Paragraph 27, I want to talk about**
2 **the portion -- I think it's in sentence three -- where**
3 **you emphasize a previous-obtained digital signature; but**
4 **am I correct when I say that that previously-obtained**
5 **digital signature is not a physical signature given by**
6 **the voter with the voter application?**
7     A. It's given by the voter under previous
8 interaction that they've had with DPS.
9     **Q. Is it a physical signature?**
10     A. I think the way that you're describing
11 physical signature, it is. It's a digitally-captured
12 physical signature.
13     And just to reiterate, this is the
14 paragraph I made that revision about, the renewal versus
15 change of address.
16     **Q. Fair enough.**
17     **So going to 29, in the first sentence you**
18 **reference a policy decision. I think I've already asked**
19 **you about policy decisions. What do you mean by a**
20 **policy decision is this context?**
21     A. In this context, I mean the policy -- hold on.
22 Hold, please.
23     In this case, I mean the policy decision
24 to not accept -- to not automate this process between
25 online DPS transactions and voter registration updates.

1   And I reference it relation to other policy decisions,
2   for example, the policy decision about how Texas deals
3   with these mail change-of-address forms, you know, when
4   asked why the State does this; why does the State take
5   the previously-recorded digital signature in case of the
6   mail change-of-address forms.  That was a policy
7   decision.  That was a decision that was made in
8   conjunction with lawyers about how they were going to do
9   that particular thing.  And that's how Texas was
10  interpreting what to do in that situation and in this
11  other situation an online update Texas is interpreting
12  what their doing as something else; and, you know, as
13  I'm pointing out in this paragraph, different in this
14  context than in other similar context.
15       Q.  **So this will go back to your opening paragraph**
16  **where you talk about policy decisions:  Who specifically**
17  **are you alleging is making that policy decision in**
18  **relation to the allegations in this case?**
19       A.  I would say the Department of Public Safety.
20  In there depositions they say these are conversations
21  that happened in conjunction with the Secretary of
22  State, actually in conjunction with Texas NIC; but,
23  primarily, it's the decision, it seems to me, of DPS as
24  they've made other similar decisions about what to do in
25  this context.  For example, you know, when asked why

1  Motion to Dismiss.
2      Q.  So let me see if I have this straight.  You
3  are relying on Judge Garcia's order to reach an -- are
4  you relying on that language in any of your opinion?
5      A.  I wouldn't say I'm relying on it, no.  Let me
6  just re-read what I wrote here.
7              Yes, I think that the quote from
8  Judge Garcia is merely there to reinforce the view that
9  I have come to independently about what the signature is
10 for and what it's not for.
11     Q.  Your last sentence reads, "Indeed, the Texas
12 Secretary of State does not make use of an additional
13 signature in the case of mail forms or in-county online
14 forms."
15             Did I read that correctly?
16     A.  Correct.
17     Q.  And you don't provide a cite to this specific
18 sentence.  Can you tell me what the basis for this
19 contention is?
20     A.  Sure.  In the mail forms, I believe it was --
21 well, the question about these mail forms was asked in
22 multiple depositions; but I think it was in
23 Mr. Crawford's deposition where it was confirmed not
24 only that old signatures, previously-recorded signatures
25 are being transferred to the Secretary of State for

1  these mail forms.  Not only that, but the Secretary of
2  State's Office would not really be able to tell the
3  difference between a digitally-recorded previous
4  signature and one that was new.
5      Q.   And what is that contention based on?
6      A.   Again, Mr. Crawford's deposition.
7      Q.   Any other deposition or any other source?
8      A.   I think that's where it was most clearly
9  articulated and asked and answered, but I do recall that
10 this question about "what's going on with these mail
11 forms" has come up in multiple depositions.
12     Q.   Any reason why you didn't provide a cite for
13 that contention?
14     A.   I think only because I'd already provided a
15 cite to it earlier in the report.
16     Q.   To that specific contention?
17     A.   I believe so, yeah.
18     Q.   Okay.  Can you tell me where exactly it is?
19     A.   Sure.
20          So I would point you to the Paragraph 27,
21 again, the end of page 12, "This process is described in
22 depositions by DPS's John Crawford and Sheri Gipson,
23 also acknowledged by Betsy Schonoff, the Voter
24 Registration Manager, and the Secretary of State."
25     Q.   I'm sorry.  What paragraph again?

1  STATE OF TEXAS)

2                    REPORTER'S CERTIFICATION

3              I, DEBBIE D. CUNNINGHAM, CSR, hereby

4  certify that the witness was duly sworn and that this

5  transcript is a true record of the testimony given by

6  the witness.

7              I further certify that I am neither

8  counsel for, related to, nor employed by any of the

9  parties or attorneys in the action in which this

10 proceeding was taken.  Further, I am not a relative or

11 employee of any attorney of record in this cause, nor am

12 I financially or otherwise interested in the outcome of

13 the action.

14              Subscribed and sworn to by me this day,

15 June 7, 2017.

16

17

18

19  _____
    Debbie D. Cunningham, CSR
20  Texas CSR 2065
    Expiration: 12/31/2018
21  INTEGRITY LEGAL SUPPORT SOLUTIONS
    3100 West Slaughter Lane, Suite 101
22  Austin, Texas 78748
    www.integrity-texas.com
23  512-320-8690; FIRM # 528

24

25