UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

FILED
MAY 10 2018
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY ______ DEPUTY CLERK

JARROD STRINGER, et. al.

v.

ROLANDO PABLOS, in his official capacity as Texas Secretary of State and STEVEN C. McCRAW, in his official capacity as Director of the Texas Department of Public Safety

CIVIL NO. SA-16-CA-257-OG

# ORDER

Pending before the Court is Plaintiffs' Motion for Summary Judgment (docket no. 77) and also Defendants' Motion for Summary Judgment (docket no. 82). The parties have filed responses (docket nos. 85, 88) and replies (docket nos. 87, 89). The Court has reviewed the record and the applicable law, and finds that Plaintiffs' motion should be granted and Defendants' motion should be denied.

## I.

## Statement of the case

This case concerns Texas's compliance with the National Voter Registration Act (NVRA) (also known as the "motor voter law"), 52 U.S.C. § 20501, et. seq., which was enacted in 1993 under the Elections Clause to make the voter registration process easier and more convenient, thus increasing voter registration and participation.[1] The only six states exempt from

---

[1] *See* 52 U.S.C. § 20501(b)(1) ("to establish procedures that will increase the number of eligible citizens who register to vote").

its requirements are those that have no voter registration or allow election day voter registration at the polls.[2] Texas is not one of them.[3]

II.

Applicable standard

Summary judgment is proper when the evidence shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-52 (1986). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails . . . to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Curtis v. Anthony*, 710 F.3d 587, 594 (5th Cir. 2013) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

The Court must draw reasonable inferences and construe evidence in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Although the evidence is viewed in the light most favorable to the nonmoving party, a nonmovant may not rely on "conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence" to create a genuine issue of material fact sufficient to survive summary judgment. *Freeman v. Tex. Dep't of Criminal Justice*, 369 F.3d 854, 860 (5th Cir. 2004).

III.

The claims, defenses, and underlying facts

Plaintiffs are eligible Texas voters who engaged in NVRA-covered online driver's license transactions but were denied simultaneous voter registration applications and thereafter

---

[2] 52 U.S.C. § 20503(b)

[3] *See* https://www.justice.gov/crt/national-voter-registration-act-1993-nvra

disenfranchised. They assert that the State of Texas, by and through the Department of Public Safety and the Secretary of State, engages in a practice that deprives Texans of their federal right to register to vote or update their voter registration simultaneously with their online driver's license renewal and change of address transactions. Plaintiffs allege that this practice, dating back several years, violates the NVRA and Equal Protection clause. Although advised of the violation, and admittedly able to change its practice and procedure, the State of Texas has refused to integrate voter registration into its online driver's license renewal and change of address process to ensure compliance with federal law.

Plaintiffs seek summary judgment on their claims that Defendants' online process violates the NVRA and Equal Protection clause. They also seek summary judgment on Defendants' affirmative defenses, including immunity, standing, and mootness.

Defendants admit that the key facts of this case are undisputed[4] and essentially argue that state law prevents them from complying with federal law. Defendants seek summary judgment on the following grounds: Article III standing, statutory standing, mootness, and on the merits – based on their interpretation of the NVRA, state election law, and the Equal Protection clause.

The parties have stipulated to the following facts:

1. Defendant Rolando Pablos is the Texas Secretary of State ("SOS") and, under Texas Election Code §31.001(a), serves as the State's Chief Election Officer.

---

[4]The Court has taken judicial notice of the evidence attached to Plaintiffs' Request for Judicial Notice (docket no. 93). Defendants did not oppose the Court taking judicial notice of the official government web pages cited in the order. Defendants did question the relevancy of exhibit A-6, which is simply a hard copy of screen shots that may be found on the official government website in question. The Court considered the screen shots in exhibit A-6 that are relevant to the issues herein and consistent with the undisputed evidence in the record. Many of the documents attached to Plaintiffs' Request for Judicial Notice are in other parts of the record with no objection thereto.

2. Defendant Steven C. McCraw is the Director of the Texas Department of Public Safety ("DPS"). DPS operates offices around the State and issues Texas driver's licenses. All references to "driver's licenses" herein refer to Texas driver's licenses issued by DPS.

3. DPS is responsible for transmitting information to SOS about eligible driver's license applicants who – during covered driver's license transactions with DPS – indicate they wish to (1) register to vote, or (2) update their voter registration information. This information is transmitted by DPS to SOS in the voter registration extract file.

4. Plaintiffs Jarrod Stringer, Benjamin Hernandez, and John O. Woods, III (collectively, "Plaintiffs") changed their addresses on their DPS-issued driver's licenses through online transactions on Texas.gov.

5. Plaintiffs' counsel sent the Secretary of State letters dated May 27, 2015, October 23, 2015, and November 18, 2015, describing the change of address transactions in paragraph 4, and stating their allegation that DPS's and SOS's handling of these transactions violated the National Voter Registration Act.

6. Among other requirements, an applicant must be a U.S. citizen to be eligible to renew his driver's license or change the address on his driver's license online.

7. An applicant completing an online transaction to renew his driver's license must enter his driver's license number, date of birth, the last four digits of his social security number, and the audit number on his driver's license.

8. An applicant completing an online transaction to change the address on his driver's license – or an applicant who changes the address on his driver's license when renewing it online – must enter his driver's license number, date of birth, the last four digits of his social security number, the audit number on his driver's license, his home address (street,

city, state, zip code, and county) and, if different than his home address, his mailing address (street, city, state, zip code, county, and country).

9. The voter registration application on the SOS voter website is found here: https://webservices.sos.state.tx.us/vrapp/index.asp

10. Between April 2013 and February 26, 2016, Step 5 of the online renewal and change of address interface prompted the applicant to select "yes" or "no" beneath the statement "I want to register to vote. Selecting 'yes' **does not** register you to vote. A link to the [SOS] voter website (where a voter application may be downloaded or requested) will be available on your receipt page." (emphasis original)

11. The signature that appears on the license generated as a result of a customer's online driver's license renewal or change of address transaction is an image of the applicant's physical signature, electronically captured during the applicant's most recent in-person transaction in a DPS field office. (On the DL-14A and DL-43 forms this is referred to as the applicant's "electronic signature").

12. Plaintiffs did not submit a change of address that relates to a Texas driver's license in person during the change of address transactions that form the basis of Plaintiffs' claims in this lawsuit.

13. Plaintiffs did not submit a change of address that relates to a Texas driver's license by mail during the change of address transactions that form the basis of Plaintiffs' claims in this lawsuit.

14. Plaintiffs did not complete a voter registration application on the Secretary of State's website through the link provided on the receipt page at the end of the change of address transactions that form the basis of Plaintiffs' claims in this lawsuit.

15. After receiving the letters described in Stipulation 5, Defendants offered, through Plaintiffs' attorneys, to confirm Plaintiffs' voter registration status and provide assistance in updating their voter registration if they desired.

16. Plaintiffs did not attempt to renew their Texas driver's license online during the change of address transactions that form the basis of Plaintiffs' claims in this lawsuit.

17. Plaintiffs are currently registered to vote in the counties where in the letters referenced in Stipulation 5 each Plaintiff indicated they wished to be registered.

18. Plaintiff Jarrod Stringer did not attempt to cast a ballot in the federal general election in 2012.

19. Plaintiff Jarrod Stringer was able to cast a ballot in the 2016 federal general election.

20. Plaintiff John Woods was able to cast a ballot in the 2012 and 2016 federal general elections.

21. Plaintiff Benjamin Hernandez was able to cast a ballot in the 2012 and 2016 federal general elections.

22. There were no special federal elections in Texas in 2013 and 2015.

(Docket no. 94, Exh. A).

The record reflects the following additional facts. Although these facts are not stipulated, they are generally undisputed:

Each named Plaintiff moved within Texas, changed his driver's license address using the online driver's license renewal and change-of-address website,[5] indicated "yes" in response to the

[5]The official website for the State of Texas, referred to as Texas.gov, was established for DPS and other state agencies to "put their services online" and provides "easy access to government information and . . . secure online services . . . through a public-private partnership between the State of Texas and Texas NICUSA, . . . the nation's leading provider of official government portals, online services, and secure payment processing solutions." Docket no. 93-6, p. 11.

prompt "I want to register to vote," but was not registered to vote. Each Plaintiff was prevented from fully exercising his fundamental right to vote in a subsequent election due to his outdated voter registration record.

Benjamin Hernandez had been a registered voter in Ector County, Texas since the age of 18. He retired from his job with the City of Odessa in February 2013 and moved to Dallas County. He went online to change his driver's license address. After inputting his information, Mr. Hernandez checked "yes" to the voter registration question and believed his voter registration would be updated and he would thereafter be registered to vote in Dallas County. On election day in 2014, Mr. Hernandez attempted to vote but was told his name was not on the rolls in Dallas County. He was allowed to cast a provisional ballot but later received notice that his vote was not counted because he was not registered to vote in Dallas County. *See* docket no. 94-4, deposition of B. Hernandez, at 16:11-17, 21-24; 18:6-12; 19:2-8, 21-22; 27:18-20; 28:2-6, 16-25; 29:1-2, 8-11; 32:2-6, 17-22; 34:8-11, 23-25; 37:1-13. *See also* docket no. 77, appx.149-165.

Dr. John Woods III changed his residence from Travis County to Harris County in June 2015. He went online to change his driver's license address. After inputting his identifying information, he checked the box to register to vote. By checking "yes," Dr. Woods believed his voter registration had been updated with the new address. But that did not happen. On election day in 2015, Dr. Woods called Harris County to identify his polling location. He was told that he was still registered in Travis County, rather than Harris County, and any provisional ballot cast in Harris County would likely not be counted. Dr. Woods went to the polling location anyway, cast his vote, and was later informed in writing that his provisional ballot was not counted. *See* docket no. 94-6, deposition of John Woods, at 22:8-13; 25:16-25; 26:1-5; 52:7-25; 53:1-6; 62:3-6; 63:3-25; 64:1-15; 65:1-9; 66:6-11. *See also* docket no. 77, appx. 188-204.

Jarrod Stringer moved from Tarrant to Bexar County and sought to change his address for driver's license and voter registration purposes. He thought that the DPS website would enable him to change his voter registration at the same time he changed his driver's license. Mr. Stringer went online and input all the requested information. There was a box he could check if he wanted to register to vote and he did so. Mr. Stringer believed he had "done the necessary steps to become a registered voter in Bexar County." He then attempted to vote in November 2014 and was told by poll workers that his name was not on the rolls. Mr. Stringer called Bexar County and was told he could vote only for statewide elections because he wasn't registered to vote in Bexar County. *See* docket no. 94-5, deposition of J. Stringer, at 15:8-24; 16:16-25; 17:1-5; 31:1-5, 19-24; 32:16-33:1; 45:7-46:22; 47:8-17. *See also* docket no. 77, appx. 167-186.

Plaintiffs' testimony regarding their personal experiences with DPS's online process is consistent with the testimony of State officials and employees with knowledge of how the process worked in the past and how it currently works. DPS operates offices around the State and issues driver's licenses and other state identification cards. DPS is also a designated voter registration agency, pursuant to 52 U.S.C. § 20506. DPS's in-person driver's license applications (DL-14A),[6] in-person renewal/replacement/change of address forms (DL-43),[7] and mail-in change of address forms (DL-64)[8] currently serve as simultaneous voter registration applications as required under the NVRA.[9] However, DPS has not integrated voter registration into its online process for driver's license renewal and change of address; thus, the driver's license application

---

[6]Docket no. 93, exh. A-7.

[7]Docket no. 93, exh. A-8.

[8]Docket no. 93, exh. A-9.

[9]Until May 2015, DL-64 did not include any question about whether the applicant wanted to register to vote. Docket no. 77, appx. 116 (admission no. 21).

and voter registration application remain separate processes rather than one simultaneous transaction.[10]

Texas has an NVRA implementation plan which explains: "The Department will [provide to each person who applies in person] a form and procedure that *combines* the department's application form for a license, identification card or EIC with an officially prescribed voter registration application form . . . The form will also inform the applicant that the applicant's *electronic signature* provided to the department will be used for submitting the applicant's voter registration application." Docket no. 77, appx. 30 (emphasis added).[11] The implementation plan further states that the "department will use a change of address form and procedure that *combines* department and voter registration functions. The change of address form submitted in person will allow a licensee or cardholder to indicate whether the change of address is also to be used for registration purposes." *Id.* (emphasis added). On "[e]ach weekday the Department is regularly open for business, the Department will *electronically* transfer to the Secretary of State (SOS) the name and relevant data regarding each applicant who is of voting age and a United States citizen who affirmatively answered the voter registration question." Docket no. 77, appx. 31 (emphasis added). This plan was implemented after the enactment of the NVRA and confirms Texas's

[10]The process for driver's license change of address and renewal is "combined online – it's one system interface." Docket no. 94-12, deposition of S. Gipson, at 37:10-16; docket no. 77, appx. 117, admission no. 5 ("the [Texas.gov] website provides a single online process for qualified applicants to renew their driver's license, update the address listed on their driver's license, or complete both processes in a single online transaction"). But voter registration is a completely separate transaction that must be done through SOS. Docket no. 94-12, deposition of S. Gipson, at 78:1-9; 94:1-4; *see also* docket no. 77, appx. 118 (admission nos. 10, 11).

[11]The form states: "By providing my electronic signature, I understand the personal information on my application form and my electronic signature will be used for submitting my voter's registration application to the Texas Secretary of State's office. Wanting to register to vote, I authorize the Department of Public Safety to transfer this information to the Texas Secretary of State." Docket no. 77, appx. 40, deposition of K. Ingram (SOS) at 62:18-63:1.

understanding that the driver's license/voter registration process must be "combined" in one simultaneous transaction and that electronic signatures would be used for voter registration purposes.

When a "motor voter" applies for a Texas driver's license the first time, he must appear in person. During the transaction he signs a key pad which captures his electronic signature.[12] After a driver's license is issued, subsequent transactions (for renewal, replacement, or change of address) may be handled by mail, online, or even by phone. For voter registration purposes, the change of address forms submitted by mail have been handled in the same manner as renewal/change of address forms submitted in person. In both form DL-43 (the in-person application for renewal/replacement/change of address) and form DL-64 (the mail-in application for change of address) the driver's license and voter registration applications have been integrated or combined into one simultaneous transaction so that a customer need only check a single box indicating that he/she would like to register or update his/her voter information. After checking the box during the transaction, no further steps are necessary.[13] DPS receives the information and the motor voter's previously stored electronic signature, along with all other identifying data, is electronically submitted to SOS to be used for voter registration purposes.[14] Upon receipt, the SOS then transmits the data to local registrars for completion of the voter

---

[12]*See* docket no. 94-8, deposition of S. Gipson (DPS), at 234:11-24.

[13]In other words, there is no need to go to SOS to obtain, print, complete, sign, and mail a separate voter registration application.

[14]Docket no. 94-7, deposition of Betsy Schonhoff, SOS voter registration manager, at 28:3-4 ("We get application files from them on a daily basis for voter registration"); docket no. 77, appx. 117, RFA 26 ("Admits that the information DPS transmits to SOS about each applicant for voter registration includes a digital image of the applicant's signature").

registration process.[15] Although the in-person and mail-in renewal/change of address forms contain a blank for a signature, neither DPS nor SOS use the signature on paper.[16] Instead, DPS and SOS use the previously stored electronic signature.[17] In fact, SOS admits that it never uses paper signatures obtained through DPS transactions – it uses only previously imaged electronic

---

[15]As B. Schonhoff further explained:

Q: So DLS is the diver's license system, correct?

A: That's what I understand, right.

Q: And how does that system function within that process, the transfer process?

A: It's my understanding that when the operator enters an application into the DLS system and indicates that a person wants to be a registered voter, that information is then warehoused, if you will, at the State, and every night the State groups up those applications and send them – well, we get them as a single file. So depending on – for the DPS applications, I think we actually go pull – they produce the file, and then we go pull it and process it through our system on a daily basis.

Q: What do you mean by "our system"?

A: I'm sorry, the voter registration system, the team database system where we actually part the addresses and give that information out to the voter registrars of the county.

(Docket no. 94-7, deposition of B. Schonhoff, at 68:1-20).

[16]*See* docket no. 94-8, deposition of S. Gipson (DPS), at 254:4-7 (Q: So DPS was never actually scanning physical ink signatures from paper and then transmitting them to SOS . . . A: No, we were not). *See also* docket no. 94-10, deposition of J. Crawford (DPS), at 73:17-25 (Q: Does the DLS only store electronic signatures? A: Yes. . . . Q: Sure. Does the DLS only store signatures which are input using the keypad? A: The DLS database itself, yes, it only stores signatures that are collected on those electronic pads); 76:20-21 (Q: Are signature files ever removed from DLS? A: No.); 77:6-16 (Q: If a person's record has more than one signature associated with that record, which signature would be batched and sent to the Secretary of State with the voter extract . . . file? A: The most recently captured one).

[17]*See* docket no. 94-10, deposition of J. Crawford, at 139:10-21 (Q: [T]he mail-in change of address, the current one . . . [w]ith regard to the batch that's sent to the Secretary of State at night for the voter registration, if the person answers "yes" on their change of address that's mailed in and that's input into DLS, it's the electronic signature that was previously provided the last time that person went in person. That's the signature that goes to the Secretary of State. Is that right? A: Yes, that's correct).

signatures for voter registration purposes.[18] As Keith Ingram, the SOS 30(b)(6) representative, testified:

> Q: So you identified for me or explained to me why – what the electronic signature or the keypad signature at DPS is used for. It's used for the signature that's required in the Texas Election Code. You read me the section. Is that right?
>
> A: That's right.
>
> Q: What's the ink signature on the DPS's physical forms used for as far as voter registration?
>
> A: I don't know. I don't know if it's used for anything. Once they've applied in person at the office, they've signed it electronically.
>
> * * *
>
> Q: On the . . . driver's license forms . . . it says, "By providing my electronic signature, I understand the personal information on my application form and my electronic signature will be used for submitting my voter registration application to the Secretary of State's Office." Correct?
>
> A: That's what it says.
>
> Q. Okay. And so that's indicating to the prospective voter that the electronic signature is what's used as the signature that's compliant with the Texas Election Code?
>
> A: The physical signature that's electronically captured, yes.

---

[18]*See* docket no. 77, appx. 117, admission no. 26 (Defendants admit "that the *information* DPS transmits to SOS about each applicant for voter registration includes a *digital image of the applicant's signature*"); appx. 118, admission nos. 10, 11 (Defendants admit "that individuals are not registered to vote in connection with their interactions with DPS unless they submit an *image of their signature*, either by submitting a signed application by mail, or providing an *electronic image* of their physical signature in person at a DPS location") (emphasis added).

Q: Okay. Back to your point about the online transactions not containing a signature, the DPS does use the prior provided electronic signature that – for the driver's license that they – the customer used – provided the last time they were in person. Correct?

A: Presumably, yes.

Q: The same goes for the mail-in change of address transaction – are you looking at your driver's license there?

A: Yeah. Because this one was renewed online, and so I guess that I wrote that signature at their signature capture device quite a while ago. . . .

Q: For the mail-in change of address form that . . . DPS receives that has the voter registration question, there is not an electronic signature or a – use your phrase – the physical signature provided on a keypad provided for that change of address interaction. Correct?

A: No. There's a physical signature on the – on the address change application.

Q: Right. But the information that gets sent on to the voter registrars through the Secretary of State's Office is the data that's pulled from that form and then the electronic signature that was previously provided by the customer in person at a DPS office?

A: That's my understanding, yes.

Q: Well, is that the Secretary of State's understanding?

A: That is the Secretary of State's understanding. You bet.

Docket no. 94-11, appx. 39, 42, deposition of K. Ingram, at 50:1-11; 95:14-97:14.

Sheri Gipson with DPS also testified:

Q: So the signature that is sent for an in-person transaction where someone answers "yes" to the voter registration question and – and similarly when someone changes their address

– excuse me – address via the mail, the signature that's sent for both of those voter registration applications, that's the electronic signature; is that right?

A: That is correct.

Q: And that's sent to the Secretary of State?

A: That is correct.

Q: Okay. The ink signature is never sent to the Secretary of State, correct?

A: That is correct.

* * *

Q: Does anyone go through and compare these two?

A: Not typically, no. . . .

* * *

Q: Okay. So then the mail-in signatures are never compared [with the stored electronic signatures]. . . .

A: During the routine process, it would never be compared . . . . When I say "routine process," what I'm talking about is the individual that's processing that mail renewal application, they would never compare that signature.

Docket no. 77, appx. 69, deposition of S. Gipson, at 203:19-204:7; appx. 79 at 234:25-235:1; 236:19-237:9.

Because preexisting electronic signatures, rather than signatures on paper, are used for paper (in-person and mail-in) renewal and change of address transactions, it would seem logical that preexisting electronic signatures would be used for paperless (online) transactions. Yet Defendants claim that, under Texas law, renewal and change of address transactions performed online require a signature on paper for voter registration purposes. As Mr. Ingram testified:

Q: So in that same way, the online transaction could utilize the previously provided electronic signature that was provided in person by the customer for the voter registration application form that gets to the voter registrar in the same way that the change of address mail-in occurs?

A: It could if the law allowed it, but the law doesn't allow it, so it can't.

Q: What portion of the [Texas] law doesn't allow it?

A: 13.002(b).

Docket no. 94-11, deposition of K. Ingram, at 97:15-24; docket no. 77, appx. 42. Because Defendants assert that Texas law requires a signature on paper, and a signature on paper during a paperless transaction is not possible, Defendants essentially claim they should be excused from compliance with the NVRA when it comes to online renewal and change of address transactions.[19]

Prior to 2013, a motor voter who engaged in an online/paperless transaction for a driver's license renewal or change of address would provide the same in-depth identifying information required for an in-person or mail-in transaction, but when reaching the question of whether he would like to register to vote or update his voter information, checking the "yes" box would automatically default to "no." Thus, while the user may have been led to believe that his "yes" answer would result in updating his voter information, and there was the appearance of compliance with the NVRA, there was never an intent on the part of DPS or SOS to actually update the voter registration information. Thus, the answer to the question regarding voter

[19]As Ms. Gipson explained, for online transactions, Texas has decided that a previously captured electronic signature is sufficient for driver's license purposes, but they've refused to accept the same electronic signature for voter registration purposes. Docket no. 77, appx. 70, deposition of S. Gipson, at 215:21-216:7.

registration was completely meaningless. SOS was aware of the NVRA requirements. SOS was also aware that the online voter registration question, programmed to automatically default to "no," was completely meaningless.[20] As Mr. Ingram testified:

> Q: Why is there a voter registration question on the online DPS transaction – application? Excuse me.
>
> A: Well, I imagine it's because of Section 5 of the National Voter Registration Act of 1993.
>
> Q: Could you elaborate on that a little bit?
>
> A: Sure. The National Voter Registration Act of 1993 required that motor vehicle agencies, in our case the DPS, whenever a person has a driver's license transaction – driver's license transaction, that they should simultaneously offer the right – the ability to update their voter registration or register to vote for the first time. That's why the NVRA is called the Motor Voter law.
>
> * * *
>
> Q: Okay. So in – back in 2012, the Secretary of State's office was aware that the answer to the "do you want to register to vote" question online was defaulting to no. Is that correct?
>
> A: Right.
>
> Q: Was there any – any discussion at that point with the Department of Public Safety to – to make that change?

---

[20]Or worse, it could have led to voter registration data being purged. Legislative history suggests that a key concern when enacting the NVRA was abuse of the purging efforts, so Congress specifically prevented states from removing voters from the rolls for failure to vote or failure to respond to a change-of-address notification. *See* H.R. Rep. No. 103-9, at 16 (1993), reprinted in 1993 U.S.C.C.A.N. 105, 120.

A: Not that I recall.

Docket no. 77, appx. 40-41, deposition of K. Ingram at 62:4-17; 84:24-85:8.

As explained in Mr. Ingram's deposition, the automatic default to "no" for voter registration was the subject of a 2012 complaint by an unidentified motor voter. Docket no. 77, appx. 41, deposition of K. Ingram at 83:15-85:3. SOS responded: "That is something we can discuss with DPS in the future." Docket no. 77, appx. 41, deposition of K. Ingram at 84:16-18. Mr. Ingram did not recall any subsequent discussions. After some passage of time, DPS did remove the automatic default to "no." Docket no. 77, appx. 41, deposition of K. Ingram at 82:7-13.

Thereafter, until February 27, 2016, Step 5 of the online renewal and change of address interface was changed to prompt the applicant to select "yes" or "no" beneath the statement "I want to register to vote." It no longer defaulted to "no," but selecting "yes" did not provide a simultaneous voter application. Instead, it gave the user a link to the SOS voter registration website for a completely separate application process. Docket no. 77, appx. 118, admission no. 7.

After February 27, 2016, Step 5 of the online renewal and change of address interface was changed to prompt the applicant to select "yes" or "no" to answer the question "Do you want to request a voter application?" Docket no. 77, appx. 118, admission 8, 9. While the online process currently accepts a "yes" answer to the voter application question, the transaction still ends there. The user is still not provided a simultaneous application for voter registration purposes. Instead, when a user responds with a "yes" answer to the voter application question, the user is simply given a website link to the SOS office.[21] *See* Stipulation no. 10, p. 5, *supra*. If the user goes to the

[21]*See* Docket no. 77, appx. 45, deposition of K. Ingram at 182:5-10 ("When they select yes to voter reg online, they are merely presented with a link and has no indication of whether or not they actually registered to vote").

SOS website, he must request and fill out a completely separate voter registration application as if there had been no DPS transaction at all.[22] For an in-county change of address, SOS will handle the transaction but it's still a completely separate process from the DPS transaction. For an out-of-county change of address, the application must be retrieved, printed, filled out, and mailed or delivered in person to the county registrar in order to update the voter registration. The application seeks the same information required by DPS for an online driver's license change of address but the motor voter must go through a completely different governmental entity (SOS) with a completely separate application process.[23] Thus, it is indisputable that the online DPS renewal/change of address transaction and SOS voter registration transaction are not simultaneous, but rather entirely separate application procedures conducted through separate agencies.[24] If the motor voter does not take these extra steps – go to the SOS website, request an

---

[22]*See* docket no. 77, appx. 78, deposition of S. Gipson at 136:20-137:21 (the voter registration process "is separate").

[23]*See* Docket no. 94-7, deposition of B. Schonhoff (SOS), at 157:19-158:18 (they would have to fill the same information out twice).

[24]*See* Docket no. 94-7, deposition of B. Schonhoff (SOS), at 159:23-160:11:

Q: Does SOS track information about whether a DPS customer clicks "yes" to the voter registration question on the online application?
A: For the DPS application?
Q: Yes.
A: No, not to my knowledge.
Q: Okay. Does SOS track information about whether a DPS customer using an online diver's license – or filling out an online diver's license application, whether that person clicks through to the SOS website?
A: No to my knowledge.
Q: And why not?
A: It's not our application. It's not our software. It's not our website.

application, print out the application, fill out and sign the application, and then mail or hand deliver it to the country registrar – he will not be registered to vote.

Both DPS and SOS claim they cannot comply with the NVRA and integrate DPS online renewal/change of address with SOS voter registration to provide a simultaneous application because the Texas Election Code requires a signature. Docket no. 94-7, deposition of B. Schonhoff, at 195:11-17; *see also* docket no. 94-11 and docket no. 77, appx. 42, deposition of K. Ingram, at 97:15-24. Yet SOS admits that it uses previously stored electronic signatures for *all* voter registration applications that originate with DPS regardless of whether those applications are paper transactions. As Betsy Schonhoff testified:

> Q: The signature that Secretary of State is currently using for voter registration applications is an electronic signature that is provided when a person goes in person to a DPS office; is that right?
>
> A: When they are – when they are in the application file, you mean?
>
> Q: Yes, the voter registration application.
>
> A: Yes, It's what they have signed on that signature pad. That's my understanding.
>
> Q: Turning your attention to the mail-in change of address. You acknowledge that the Secretary of State does receive voter registration applications from change of address mail-ins that DPS processes; is that correct?
>
> A: That's correct.
>
> Q: Yes.
>
> A: It is my understanding they treat in-person just like – mail just the same as in person.
>
> Q: But the mail-in – correct me if I am wrong – the mail-in address to the application for update with DPS, the signature that's on that form is not extracted and somehow the

Secretary of State gets access to it; is that correct?

A: That's my understanding.

Q: . . . It is your understanding that the current law requires a signature for the voter registration application. Do I have that right?

A: Yes.

Q: The mail-in forms that you all are getting information from, from DPS, uses the prior provided electronic signature from that customer; is that right?

A: That's my understanding.

Docket no. 94-7, deposition of B. Schonhoff, at 195:18-196:25.

Defendants also stipulate that DPS uses electronic signatures for *all* online driver's license renewal or change of address transactions. Docket no. 94, Stipulation 11 ("The signature that appears on the license generated as a result of a customer's online driver's license renewal or change of address transaction is an image of the applicant's physical signature, electronically captured during the applicant's most recent in-person transaction in a DPS field office (On the DL-14A and DL-43 forms this is referred to as the applicant's 'electronic signature')"). Defendants admit that they even use electronic signatures for driver's license transactions conducted over the telephone. *See* docket no. 94-12, deposition of S. Gipson, at 175:2-23 ("Telephone transactions are handled in the same manner as an online transaction . . . Q: So when a customer renews a driver's license on – over the telephone, does DPS use the signature that was previously on file to – to put on the customer's renewed driver's license? A: Yes.").

Defendants admit that the personal information required for authenticating online transactions is equal to or even more rigorous than the identifying information used for in-person

and mail-in transactions.[25] They also admit there are no technological barriers to simultaneous online transactions. Again, Ms. Schonhoff testified:

Q: . . . If they send – DPS collects and sends to you, the Secretary of State's office, all of the information they currently send to you for in-person transactions where the individual checks "yes," I want to register to vote, they send you all of that same information, the same data points, the same electronic signature, the TEAM system on your end could process it in the same way that it currently processes the information that comes for in-person transactions at DPS?

A: From a technical standpoint?

Q: Yes.

A: That's correct.

Docket no. 94-7, deposition of B. Schonhoff, at 222:9-22.

And Mr. Ingram also testified:

Q. Well . . . going back to the mail-in change of address with DPS, that information goes on to the Secretary of State. If someone chooses to register to vote, that signature is retrieved from DLS and sent on to the Secretary of State. Right?

---

[25]*See* docket nos. 94-8 and 94-12, deposition of S. Gipson (DPS), at 237:16-20 (Q: How does DPS go about verifying the information submitted online for the online change of address or renewal form? A: Again, the only verification that's done there is their log-in credentials); 234:2-9 ("They're ... well, the only thing that they're changing is their address. But they're – they're verifying who they are through the authentication process that occurs up front by providing key pieces of data, which is their . . . name, the driver-license number, date of birth, *the audit number* that's on the card they currently hold, and the last four of their Social.") (emphasis added); 224:12-14 (Q: What about an audit number, is that requested on paper forms? A: No, it's not.). *See also* docket no. 94-9, deposition of E. Hutchins, at 28:4-25; 30:4-31:16; 33:8-34:1 (authentication of users on DPS's online process for driver's license renewal and change of address is done in real-time). *Compare* docket no. 93-8 (in-person); 93-9 (mail-in); and 93-10 (online).

A: It's retrieved from wherever they keep it, yes.

Q: Okay. And, presumably, that same signature could be sent on if the person answered yes to the voter registration question online?

A: If it was legal to do so. I've already told you I think that's technically possible. You bet.

Q: Okay. And –

A: And I don't think it would cost a lot of money.

* * *

Q: But the Secretary of State does know that DPS is able to pull the proper signature to send on for voter registration purposes to the Secretary of State for mail-in change of address forms?

A: I'm not arguing with you that this is not possible. That is not my argument at all. My argument is exactly to the contrary. This is a very possible thing to do what you're saying if it was legal, and it's not legal . . . So I'm not contesting the logistics of it. We can agree that it's a possible thing to do.

Docket no. 77, appx. 45, deposition of K. Ingram at 184:12-185:1; 186:5-16. *See also* docket no. 94-9, deposition of E. Hutchins, at 99:22-100:2; docket no. 94-10, deposition of J. Crawford, at 142:6-18; 143:12-144:21 (DLS could send all the information it currently obtains to the Secretary of State's office, and "it could also send the previously provided electronic signature from that customer, just like it does with a mail-in change of address").[26] While feasible, Defendants refuse

---

[26]When motor voters submit a mail-in a change of address form, a DPS employee manually inputs all of the responses into the DLS via computer, including the response to the question of whether he or she would like to register to vote (docket no. 77, appx. 120, RFA 23) and the stored electronic signature is used. Thus, there is no real distinction in processing of online transactions and mail-in transactions other than the physical signature on the mail-in form,

to use the voter information and technology currently available because they claim the Texas Election Code does not allow the use of previously captured electronic signatures for online transactions – even though they already use them for mail-in and in-person transactions. Plaintiffs disagree with Defendants' legal argument and assert that because SOS uses previously captured electronic signatures for voter registration purposes in all other instances, there is no reason why Defendants cannot use those same electronic signatures for online transactions.

IV.

Overview of the NVRA

The NVRA was enacted in 1993 pursuant to Congress's constitutional authority under the Elections clause to "make or alter regulations" which have an effect upon federal elections. U.S. CONST. art. 1, § 4, cl. 1. Specifically, Congress found that –

(1) the right of citizens of the United States to vote is a fundamental right;

(2) it is the duty of the Federal, State, and local governments to promote the exercise of that right; and

(3) discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities.

52 U.S.C. § 20501(a)(1)-(3).

The stated purposes of the Act are –

(1) to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office;

---

which is not compared with the electronic signature, not used for DPS purposes, and not forwarded to SOS for voter registration purposes.

(2) to make it possible for Federal, State, and local governments to implement this chapter in a manner that enhances the participation of eligible citizens as voters in elections for Federal office;

(3) to protect the integrity of the electoral process; and

(4) to ensure that accurate and current voter registration rolls are maintained.

52 U.S.C. § 20501(b)(1)-(4).

Based on these findings and for these stated purposes, Congress imposed national procedures for voter registration for elections for federal office as follows:

(a) In general

Except as provided in subsection (b), notwithstanding any other Federal or State law, in addition to any other method of voter registration provided for under State law, each State shall establish procedures to register to vote in elections for Federal office –

(1) by application made *simultaneously* with an application for a motor vehicle driver's license pursuant to section 20504 of this title;

(2) by mail application pursuant to section 20505 of this title; and

(3) by application in person –

(A) at the appropriate registration site designated with respect to the residence of the applicant in accordance with State law; and

(B) at a Federal, State, or nongovernmental office designated under section 20506 of this title.

52 U.S.C. § 20503 (emphasis added).

Section 20504 specifically describes the requirements for a simultaneous application for voter registration and motor vehicle driver's license:

(a) In general

(1) Each State motor vehicle driver's license application (*including any renewal application*) submitted to the appropriate State motor vehicle authority under State law *shall serve as an application for voter registration* with respect to elections for Federal office unless the applicant fails to sign the voter registration application.

(2) An application for voter registration submitted under paragraph (1) shall be considered as updating any previous voter registration by the applicant.

* * *

(c) Forms and procedures

(1) Each State shall include a voter registration application form for elections for Federal office *as part of* an application for a State motor vehicle driver's license –

(2) The voter registration application *portion* of an application for a State motor vehicle driver's license –

(A) *may not require any information that duplicates information required in the driver's license portion of the form* (other than a second signature or other information necessary under subparagraph (C));

(B) may require only the minimum amount of information necessary to –

(i) prevent duplicate voter registrations; and

(ii) enable State election officials to assess the eligibility of the applicant and to administer voter registration and other parts of the election process;

(C) shall include a statement that –

(i) states each eligibility requirement (including citizenship);

(ii) contains an attestation that the applicant meets each such requirement; and

(iii) requires the signature of the applicant, under penalty of perjury;

* * *

(d) Change of address

Any change of address form submitted in accordance with State law for purposes of a State motor vehicle driver's license *shall serve as notification of change of address for voter registration* with respect to elections for Federal office for the registrant involved unless the registrant states on the form that the change of address is not for voter registration purposes.

52 U.S.C. § 20504 (emphasis added).

Section 20506(a)(5)(C) further states that "A person who provides service . . . shall not . . . "take any action the purpose or effect of which is to discourage the applicant from registering to vote."

And finally, Section 20510 provides civil enforcement by the Attorney General and a private right of action for any person "who is aggrieved by a violation of this chapter," 52 U.S.C. § 20510(a)-(b), and the "rights and remedies . . . are in addition to all other rights and remedies provided by law," 52 U.S.C. § 20510(d).

The notice provision in § 20510(b) further states:

(1) A person who is aggrieved by a violation of this chapter may provide written notice of the violation to the chief election officials of the State involved.

(2) If the violation is not corrected within 90 days after receipt of a notice under paragraph (1), or within 20 days after receipt of the notice if the violation occurred within 120 before the date of an election for Federal office, the aggrieved person may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect

to the violation.

(3) If the violation occurred within 30 days before the date of an election for Federal office, the aggrieved person need not provide notice to the chief election official of the State under paragraph (1) before bringing a civil action under paragraph (2).

52 U.S.C. § 20510(b)(2)-(3).

V.

Analysis

The Court will first address the issues that Defendants have raised in their defense, and will then address the merits of Plaintiffs' case.

A. Statutory standing/notice

Defendants claim that Plaintiffs lack statutory standing for failure to comply with the notice provision in the NVRA, 52 U.S.C. § 20510. On May 27, 2015, Plaintiffs' counsel sent a notice letter on behalf of Benjamin Hernandez and others explaining in detail the applicable law, the NVRA violation made the basis of this lawsuit, and why the complainants believed their rights were being violated. Docket no. 77, appx. 2. On October 23, 2015, Plaintiffs' counsel sent a supplemental notice letter on behalf of Jarrod Stringer, explaining how the continuing violation affected him and urging correction and compliance. Docket no. 77, appx. 23. On November 18, 2015, a second supplemental notice letter was sent on behalf of Dr. Woods, explaining his experience and urging compliance with NVRA mandates and correction of the continuing violations with online transactions. Docket no. 77, appx. 26. Defendants refer to the letters as "purported notice" and claim that Plaintiffs "have not complied with the NVRA's mandatory notice provision." Docket no. 82, pp. 2, 11. But Defendants do not explain why the letters should be considered ineffective for notice purposes. The statute merely requires that "a person who is

aggrieved by a violation of this chapter may provide written notice of the violation." 52 U.S.C. § 20510(b)(1). This requirement has been satisfied.

In response to the notice letters, the parties exchanged several written communications over a six month period, met in person, and attempted to work out the non-compliance issues raised in the notice letters.[27] Plaintiffs did ultimately get registered to vote, but Defendants disagreed with Plaintiffs about what the NVRA requires and refused to take the steps that Plaintiffs contend are required by the NVRA to cure the underlying violations. Plaintiffs filed this lawsuit on March 14, 2016, more than 90 days after receipt of notice and an opportunity to correct the violations. Docket no. 1.[28]

Defendants rely on *Scott v. Schedler*, 771 F.3d 831 (5th Cir. 2014), for the proposition that they cannot be sued if the aggrieved person is registered to vote within 90 days after notice of a violation.[29] Neither the NVRA nor the holding in *Scott* supports this broad proposition, and Defendants' argument ignores the underlying violations that occurred when Plaintiffs were not provided simultaneous voter registration applications as required by the NVRA. In the *Scott* case, the individual plaintiff, Luther Scott, Jr., never sent a notice letter. The NAACP sent a notice letter to the Louisiana SOS, but never mentioned Scott. On appeal, Scott admitted that he himself did not provide notice but claimed notice was not required from him personally because the NAACP provided notice. Without reaching the merits of Scott's claim, the Fifth Circuit held that

---

[27]Docket no. 77, appx. 99; admission no. 23.

[28]More than two years has now passed. The online process has still not changed and Defendants have indicated a refusal to make any changes.

[29]Docket no. 82, p. 2 ("Plaintiffs lack statutory standing because it is undisputed that – following their purported 'notice' letters to the State – Defendants offered their assistance in confirming each Plaintiffs' voter registration and assisting any Plaintiff that wanted to update his information.").

"Scott's failure to provide notice is fatal to his suit." *Scott*, 771 F.3d at 836.

Plaintiffs in this case did not fail to provide notice and Defendants have not corrected the violations made the basis of Plaintiffs' complaint. Defendants' broad assertion – that offering registration assistance after receiving notice excuses the prior/ongoing violation, strips the plaintiff of standing, and precludes suit regardless of the nature of the violation – ignores the mandates of the NVRA, the facts and holding in the *Scott* case, and the facts and underlying violations in this case.[30] Plaintiffs have complied with the statutory notice requirements and have standing to pursue their claims under the NVRA.[31]

---

[30]In the *Scott* case, the individual plaintiff (who was intermittently homeless) complained that he was not given a voter registration form when he visited the Louisiana Department of Children and Family Services (LCFS) in person. 771 F.3d at 833. Scott did not give written notice and his claim was dismissed on that basis alone. *Id.* ("We dismiss Scott's claim on standing and notice grounds."). The LCFS did try to provide Mr. Scott with voter registration forms in an attempt to cure the alleged violation which the Fifth Circuit noted, in *dicta*, was the sort of response that pre-litigation notice was meant to encourage. *Id.* at 836. At the same time, the Fifth Circuit considered the NAACP's claims which alleged violations far broader than the narrow focus of Scott's individual claim and which the defendants had failed to cure after receiving notice. In this case, Plaintiffs have complained that they were deprived of their statutory right to a *simultaneous* voter registration application during their online transactions with Texas DPS. In other words, Defendants failed to treat their online driver's license applications as simultaneous voter registration applications and required them to subsequently submit duplicate information for voter registration that was separate and apart from information submitted during their driver's license transactions. *See* docket no. 1. Defendants were given pre-litigation notice, but the violations in issue – which are rooted in the failure to provide *simultaneous* voter registration applications during online transactions – have not been cured and Defendants have not demonstrated a willingness to cure the violations. *See* Scott, 771 F.3d at 836 (discussing futility argument when there is no demonstrated desire to comply with the NVRA).

[31]Defendants also cite *Georgia State Conference v. Kemp*, 841 F. Supp. 2d 1320 (N.D. Ga. 2012) for the proposition that "attempt[ing] to comply" with the relevant NVRA provisions after receiving notice, if "more than an empty gesture," precludes litigation. Docket no. 88, pp. 6-7. The violation in *Kemp* was the systemic failure to provide voter registration to persons seeking public assistance. Simultaneous voter registration was honored for persons obtaining a hunting, fishing, or trapping license, but not for persons seeking public assistance benefits. The court found that the plaintiffs had stated a viable claim. Moreover, the court found all plaintiffs – with the exception of Mr. Murphy – had complied with the notice provision. "Murphy's particular situation was not made known to the defendants until they were served with the amended

B. Article III standing/mootness

To establish Article III standing, a plaintiff must show an "injury in fact" that is concrete, particularized, and actual or imminent, not conjectural or hypothetical; that the injury is "fairly traceable" to the challenged conduct of the defendant; and that it is likely, not merely speculative, that the injury can be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Friends of the Earth, Inc. v. Laidlaw Environmental Services*, 528 U.S. 167, 180-81 (2000). Here, Plaintiffs were deprived of their individual right to simultaneous voter registration applications at the time they engaged in the online DPS transactions to change their driver's licenses. Plaintiffs would have been properly registered to vote in time for the following election if Defendants had complied with the NVRA. The violation itself and the resulting disenfranchisement is fairly traceable to Defendants' noncompliance with the NVRA. Plaintiffs have articulated and shown an individualized dispute, rather than a generalized complaint. Court-ordered compliance with the NVRA would prevent repetition of the same injury to Plaintiffs and others.

Defendants claim that their offer of assistance in updating Plaintiffs' voter information

---

complaint." 841 F. Supp. 2d at 1335. Thus, Murphy did not have standing. The court did note that Georgia attempted to comply "with regard to Mr. Murphy" but that was not the basis for dismissal. Instead, Mr. Murphy's claim was dismissed for failing to comply with the notice requirement. *Id.* at 1335-36. The court refused to dismiss the remaining claims because the other plaintiffs did provide notice, their claims were much broader, and Georgia's "efforts" to change its practices were insufficient to render the controversy moot. *Id.* at 1338-39. In this case, Plaintiffs have satisfied the notice requirement and Defendants have refused to modify their practices. The NVRA plainly states that a violation must be "corrected," not just attempted. 52 U.S.C. § 20510(b)(2). In this case, Plaintiffs were *subsequently* provided voter registration applications, but they were not provided *simultaneous* applications as required by the NVRA. The failure to provide Texans with simultaneous applications during online DPS transactions still persists. The State has refused to correct the violations made the basis of Plaintiffs' complaint and, based on the deposition testimony of SOS and DPS officials, they have no plans to correct the violations being asserted herein.

and/or confirming their registration status after the violation renders this controversy moot. But Defendants were simply providing the assistance that they are required by law to provide to voters. *See* 52 U.S.C. § 20506 (a)(4)(A),(6)(C) (A voter registration agency shall provide assistance to each applicant in completing voter registration forms unless the applicant refuses such assistance). And compliance with one provision of the law does not render moot violations of other provisions of the law. The underlying violations that form the basis of Plaintiffs' complaint have not been corrected and continue unabated. The DPS online renewal and change of address transactions do not serve as "simultaneous" applications for voter registration, in violation of 52 U.S.C. §§ 20503(a)(1), 20504(a)(1); the separate SOS voter registration process is not "part of" the DPS online driver's license transaction, as required by 52 U.S.C. § 20504(c)(1); information required by SOS for a separate voter registration transaction "duplicates" the information required by DPS for an online renewal or change of address transaction, in violation of 52 U.S.C. § 20504(c)(2)(A); and the online change of address transaction does not "serve as notification of change of address for voter registration," as required by 52 U.S.C. § 20504(d). These are the violations that form the basis of Plaintiffs' complaint and these violations have not been corrected despite notice and the ability to do so.

Defendants' mootness argument also overlooks the two-fold nature of Plaintiffs' cause of action. Plaintiffs contend that the State's online process itself is unlawful under the NVRA; thus, they allege not only disenfranchisement, but also a violation of the statutory right to a simultaneous application for both voter registration and driver's license renewal and change of address. Defendants' assertion – that post-notice voter registration assistance effectively cures any NVRA violation – ignores the clear mandates of the NVRA. The lack of voter registration and resulting disenfranchisement were merely the symptoms of the underlying violation, and

treating the symptoms does not cure the underlying violation. Thus, the controversy is not moot just because Plaintiffs were ultimately registered to vote.

Defendants also argue that Plaintiffs' injuries are not redressable and their claims are moot because they were disenfranchised only in past elections and the "capable of repetition" exception to mootness does not apply because there is not a reasonable expectation that Plaintiffs will be disenfranchised in this manner in the future. Voting-related lawsuits do not become moot just because an election has passed. *Ctr. for Indiv. Freedom v. Carmouche*, 449 F.3d 655, 662 (5th Cir. 2006) ("Controversy surrounding elections laws . . . is one of the paradigmatic circumstances in which the Supreme Court has found that full litigation can never be completed before the precise controversy (a particular election) has run its course."). Because this controversy is not moot, the case does not necessarily turn on the "capable of repetition" exception to mootness. But this is exactly the type of violation that is capable of repetition yet evading review. *See Spencer v. Kemna*, 523 U.S. 1, 17-18 (1998) (the doctrine applies when the challenged action is in its duration too short to be fully litigated prior to cessation or expiration and there is a reasonable expectation that the same complaining party will be subject to the same action again). Defendants have refused to change their online process to allow simultaneous voter registration applications. Thus, if these Plaintiffs (or others) were to relocate tomorrow, and engage in an online DPS transaction to change their address, they would be deprived of their right to simultaneously change their voter registration information. And unless these Plaintiffs (or others) took further steps on their own, which the NVRA protects *against*, they would be disenfranchised.[32] Thus, whether the focus is on these particular Plaintiffs or others, the same

[32]The mandates of the NVRA dictate exactly the opposite of what Defendants want Texans to do to personally ensure they are registered to vote: engage in a second transaction that requires a separate application with duplicate information and the burden of downloading, printing, and mailing or personal delivery. Congress lifted these burdens to make voter

injury is likely to occur again. *See Carmouche*, 449 F.3d at 662 (citing *Storer v. Brown*, 417 U.S. 926 (1974) and *Dunn v. Blumstein*, 403 U.S. 330 (1972) for the proposition that a case is not moot if other individuals will be affected by the action being challenged). When a controversy is truly moot, there is nothing left to remedy. In this case, Defendants' noncompliance with the NVRA has continued unabated, and although resulting disenfranchisement may cease prior to a remedy, the challenged action continues.

Defendants further argue that Plaintiffs have failed to establish Article III standing because their injuries stem from their own failure to take the extra steps to print, complete, and mail paper voter registration forms through SOS as instructed in their online driver's license transactions with DPS. The irony of this argument does not go unnoticed. In sum, Defendants claim that Plaintiffs and others should never have Article III standing to sue for the State's noncompliance with the NVRA if they do not follow the State registration process that allegedly violates the NVRA. As Plaintiffs explained in their deposition testimony, they believed their change of address transaction for driver's license purposes also served to update their voter registration. They showed up at the polls to vote in the following election only to discover that their registration had not been updated. Even if they did not complete the SOS registration process (which they believed they had done), the failure to complete the extra steps put in place by the State does not strip them of Article III standing to pursue a claim under federal law. Nothing in the NVRA requires Plaintiffs or others to exhaust a state process before pursuing a federal claim – especially when the state process itself is alleged to violate the federal law being enforced.

---

registration easier, yet Defendants ignore the NVRA mandate and impose requirements which result in disenfranchisement if voters do not jump through all the hoops.

Defendants rely upon the holding of the Fifth Circuit in *Westfall v. Miller,* 77 F.3d 868 (5th Cir. 1996). In that case, the court found a lack of standing because the plaintiff was challenging a federal requirement that he obtain law enforcement certification before being permitted to purchase a machine gun and he unsuccessfully sought certification from some, but not all, of the officials who could provide it. *Id.* at 871. *Westfall* is distinguishable because the plaintiff therein was challenging a federal regulation that required a specific process. In this case, Plaintiffs are not challenging the NVRA; they are seeking to enforce it. And the state process that Plaintiffs are challenging is not a federal process that the NVRA requires. Instead, the NVRA mandates *against* the state process. Again, Defendants' argument that Plaintiffs are responsible for their own injury because they failed to complete the State's registration process overlooks Plaintiffs' claim that the State's registration process is itself unlawful, and thus they allege not only disenfranchisement, but also a violation of their federal right to "[s]imultaneous application for voter registration and . . . driver's license[.]" 52 U.S.C. § 20504. This statutory injury remains cognizable regardless of whether Plaintiffs completed the state registration process that they challenge under federal law. *See Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1549 (2016), *as revised* (May 24, 2016) ("Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before."); *Wendt v. 24 Hour Fitness USA, Inc.*, 821 F.3d 547, 552 (5th Cir. 2016) ("[t]he actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing."); *ACORN v. Fowler*, 178 F.3d 350, 363 (5th Cir. 1999) (the NVRA's private right of action "extend[s] standing under the Act to the maximum allowable under the Constitution"); *Arcia v. Florida Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014) ("Even though they were ultimately not prevented from voting, an injury like theirs [being erroneously identified as a non-citizen and removed from the voter rolls] is sufficient to confer standing.");

*Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351 (11th Cir. 2009) ("A plaintiff need not have the franchise wholly denied to suffer injury.").

C. Dr. Woods' standing

Defendants also claim that Dr. Woods does not have standing individually to pursue a claim under the NVRA because he was disenfranchised only in the 2015 election and the ballot did not include any federal contests.[33] This standing argument against Dr. Woods individually may present a closer question than the standing challenges against Plaintiffs collectively. In *Broyles v. Texas*, 618 F. Supp. 2d 661, 690-92 (S.D. Tex. 2009) the district court found the NVRA inapplicable because the plaintiffs therein complained about irregularities in a municipal special purpose election. The plaintiffs in *Broyles* did not allege or present "any evidence of registration problems that affected their right to vote in a federal election or on any issue beyond the [municipal] incorporation issue." *Id.* Although the *Broyles* court found that the NVRA did not apply, it did explain that even if the NVRA did apply to municipal registration issues, the plaintiffs therein did not satisfy the prerequisite notice requirement. *Id.* at 691. They waited until after the municipal incorporation vote and then simply filed suit. 618 F. Supp. 2d 691 ("the 'notice' came in the form of a Summons and Original Complaint").

The Court believes that deciding this issue based on whether a subsequent election is state or federal and whether the plaintiff was disenfranchised in whole or in part is inconsistent with traditional notions of standing. First, the NVRA's private right of action "extend[s] standing under the Act to the maximum allowable under the Constitution." *ACORN v. Fowler*, 178 F.3d at 363. Second, the presence of one party with standing is sufficient to satisfy Article III. *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 52 n. 2 (2006); *Texas v. U.S.*,

[33]It is undisputed that both Stringer and Hernandez were disenfranchised in 2014, a federal election year. Thus, although Defendants repeatedly refer to "Plaintiffs" in making this argument, it applies only to Dr. Woods.

787 F.3d 733, 747 (5th Cir. 2015). Third, a threat of impending injury is sufficient to satisfy Article III standing. *See Wendt,* 821 F.3d at 552 ("[t]he actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing"). Here, Plaintiffs have presented undisputed evidence of violations and immediate injury (a failure to provide *simultaneous* applications for voter registration) that occurred *at the time* of their online DPS transactions. They complied with the NVRA pre-litigation notice requirements but Defendants failed to take the necessary steps to cure the statutory violation and come into compliance. The threat of injury to Plaintiffs and others continues because Defendants have refused to alter their practices.

The statutory violation and requisite injury occurred at the moment Dr. Woods was denied a simultaneous voter registration application. This should be sufficient to confer standing. Later disenfranchisement (regardless of the nature of the election) furthered the injury, but the violation and immediate injury had already occurred during the online transaction with DPS. NVRA expressly reminds us that "it is the duty of the Federal, State, and local governments to promote the exercise of [the fundamental right to vote]." 52 U.S.C. § 20501(a)(2). And it is the duty of "Federal, State, and local governments to implement this chapter . . .". 52 U.S.C. § 20501(b)(2). The State of Texas has combined state and federal voter registration; thus, the ability to vote in state and local elections will be affected by any federal violation in the registration process. *See ACORN v. Miller*, 129 F.3d 833, 837 (6th Cir. 1997) (explaining that NVRA registration requirements will affect state and local elections). More importantly, there is nothing in the NVRA stating that a voter must be disenfranchised in a federal election before they can bring an enforcement action. In fact, nothing in the NVRA states that a voter must be disenfranchised at all. *See* 52 U.S.C. § 20510 (b)(1) ("A person who is aggrieved *by a violation of this chapter* . . ."). The courts have recognized organizational plaintiffs' standing under the

NVRA to sue states with unlawful registration procedures and they do not require the organizational members to be disenfranchised. *See, e.g., Scott*, 771 F.3d at 837 (standing conferred because organization expended resources on voter register drives outside public assistance agencies); *Fowler*, 178 F.3d at 360-61 (same). To require more from an individual voter like Dr. Woods who personally went through the process is inconsistent with the plain language of the statute and basic principles of standing.

D. Waiver of immunity

Defendants also assert that Plaintiffs have failed to validly invoke the NVRA's limited waiver of immunity and are not entitled to bring an action under the *Ex parte Young* exception to immunity.

The NVRA imposed voter registration requirements on the states to ensure that all practical barriers that make voter registration more restrictive or inconvenient are removed. More than thirty years later, there are states that still refuse to comply with its mandates. Congress's abrogation of immunity under the NVRA is clear and unequivocal. When a state fails to comply with the Act, the Act authorizes judicial intervention. The Attorney General can seek declaratory or injunctive relief, and the Act establishes a private right of action for individuals aggrieved by a violation who meet the Act's notice requirement. 52 U.S.C. § 20510(a),(b). Defendants admit that they "each play a part in implementing the NVRA in Texas." Docket no. 82, p. 4. SOS is chief election officer, and DPS is a voter registration agency. *Id.* As such, they may be sued in any enforcement action arising from violations. The evidence in this record clearly shows that Plaintiffs met the Act's notice requirement and gave Defendants an opportunity to cure. This private enforcement action is now appropriately before the Court. Moreover, the Supreme Court has long recognized Equal Protection claims of this nature against state officials tasked with carrying out laws that affect the rights of voters. *Crawford v. Marion*

*County*, 553 U.S. 181 (2008) (Equal Protection claim against the Indiana Secretary of State and others challenging state voter ID law); *Burdick v. Takishi*, 504 U.S. 428 (1992) (voter's Equal Protection claim against Hawaii Director of Elections and others challenging state write-in voting prohibition).

E. Renewal v. change of address

Defendants also allege that Plaintiffs' challenge should be restricted to online change of address transactions, not online renewal transactions, because Plaintiffs' transactions were for a change of address rather than renewal. However, this argument seems to go to the underlying reason for the transaction, rather than the lawfulness of the process being challenged. Regardless of whether a Texan seeks to change his address or renew his driver's license online, the process is the same and the outcome is the same. DPS uses the same website (Texas.gov) and the same "Driver's License Renewal and Change of Address" system, which authenticates users, detects eligibility, and processes data in the same manner for both renewals and changes of address. Docket no. 94-9, deposition of E. Hutchins, at 30:4-31:16; 33:8-34:1; docket no. 94-12, deposition of S. Gipson, at 37:10-16 (the process is combined online, "it's one system interface"); docket no. 93, website links and exh. A-1, A-2, A-10 (DPS/Driver's License Division online process for driver's license renewal and/or change of address). Neither type of transaction, using the same online process, allows simultaneous applications for voter registration as required by the NVRA. Docket no. 94-12, deposition of S. Gipson, at 37:10-40:5. Given that Defendants have chosen to combine the online process and use the same system for both change of address and renewal transactions, a change in programming to allow online simultaneous voter registration would mean a change for both types of transactions. Likewise, an NVRA violation in online change of address transactions imputes a violation in online renewal transactions because Defendants admit that the online process (which encompasses both) does

not allow simultaneous voter registration. Having combined the online process for both types of transactions, both types of transactions fall within the same mandates under 52 U.S.C. §§ 20503(a)(1) and 20504 and will be affected by any relief granted herein. *Accord Miller*, 129 F.3d at 837 (the State chose, as a matter of convenience, to implement one voter registration process for federal, state, and local elections; thus, the registration obligations imposed by the Act affect registration procedures associated with state and local elections). For these reasons, the issue to be examined is whether DPS's online process for driver's license renewal and change of address violates the NVRA by failing to allow simultaneous applications for voter registration.

In sum, the jurisdictional challenges and defenses raised in Defendants' motion for summary judgment are virtually identical to those raised in their motion to dismiss, which the Court previously denied. Docket no. 52. Nothing in the law or the record compels a different conclusion at this stage of the proceedings.

F. Merits of the NVRA claims

First, Plaintiffs contend Defendants have violated and continue to violate the NVRA by failing to provide simultaneous applications for voter registration during online driver's license transactions. Second, Plaintiffs contend Defendants have violated and continue to violate the NVRA by requiring motor voters who use the online process to take additional steps to update their voter registration and separately submit information through a different transaction with a different agency that duplicates information required in the driver's license transaction. And third, Plaintiffs allege that Defendants have violated the NVRA by failing to ensure eligible applicants are registered to vote and to transmit voter registration information submitted online to the appropriate State election official within the statutorily required timeframe. Docket no. 1, pp. 15-17.

1. Statutory interpretation

Because the parties disagree on the meaning of some of the applicable provisions in the NVRA, the Court is guided by the governing principles of statutory construction. The first step is to determine whether the statutory text, when considered in context, is plain and unambiguous. If the statutory language is plain, the Court must enforce it according to its terms. *King v. Burwell*, 135 S.Ct. 2480, 2489 (2015) (citing *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010)). "[O]ftentimes the "meaning – or ambiguity – of certain words may only become evident when placed in context." *Id.* (citing *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000)). "So when deciding whether the language is plain, we must read the words 'in their context and with a view to their place in the overall statutory scheme.'" *Id.* (quoting, in part, *Brown & Williamson*, 529 U.S. at 133). "Our duty, after all, is 'to construe statutes, not isolated provisions.'" *Id.* (quoting, in part, *Graham County Soil and Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 290 (2010)). "A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." *King v. Burwell*, 135 S.Ct. at 2492 (quoting *United Sav. Assn. of Tex v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 371 (1988)). The Court cannot interpret a federal statute in a manner that negates its own stated purpose. *See id.* at 2495; *see also New York State Dept. of Social Servs. v. Dublino*, 413 U.S. 405, 419-20 (1973).

2. The NVRA applies to motor voter transactions conducted online

The requirements in the NVRA clearly apply to online transactions (also known as electronic, remote, or internet transactions). There is nothing in the statute that expressly or impliedly excludes online transactions; instead, the plain language of the NVRA indicates that it applies to all transactions. *See* 52 U.S.C. §§ 20504 (a)(1) ("*Each* State motor vehicle driver's

license application . . .") and (d) ("*any* change of address form . . .") (emphasis added). Numerous courts have determined that the NVRA applies to online or remote transactions with the same force as it applies to in person and mail transactions. *See, e.g.*, *Action NC v. Strach*, 216 F.Supp. 3d 597, 622-23 (M.D.N.C. 2016) ("[the] words 'each' and 'any' as used in NVRA provision requiring that each state motor vehicle driver's license application serve as application for voter registration and that any change of address form submitted shall serve as notification of change of address for voter registration were unambiguous and reflected Congress' intent to make the NVRA applicable to 'each' and 'every' covered transaction, irrespective of whether the transaction occurred remotely or in person"); *Kemp*, 841 F. Supp. 2d at 1331-32 (explaining that the NVRA cannot be read to cover only in-person transactions and Georgia's limited interpretation and implementation that excluded internet transactions conflicted with its acknowledgment that noncompliance likely led to decline in voter registration as more applicants prefer to apply remotely).

Defendants have not argued that the NVRA does not apply to online or remote transactions. In fact, they have admitted that compliance with the NVRA is required for online transactions. *See* docket no. 77, appx. 65, deposition of S. Gipson (DPS), at 94:5-12 (Q: Why does DPS include a voter registration question during the online renewal and change of address portion? A: So it is part of the plan between the Secretary of State and Department of Public Safety in compliance with the voter registration question being combined as part of the application process for a diver license or ID"); 95:5-15 (Q: What requires you to do that? A: ... basically the NVRA and Chapter 20 of the Election Code and Texas Statute.); docket no. 94-8, deposition of S. Gipson at 136:20-23 (Q: Why does DPS require customers to answer that question if they don't even retain the answer? A: The – because we need to offer them the availability of the application); docket no. 94-11, deposition of K. Ingram (SOS), at 62:4-8 (Q:

Why is there a voter registration question on the online DPS transaction – application? . . . A: Well, I imagine it's because of Section 5 of the National Voter Registration Act of 1993. Q: Could you elaborate on that a little bit? A: Sure. The National Voter Registration Act of 1993 required that motor vehicle agencies, in our case the DPS, whenever a person has a driver's license transaction – driver's license transaction, that they should be simultaneously offered the right – the ability to update their voter registration or register to vote for the first time. That's why the NVRA is called the Motor Voter law."). Yet Defendants' compliance with the NVRA falls short when it comes to online transactions. Texans have repeatedly complained about DPS's failure to process voter registration information through its online system, but Defendants still refuse to correct the deficiencies. Thus, rather than furthering the purpose of the NVRA by "establish[ing] procedures that will increase the number of eligible citizens who register to vote,"[34] the State is thwarting the efforts of Texans who wish to register to vote.

3. The "simultaneous application" requirement

Congress was not subtle about requiring DPS, a voter registration agency, to provide a simultaneous application for voter registration. The terms are used more than once in the statute, and its plain meaning is clear and unambiguous. Section 20503, titled "National procedures for voter registration for elections for Federal office," directs that "each State shall establish procedures to register to vote . . . by application made *simultaneously* with an application for a motor vehicle driver's license." 52 U.S.C. § 20503(a)(1). Defendants do not dispute the meaning

[34] 52 U.S.C. § 20501(b)(1)

of "simultaneous," which is defined as "existing or occurring at the same time; exactly coincident,"[35] or "happening or existing at exactly the same time,"[36] or "occurring, operating, or done at the same time."[37]

Section 20504, titled "*Simultaneous* application for voter registration and application for motor vehicle driver's license" explains this requirement as one simultaneous application form that serves dual purposes – driver's license and voter registration. This section, when read in context, not only requires that the applications be simultaneous, but discusses them in terms of a single transaction. Under subsection (a), each State motor vehicle driver's license application "*(including any renewal application)* . . . *shall serve as an application for voter registration*" and "[a]n application for voter registration . . . *shall be considered as updating any previous voter registration by the applicant*." Under subsection (c), "[e]ach State shall include a voter registration application form . . . *as part of* an application for a State motor vehicle driver's license," and the "voter registration application *portion* of an application for a State motor vehicle driver's license . . . may not require any information that duplicates information required in the driver's license *portion* of the form." 52 U.S.C. § 20504(a),(c). Under subsection (d), "[a]ny change of address form" . . . for purposes of a State motor vehicle driver's license *shall serve as notification of change of address for voter registration* . . . unless the registrant states on the form that the change of address is not for voter registration purposes." 52 U.S.C. § 20504(d).

Defendants seem to have a clear understanding of what the statute requires, yet they distort the statutory language in the interpretations they propose. For example, Mr. Ingram with SOS testified that "the NVRA requires a simultaneous opportunity to register to vote." *See*

[35] https://www.merriam-webster.com/dictionary/simultaneous

[36] https://dictionary.cambridge.org/us/dictionary/english/simultaneous

[37] https://en.oxforddictionaries.com/definition/simultaneous

docket no. 77, appx. 40, deposition of K. Ingram, at 63:15-16; 64:24-25; *see also* appx. 113, RFA no. 4 (inserted the word "opportunity" when asked to admit their legal obligations under the NVRA). Defense counsel uses the same "simultaneous opportunity" argument in their briefs. But the NVRA plainly and unequivocally requires DPS, a voter registration agency, to provide a simultaneous application – not merely a "simultaneous opportunity" to go through a second duplicate application process with SOS. "Opportunity" could mean many things, but we do not need to speculate about what it means because the NVRA does not use that term. Likewise, Ms. Gipson testified that DPS "need[s] to offer them the availability of the application." Docket no. 94-8, deposition of S. Gipson, at 136:20-23. But the NVRA requires more than simply making voter registration applications "available." Again, making applications "available" could mean many things but the NVRA does not use that term. The operative terms in the NVRA are much more commanding and specific: it clearly and unequivocally requires a "simultaneous application" with DPS (the voter registration agency), not a mere "opportunity" to go through a wholly separate, non-simultaneous application process with SOS. If the Court were to accept the argument that DPS can simply direct Texans to SOS to obtain, fill out, sign, and mail in or deliver in person a wholly separate voter registration form, the language in the NVRA would be rendered meaningless. Plaintiffs are correct in their assertion that the central fact of this case has never been disputed: when eligible Texans update their driver's licenses online with DPS, they are not provided a simultaneous application to register to vote or update their voter registration information. The NVRA's requirement that DPS, a voter registration agency, provide a simultaneous application for both driver's license and voter registration purposes is plain and unambiguous and the facts in the record confirm that Texans are being deprived of this statutory right. Docket no. 77, appx. 118, admission no. 8 (Defendants admit that now when applicants reach Step 5 of the online process, they are asked "Do you want to request a voter application?");

admission no. 11 (Defendants admit that if an eligible voter checks "yes" under the question "Do you want to request a voter application?," they are not registered to vote . . . unless they submit an image of their signature, either by submitting a signed application *by mail*, or providing an electronic image of their physical signature *in person* at a DPS location) (emphasis added); appx. 121, admission no. 9 (Defendants admit that a "Yes" answer during an online transaction is never entered as a response in the Voter Field for purposes of forwarding the information to SOS); appx. 123, admission nos. 21, 23 (Defendants admit that when an eligible voter who updates his or her driver's license information on the current DPS website responds "yes" under the statement "Request a voter registration application," DPS does not transfer his or her data to SOS); appx. 96, admission no. 8 (Defendants admit that an eligible voter who changes the address on her non-commercial Texas driver's license online must submit a signed voter registration application *in person or by mail* in order for his voter registration information to be updated. The DPS and Texas.gov online interface links such voters to an application they may *print out, sign, and mail*, and also gives such voters the *option to request that a voter registration application be mailed to them*, postage paid, and contains language indicating that the *separate form* must be filled out in order to complete the voter's registration) (emphasis added); appx. 98, admission no. 12 (information voters submit to the DPS change of address online portal relating to voter registration is not transmitted to SOS); *see also* docket no. 77, appx. 33, DPS Voter Inquiry Web Portal (informing the public that online registration is not possible, and persons seeking voter registration must print, sign, and deliver the application to the voter registrar in their county); appx. 133, driver's license renewal and change of address receipt (showing that a separate voter registration application may be requested). Thus, it is clear that Defendants are violating 52 U.S.C. §§ 20503 and 20504 by failing to comply with the simultaneous application requirement.

4. The duplicate information prohibition

To further the simultaneous application requirement, Congress saw fit to prohibit the states from requiring duplicate information. The prohibition against duplicate information is plain and unambiguous, leaving no room for argument as to its meaning. Section 20504(c)(2)(A) clearly states that "[t]he voter registration application portion of an application for a State motor vehicle driver's license may not require any information that duplicates information required in the driver's license portion of the form." This prohibition reinforces the simultaneous application requirement because an application that is truly simultaneous does not require duplication. On the other hand, any process that requires duplication of information is an indication that the voter registration "portion" of an application for a State motor vehicle driver's license is not truly simultaneous. The NVRA does permit states to seek a "minimum amount" of additional information that may be necessary for "State election officials to assess the eligibility of the applicant" for voter registration purposes. 52 § 20504 (c)(2)(B),(C). But the minimum information necessary to verify voter registration eligibility cannot duplicate the information already provided for driver's license purposes. For example, some states do not require citizenship to obtain a driver's license, so those states could include a citizenship question in the voter registration portion of the application without violating the duplicate information prohibition. But Texas DPS requires an applicant to answer a citizenship question for driver's license purposes; thus, another duplicate question about citizenship for voter registration purposes would violate this prohibition.

Defendants' violation of the duplicate information prohibition is indisputable, and has continued unabated. Defendants admit that none of the information in the online application for driver's license renewal or change of address is used for voter registration purposes. At the end of the DPS transaction, a "yes" answer does not mean that the information already provided will

be used for voter registration purposes pursuant to the NVRA. Instead, the DPS transaction ends, none of the information already provided is forwarded to SOS, and the user is directed to SOS for an entirely separate voter registration application that requires the same information already provided to DPS in the driver's license transaction. It is a separate and distinct transaction with a separate office (SOS) which requires a separate and distinct application with duplicate information. Docket no. 77, appx. 96, admission no. 8 (Defendants admit that upon completion of the DPS transaction, a voter must follow the link to SOS and then "request that a voter registration be mailed to them . . . and [the portal] contains language indicating that the separate form must be filled out in order to complete the voter's registration"); appx. 132 (change of address transaction informs users that their DPS transaction does not register them to vote and they must follow link to SOS website where a separate voter application form can be downloaded or requested); appx. 134 (separate voter registration application provided by SOS that must be printed, signed, and mailed); docket no. 93, exh. A-3 (same); exh. A-4 (SOS information page explaining: a) voter registration application forms can be accessed online through SOS (not DPS, the voter registration agency); b) the application can be filled out on the computer, printed, and mailed to the voter registrar in the voter's county of residence; and c) informing voters that they will not be registered until all steps are completed); docket no. 94-12, deposition of S. Gipson, at 218:2-219:16 (explaining that at end of DPS transaction, the customer is directed to SOS if he wants to register to vote or update his voter registration information).

In Texas, DPS requires applicants seeking a renewal and/or change of address to provide several pieces of information, including their name, address, driver's license number, date of birth, and the last four digits of their Social Security number. Docket no. 94-8, deposition of S. Gipson, at 234:2-9; docket no. 94-9, deposition of E. Hutchins, at 25:11-22; docket no. 77, appx. 130. When customers finish their transaction with DPS and then go to SOS to fill out a

completely separate application for voter registration purposes, they must provide the same information : name, address, driver's license number, date of birth, and the last four digits of their Social Security number. Docket no. 77, appx. 134 (voter registration application); docket no. 94-7, deposition of B. Schonhoff, at 157:19-158:18 (both the DPS change of address form and SOS voter registration form ask the person's name, date of birth, and address; applicants would have to fill this information out twice). Requiring motor voters to go to a different agency (SOS) to obtain and fill out a separate application that requires the same information violates the prohibition against duplicate information set forth in 52 U.S.C. § 20504(c).

5. The timely submission requirement

The NVRA also requires that "a completed voter registration portion of an application for a State motor vehicle driver's license accepted at a State motor vehicle authority shall be transmitted to the appropriate State elections official not later than 10 days after the date of acceptance." 52 U.S.C. § 20504(e)(1). The deadline for transmittal is shorter (five days) if the voter registration application is accepted within five days before the last day for registration to vote in an election. 52 U.S.C. § 20504(e)(2). Because the evidence in the record shows that DPS does not provide simultaneous voter registration as part of the online driver's license renewal and change of address process, DPS does not transmit to SOS any voter registration information in connection with such transactions. In fact, it is undisputed that DPS does not even record, and therefore cannot transmit, motor voters' responses to the voter registration question in the online driver's license renewal and change of address application. Docket no. 94-8, deposition of S. Gipson at 136:10-19; docket no. 77, appx. 67, deposition of S. Gipson at 102:10-19:103:16-25; docket no. 94-7, deposition of B. Schonhoff at 159:23-160:3; 220:18-23.

As a voter registration agency, DPS has a statutory duty to provide motor voters with simultaneous voter registration applications *and* transmit the applications to SOS within 10 days after acceptance. DPS admits it does not submit voter registration information to SOS for online transactions conducted by motor voters "[b]ecause [they] have not been advised by the Secretary of State that providing that through the online process is permissible at this point." Docket no. 77, appx. 67, deposition of S. Gipson at 103:16-25. The NVRA's timely submission requirement continues to be violated in every online renewal and change of address transaction.

6. State law must yield to federal law

The facts in the record lead to only one conclusion: DPS, a voter registration agency, does not provide a simultaneous voter registration application to motor voters who engage in online driver's license transactions. Instead, motor voters are simply directed to SOS, which requires them to fill out a completely separate voter registration application with duplicate information, and then print, mail, and/or hand deliver it to the voter registrar. But Defendants have refused to change their practice, claiming that Texas election law does not allow the procedure dictated by the NVRA. This argument is fatally flawed.

Defendants claim that the NVRA incorporates Texas election law, making it subject to state law, and rely on the following provisions:

> (a) In general
>
> (1) *Each State motor vehicle driver's license application (including any renewal application) submitted to the appropriate State motor vehicle authority under State law* shall serve as an application for voter registration . . .
>
> * * *

(d) Change of address

*Any change of address form submitted in accordance with State law for purposes of a State motor vehicle driver's license* shall serve as notification of change of address for voter registration . . .

52 U.S.C. § 20504(a)(1), (d).

These provisions neither incorporate Texas election law nor make it subject thereto. Instead, the plain language of these provisions, when considered in context and with a view to their place in the overall statutory scheme, simply mean that driver's license applications submitted in accordance with state driver's license laws (i.e., the Texas Transportation Code), shall also serve as applications for voter registration purposes. The reference to state law in these provisions cannot be interpreted to mean the NVRA is dictated by the election laws of 50 different states, as it would be contrary to the plain language of the statute, require the Court to take it out of context, and render the NVRA entirely meaningless. The NVRA was enacted under the Elections clause, U.S. Const. Art. I § 4, cl. 1, which gives Congress the broad power to preempt, alter, and supplant state law when it comes to federal voter registration practices. *Arizona v. InterTribal County of Arizona, Inc.*, 570 U.S. 1, 133 S. Ct. 2247, 2253-57 (2013). ("The Clause's substantive scope is broad" and "Elections Clause legislation, so far as it extends and conflicts with the regulations of the State, necessarily supersedes them"). To the extent state voter registration procedures are inconsistent with the NVRA, they are superseded. *Id.* at 2253-54 ("the state law, so far as the conflict extends, ceases to be operative"). On the other hand, the NVRA does not supplant state driver's license laws. Thus, interpreting the provisions in 52 U.S.C. § 20504(a)(1) and (d) to mean that driver's license applications submitted in accordance

with the Texas Transportation Code shall also serve as applications for voter registration purposes is consistent with the purpose of the Act and the entire statutory scheme.

Defendants have consistently argued that DPS, the voter registration agency tasked with carrying out the mandates of the NVRA, cannot provide motor voters with simultaneous driver's license - voter registration applications because Texas election law requires a physical signature. In other words, Defendants claim that a physical signature written by hand is necessary to comply with Texas election law; therefore, although online driver's license transactions are legally valid, a simultaneous voter registration application would be legally invalid. Again, this argument is flawed for several reasons.

First, Texas law cannot be used as an excuse for failing to comply with the NVRA. To the extent it is inconsistent with the NVRA, the Texas Election Code must yield to the NVRA. Moreover, Defendants have simply cherry-picked the provisions they believe justify their continued noncompliance. Defendants believe sections 13.002(b) and 15.021(a) of the Texas Election Code (requiring an application to be "signed") support their position,[38] but they ignore section 20.062 (requiring DPS to use a form and procedure that combines driver's license/ renewal/change of address with voter registration), which does not support their position.[39] Defendants' reliance on Texas election law as an excuse for federal noncompliance is misplaced because it is preempted, altered, and supplanted by the mandates in the NVRA. But even if Texas

[38]Docket no. 94-11, deposition of K. Ingram, at 97:15-24; docket no. 77, appx. 42 (Q: What portion of the law doesn't allow it? A: 13.002(b)).

[39]Section 20.062(a) states: The Department of Public Safety shall prescribe and use a form and procedure that combines the department's application form for a license or card with an officially prescribed voter registration application form. Section 20.062(b) states: The department shall prescribe and use a change of address form and procedure that combines department and voter registration functions. The form must allow a licensee or cardholder to indicate whether the change of address is also to be used for voter registration purposes.

election law was not preempted, there is nothing in the law that precludes the use of electronic signatures.

Second, the NVRA does state that a simultaneous driver's license-voter registration application and any renewal application "requires the signature of the applicant." *See* 52 U.S.C. § 20504(a)(1), (c)(2)(C)(iii). The NVRA's change of address provision is separate, and does not state that a signature is necessary for a simultaneous driver's license-voter registration change of address. 52 U.S.C. § 20504(d). But even in renewal transactions that require a signature, neither the NVRA nor Texas election law defines or limits the type of signature that is required for voter registration renewal or change of address applications, and Defendants cite no authority for the proposition that it must be a physical ink signature written on paper by hand. With twenty-first century technology and legislation such as the Global and National Commerce Act (E-Sign Act) and Uniform Electronic Transactions Act (UETA), electronic signatures are legally recognized and widely used. 15 U.S.C. § 7001 et. seq.; Unif. Electronic Transactions Act, U.L.A. (1999). Under the Uniform Electronic Transactions Act, which has been adopted by Texas and 46 other states, the medium in which a signature is created, presented or retained does not affect its legal significance. *See* UETA § 7; Tex. Bus. & Com. Code Ann. § 322.007(a),(c),(d) (Vernon 2015) (TUETA). As these provisions explain:

> (a) A record or signature may not be denied legal effect or enforceability solely because it is in electronic form.
>
> (c) If a law requires a record to be in writing, an electronic record satisfies the law.
>
> (d) If a law requires a signature, an electronic signature satisfies the law.

Interpreting the signature requirement in the NVRA to include electronic signatures is consistent with the purpose of the Act and the overall statutory scheme. *Accord Kemp*, 208 F. Supp. 3d at

1335-36 (Georgia SOS argued that the "records" requirement in the NVRA was limited to physical records; the court determined that the requirement includes electronic records). Mr. Ingram, the 30(b)(6) representative for SOS, admits that an electronic signature complies with the signatures requirements under the NVRA. Docket no. 77, appx. 40, deposition of K. Ingram at 62:18-63:1 ("DPS's compliance with [the NVRA] for in-person transactions is [satisfied by] the question . . . on the DPS forms, 'Do you want to register to vote? I've agreed to provide my electronic signature, and it can be sent to the Secretary of State's Office.'"). If an electronic signature is legally sufficient under the NVRA for paper transactions, it is legally sufficient for online transactions. The NVRA established procedures to remove barriers to voter registration, to make the process easier and more convenient, and to increase voter participation. Interpreting the "signature" requirement to allow only physical, manual, or wet ink signatures written by hand on paper would be inconsistent with the plain language of the NVRA and the entire statutory scheme. And while Defendants continue to rely on Texas election law as a excuse for noncompliance with the NVRA, there is nothing in Texas law that precludes the use of electronic records and electronic signatures. On the contrary, Texas law permits SOS and DPS to accept electronic records and electronic signatures. *See* Tex. Bus. & Com. Code § 322.017 (each state agency has the option to accept electronic records and electronic signatures);[40] Tex. Bus. & Com. Code § 322.007 ("If a law requires a signature, an electronic signature satisfies the law.").[41] And

[40]As Eiten Hersh noted, the refusal to accept electronic signatures appears to have been a state policy decision. *See* docket no. 94-13, deposition of E. Hersh, at 121:23-122:25. But state policy – like state law – must yield to the mandatory requirements under the NVRA.

[41]*See also* Tex. Bus. & Com. Code § 322.008(a) ("If parties have agreed to conduct a transaction by electronic means and a law requires a person to provide, send, or deliver information in writing to another person, the requirement is satisfied if the information is provided, sent, or delivered, as the case may be, in an electronic record . . ."); Tex. Bus. & Com. Code § 322.012 ("if a law requires that a record be retained, the requirement is satisfied by retaining an electronic record"); Tex. Govt Code § 2054.060 ("digital signature may be used to authenticate a written electronic communication sent to a state agency"); 1 Tex. Admin. Code §

it is undisputed that Texas is already using voter registration signatures in electronic form. *See* Tex. Election Code § 20.066 (for in person and mail transactions, the information provided is input "into the department's electronic data system"; the applicant is informed "that the applicant's electronic signature" will be used; and the department "electronically transfer[s] the applicant's voter registration data, including the applicant's [electronic] signature, to the secretary of state"); 1 Tex. Admin. Code § 81.58 (allowing a voter's signature to be captured by an electronic device for the signature roster). Defendants provide no legal justification for failing to comply with the NVRA when it comes to online renewal and change of address transactions.

Finally, Plaintiffs are not asserting that all signature requirements be tossed out or ignored. Instead, they are asserting that Defendants already retain electronic signatures for every licensed motor voter in Texas and currently use those electronic signatures for both driver's license and voter registration purposes; thus, there is no reason for refusing to use those same signatures for online renewal and change of address transactions. *See* docket no. 77, appx. 39, 42, deposition of K. Ingram at 50:1-11; 95:14-97:14; docket no. 77, appx. 69, 70, 79, deposition of S. Gipson at 203:19-204:7; 215:21-216:7; 234:21-235:1; 236:19-237:9. Even when a signature is required, that requirement may be satisfied with the electronic signature that is on file for every Texas motor voter.[42] There is no legal impediment to using electronic signatures, and there is no technological barrier to online transactions that allow simultaneous renewal and change of address for driver's license and voter registration. *See* docket no. 94-7, deposition of B. Schonhoff, at 222:9-22; docket no. 77, appx. 45, deposition of K. Ingram at 184:12-185:1; 186:5-203.24 (describing technology that may be acceptable for use by state agencies).

[42]Because every Texan must provide an electronic signature when they obtain their original driver's license, and the online process only involves the renewal of an existing driver's license or a change of address on an existing driver's license, it is undisputed that the State of Texas already has preexisting electronic signatures for every motor voter that uses the online system.

16; docket no. 94-9, deposition of E. Hutchins at 99:22-100:2; docket no. 94-10, deposition of J. Crawford at 142:6-18; 143:12-144:21 (DLS could send all the information it currently obtains to the Secretary of State's office, and "it could also send the previously provided electronic signature from that customer, just like it does with a mail-in change of address"); docket no. 94-13, deposition of Eitan Hersh at 34:20-23 ("my opinion is that there are no obvious substantial technical reasons why Texas does not do that or financial situations why Texas does not do that"); 110:6-111:13 (. . . "it [could] transmit, just as it does now for mail and in-person transactions, the previously-recorded digital signature of the voter because everyone who is renewing or changing their address online has a digital signature stored at the DPS"); 115:15-25 (38 other states have an online process for voter registration).

G. Merits of the Fourteenth Amendment claim

Plaintiffs also assert that Defendants' refusal to provide voter registration applications simultaneously with online driver's license renewal and change of address transactions constitutes a violation of their Equal Protection rights under the Fourteenth Amendment.[43] The right to vote is a fundamental right protected under the Equal Protection Clause of the Fourteenth Amendment. *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966). "The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise." *Bush v. Gore*, 531 U.S. 98, 104 (2000) (per curiam). The Equal Protection Clause applies when state procedures restrict voters' rights. *Bush v. Gore,* 531 U.S. at 103 (Supreme Court found that Florida's failure to institute reliable recount procedures violated the Equal Protection Clause); *Obama for Am. v. Husted*, 697 F.3d 423, 436-37 (6th Cir. 2012)

---

[43]"The rights and remedies established by [the NVRA] are in addition to all other rights and remedies provided by law." 52 U.S.C. § 20510(d)(1).

(Circuit court found that Ohio law that prevented casting of early ballots by non-military voters violated the Equal Protection Clause).

1. Applicable standard

The parties disagree on the applicable standard of review. Plaintiffs assert that the *Anderson-Burdick*[44] standard applies (docket no. 77, pp. 19-23; docket no. 85, pp. 16-17), while Defendants assert that an *Arlington Heights*[45] strict scrutiny analysis or *City of Cleburne*[46] heightened scrutiny analysis applies (docket no. 82, p. 24; docket no. 88, pp. 19-20). Because this case involves a challenge to a state voter registration procedure that is alleged to unfairly restrict the right to vote and harm voter participation, the more flexible *Anderson-Burdick* standard applies. *Burdick v. Tukushi*, 504 U.S. 428, 433 (1992) ("to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest, as petitioner suggests, would tie the hands of States seeking to assure that elections are operated equitably and efficiently").[47] Under this standard, "[a] court considering a challenge to a state election law must weigh the character and magnitude of the asserted injury to the rights protected by the [Constitution] that the plaintiff seeks to vindicate against the precise interests

---

[44]*Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*, 504 U.S. 428 (1992).

[45]*Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252 (1977).

[46]*City of Cleburne, Texas v. Cleburne Living Center*, 473 U.S. 432 (1985).

[47]*See also Voting for Am., Inc. v. Steen*, 732 F.3d 382 (5th Cir. 2013) (Fifth Circuit applied *Anderson-Burdick* analysis in challenge to state law regulating volunteer deputy registrars); *Tex. Democratic Party v. Williams*, 285 Fed. Appx. 194, 195 (5th Cir. 2008) (per curiam) (noting that district court properly applied *Anderson-Burdick* balancing test to the constitutional claims challenging use of eSlate voting machines), *cert. denied*, 555 U.S. 1100 (2009); *Faas v. Cascos*, 225 F. Supp. 3d 604, 610 (S.D. Tex. 2016) (State election laws "could hardly serve their legitimate purposes if they were routinely subject to strict scrutiny . . . [thus], [t]he United States Supreme Court recognized the need for a more flexible analytical framework in two landmark cases: *Anderson* and *Burdick*").

put forward by the State as justification for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Burdick*, 504 U.S. at 434 (internal quotes omitted). "However slight the burden [to the voters] may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cty. Elec. Bd.*, 553 U.S. 181, 191 (2008).

2. Analysis

"[V]oting is of the most fundamental significance under our constitutional structure," *Burdick*, 504 U.S. at 433, and unfair registration procedures can have a direct and damaging effect on voter participation. *See* 52 U.S.C. § 20501(a)(3) (Congressional findings). While the State can impose reasonable restrictions, those restrictions must be justified by specific interests that outweigh the burden on voters. The undisputed facts show that Defendants permit simultaneous voter applications for motor voters that renew or change their driver's license in person or by mail, but refuse simultaneous voter applications for motor voters that renew or change their driver's license online. Motor voters that renew or change their driver's license in person or by mail need only check a single box indicating that he would like to register or update his voter information. After checking the box on the driver's license form, no further steps are necessary. DPS sends the updated information to SOS in nightly batches, so the voter registration is updated timely and efficiently. However, motor voters that renew or change their driver's license online are denied the same process. Online motor voters must end their DPS driver's license transaction, and then go to SOS to obtain, print, and complete a separate voter registration application which requires duplicate information.[48] Once the additional application is complete, it

[48] *See generally* pp. 17-19, *supra*.

must be mailed or hand delivered.[49] DPS, a voter registration agency, maintains a procedure that accepts simultaneous voter registration applications for some, while rejecting them for others. This type of restriction on voter registration imposes a burden on the fundamental right to vote that warrants the demonstration of a corresponding interest sufficiently weighty to justify the limitation.

Defendants' only justification for the voter registration burden imposed on motors voters is the "signature" requirement under Texas election law. However, neither federal nor state law limits the signature requirement to physical hand written signatures on paper.[50] Electronic signatures and electronic records are legally recognized and widely used, and Defendants offer no reason for refusing to accept them for online motor voter transactions.[51] DPS already uses electronic records and previously imaged electronic signatures for every Texan that uses the online system for driver's license renewal or change of address.[52] SOS admits that electronic signatures comply with signature requirements under the NVRA and Texas Election Code.[53] SOS admits it never uses physical, manual, or wet ink handwritten signatures on paper for voter

---

[49]*See id.*

[50]*See* pp. 52-55, *supra*.

[51]*See id.*

[52]Docket no. 77, appx. 70, deposition of S. Gipson at 215:21-216:7 (for online transactions, Texas has decided that a previously captured electronic signature is sufficient for driver's license purposes, but they refuse to accept the same signature for voter registration purposes); Stipulation no. 11, p. 5, *supra* ("The signature that appears on the license generated as a result of a customer's online driver's license renewal or change of address transaction is an image of the applicant's physical signature, electronically captured during the applicant's most recent in-person transaction").

[53]Docket no. 77, appx. 39-40, 42, K. Ingram deposition at 50:1-6; 62:4-63:1; 97:4-14.

registration purposes.[54] DPS already has, in its possession and control, an electronic signature of every motor voter that has been issued a license. With motor voters' electronic signatures already in the voter registration agency's possession, there is no reason why Defendants could not register them to vote in a simultaneous online transaction.

Neither the law nor the facts support Defendants' alleged justification for limiting simultaneous voter applications to in-person and mail motor voter transactions and refusing simultaneous voter applications for motor voters that renew or change their driver's license online. Because the alleged justification is not legitimate, there is no state interest that outweighs the burden imposed on voters. Defendants fail to demonstrate a corresponding interest sufficiently weighty to justify the limitation on voters' rights.

Not only have Defendants failed to justify their actions, but they also acknowledge that permitting simultaneous voter applications for motor voters that renew or change their driver's license online would be technologically very feasible and the cost would be minimal.[55] In fact, the undisputed testimony reflects that changing the online process to include simultaneous voter

---

[54]Docket no. 77, appx. 39, K. Ingram deposition at 50:7-11 (Q: What's the ink signature on the DPS's physical form used for as far as voter registration? A: I don't know. I don't know if it's used for anything. Once they've applied in person at the office, they've signed it electronically"); docket no. 77, appx. 117, RFA 26 ("Admits that the information DPS transmits to SOS about each applicant for voter registration includes a digital image of the applicant's signature"); docket no. 77, appx. 122, RFA 13 (Defendants admit that prior to transmission to SOS, the DPS computer system locates records that [include] a "Signature Image"); docket no. 77, appx. 118, RFA 10, 11 (Defendants admit that individuals are not registered to vote in connection with their interactions with DPS unless they submit an electronic image of their signature).

[55]*See* docket no. 77, appx. 45-46, deposition of K. Ingram at 184:19-185:2 (it's "technically possible" and "I don't think it would cost a lot of money"), 186:15-16 ("I'm not contesting the logistics of it"); docket no. 77, appx. 90, deposition of J. Crawford (from an IT perspective, DLS is currently capable of sending the voter data and electronic signature to SOS); *see also* docket no. 94-13, deposition of E. Hersh at 110:6-10 (it would be a "massive cost savings"); 111:10-13 (the savings would be statewide); report of E. Hersh at pp. 6, 12-15 (the technology clearly exists for state motor vehicle authorities that allow online transactions).

registration applications would very likely lead to greater efficiency for the State and increased voter registration for Texans.[56] *See Anderson*, 460 U.S. at 806 (even if the State has legitimate interests, if the State also has open to it a less drastic way of satisfying those interests it may not choose a scheme that restricts the right to vote).

VI.

Conclusion

DPS encourages Texans to use its online services to renew their driver's license and change their address because it is easier and more convenient.[57] It cannot, at the same time, deny simultaneous voter registration applications when those online services are used. DPS is legally obligated, as a designated voter registration agency under the NVRA, to permit a simultaneous voter registration application with every transaction. Asking motor voters whether they are interested in voter registration and sending them to SOS for an entirely separate application process is not enough. The NVRA demands much more from voter registration agencies. Defendants are violating §§ 20503(a)(1); 20504(a),(c),(d), and (e); 20506(4)(A)(iii), and (d); and 20507(a)(1)(A) of the NVRA and their excuse for noncompliance is not supported by the facts or the law. Plaintiffs are also being denied equal protection under the law. Plaintiffs are entitled to the relief they are seeking herein.

It is therefore ORDERED Plaintiffs' Motion for Summary Judgment (docket no. 77) is GRANTED and Defendants' Motion for Summary Judgment (docket no. 82) is DENIED. Final

---

[56]*See* docket no. 94-13, deposition of E. Hersh at 114:8-10; 114:24-115:14 (having people filling out information by hand and then having state employees key that information in electronically leads to more errors); report of E. Hersh at p. 4 (in 11 of the 38 states with online registration, the policy was adopted without any legislation, but simply as a technological upgrade to an existing governmental function); docket no. 85, appx. 25 (potential number of motor voters affected in average week and month).

[57]Docket no. 94-9, deposition of E. Hutchins, at 38:18-23; 39:12-19.

judgment will be entered separately, with costs, fees, and expenses to be taxed against Defendants. 52 U.S.C. § 20510(c). The parties shall submit a proposed form of judgment setting forth the necessary declaratory and injunctive relief, consistent with the Court's findings, within seven days from the date below.

SIGNED this 10 day of May, 2018.

ORLANDO L. GARCIA
CHIEF U.S. DISTRICT JUDGE