IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| JARROD STRINGER, et al.,<br>　　*Plaintiffs,* | §<br>§<br>§ | |
| v. | §<br>§ | No. 5:16-CV-00257-OG |
| ROLANDO PABLOS, et al.,<br>　　*Defendants.* | §<br>§<br>§ | |
| —————————————————— | §<br>§ | |
| JARROD STRINGER, et al.,<br>　　*Plaintiffs,* | §<br>§<br>§ | |
| v. | §<br>§ | No. SA-20-CV-46-OG |
| RUTH R. HUGHS, et al.,<br>　　*Defendants.* | §<br>§<br>§ | |

## DEFENDANTS' MOTION TO DISMISS

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Defendants respectfully request that the Court dismiss the complaint filed by the Texas Democratic Party ("TDP"), Democratic Senatorial Campaign Committee ("DSCC"), and Democratic Congressional Campaign Committee ("DCCC") (collectively, "Democratic Party Intervenors"), Dkt. 137.

## BACKGROUND[1]

The above-captioned matter is the consolidation of case No. SA-20-CV-46-OG, ("*Stringer II*"), filed in 2020, and case No. SA-16-CV-257-OG, ("*Stringer I*"), filed in 2016. *Stringer I* was litigated to final judgment in this Court. On appeal from that final judgment, the Fifth Circuit held that this Court lacked subject matter

---

[1] The Court is familiar with the factual background, so Defendants do not reiterate it here.

jurisdiction and remanded with instructions to dismiss for lack of standing. *Stringer v. Whitley*, 942 F.3d 715, 725 (5th Cir. 2019). After remand, the Democratic Party Intervenors moved to intervene in *Stringer I*. Dkt. 124. Defendants opposed that intervention. Dkt. 133. On January 21, 2020, this Court *sua sponte* consolidated *Stringer I* and *Stringer II*, Dkt. 135, and granted the Motion to Intervene that the Democratic Party Intervenors filed in *Stringer I*. Dkt. 136. This Court then dismissed the *Stringer I* Plaintiffs' claims from the newly consolidated case. Dkt. 139.

The Democratic Party Intervenors allege that Texas "arbitrarily subject[s] eligible voters to disparate voter registration standards" and has "denied voters an equal opportunity to participate in federal and state elections in violation of Section 1 of the Fourteenth Amendment." Dkt. 137, ¶ 33. They further allege that, "[a]s a result of this disparate treatment, Intervenor-Plaintiffs were directly harmed in their mission to elect Democratic representatives, and those among their membership harmed through disenfranchisement." *Id.* The cause of these alleged harms, according to Plaintiffs, is Texas's written-signature requirement for voter-registration applications and changes to voter-registration addresses.

## ARGUMENT AND AUTHORITY

The Democratic Party Intervenors' complaint should be dismissed for lack of jurisdiction because the Court did not have authority to grant the motion to intervene, and because the Intervenors fail to allege injury-in-fact to themselves or to their members. They also lack statutory standing to bring an equal protection claim. Even if they had standing, the Democratic Party Intervenors' claim fails on the

merits because they allege neither a discriminatory intent nor effect on an identifiable political group, and because Texas's written-signature requirement applies equally to all voters.

## I. The Democratic Party Intervenors should be dismissed under Rule 12(b)(1) for lack of jurisdiction.

Federal Rule of Civil Procedure 12(b)(1) governs motions to dismiss for lack of subject-matter jurisdiction. *E.g.*, *Hooks v. Landmark Indus., Inc.*, 797 F.3d 309, 312 (5th Cir. 2015)). "Subject-matter jurisdiction" refers to "the courts' statutory or constitutional power to adjudicate the case." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998). Subject-matter jurisdiction is "a threshold issue that must be resolved before any federal court reaches the merits of the case before it." *Perez v. U.S.*, 312 F.3d 191, 194 (5th Cir. 2002); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. at 94-95.

### A. The Court lacked jurisdiction to allow the Democratic Party Intervenors to intervene in *Stringer I.*

As explained in Defendants' Response in Opposition to the Motion to Intervene, Dkt. 133,[2] once the Court of Appeals declared *Stringer I* jurisdictionally defective, there ceased to be an existing suit within this Court's jurisdiction in which to intervene. Instead, *Stringer I* should have been dismissed and closed by this Court.

It is well-settled that "[a]n existing suit within the court's jurisdiction is a prerequisite of an intervention." *Kendrick v. Kendrick*, 16 F.2d 744, 745 (5th Cir. 1926), *cert. denied*, 273 U.S. 758 (1927) (denying intervention where court did not

---

[2] Defendants re-urge and incorporate by reference Dkt. 133 as if fully set forth herein.

3

have jurisdiction over original lawsuit for lack of indispensable parties). Thus, "a person may not intervene if the original, underlying case was jurisdictionally defective." *Odle v. Flores*, 899 F.3d 344, 348 (5th Cir. 2017) (citing *Non Commissioned Officers Ass'n v. Army Times Publ'g Co.*, 637 F.2d 372, 373 (5th Cir. 1981)); *see also id.* ("'[T]here is no right . . . to intervene in a [jurisdictionally] defective suit.'") (quoting *Truvillion v. King's Daughters Hosp.*, 614 F.2d 520, 526 (5th Cir. 1980)).

Whether there is an existing suit within the court's jurisdiction is assessed based upon "when the motion to intervene was filed." *Krim v. PCOrder.com*, 402 F.3d 489, 502 (5th Cir. 2005); *see also id.* ("The 'prerequisite of an intervention' that there be 'an existing suit within the Court's jurisdiction' depends here on the individual claims. That none of the individual claims remained viable . . . when the motion to intervene was filed, disposes of the attempt at intervention.") (quoting *Army Times Publ'g Co.*, 637 F.2d at 373).

When the Court of Appeals issued its mandate on December 5, 2019, there ceased to be "an existing suit within the Court's jurisdiction" because—at that point— "none of the individual claims" upon which Plaintiffs invoked this Court's jurisdiction "remained viable." *E.g., Krim*, 402 F.3d at 502; *see also, e.g., Ericsson Inc. v. InterDigital Commc'ns Corp.*, 418 F.3d 1217, 1222 (Fed. Cir. 2005) (rejecting the argument that—because  the district court retained jurisdiction to entertain a motion for relief from final judgment under Rule 60(b)—there was "an existing suit within the court's jurisdiction" for purposes of intervention) (citing *Kendrick*, 16 F.2d at 745).

4

Thus, this Court lacked jurisdiction to grant the Motion to Intervene—both as a jurisdictional matter and in accordance with the mandate rule. "Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. at 94 (quoting *Ex parte McCardle*, 74 U.S. 506, 514 (1868)). "Compliance with an order to relinquish jurisdiction necessarily precludes the lower court from taking any further action other than dismissal, for to do so would involve retaining jurisdiction." *Stamper v. Baskerville*, 724 F.2d 1106, 1108 (4th Cir. 1984). As the Fifth Circuit has explained, "[t]he mandate rule requires a district court on remand to effect our mandate and to do nothing else." *Gen. Universal Sys., Inc. v. HAL, Inc.*, 500 F.3d 444, 453 (5th Cir. 2007).

The Democratic Party Intervenors' claims should be dismissed because this Court lacked jurisdiction to grant the motion to intervene.

## B. The Democratic Party Intervenors lack standing.

Even if the Court had jurisdiction to grant the Motion to Intervene, the Democratic Party Intervenors fail to allege facts which, if true, would establish their standing. "[S]tanding is perhaps the most important of the jurisdictional doctrines." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (internal quotation omitted). To establish Article III standing, a plaintiff must show: (1) an actual or imminent, concrete and particularized "injury-in-fact"; (2) that is fairly traceable to the challenged action of the defendant (causation); and (3) that is likely to be redressed by a favorable decision (redressability). *Friends of the Earth, Inc. v. Laidlaw Envt'l.*

*Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). All three elements are "an indispensable part of the plaintiff's case" and each plaintiff bears the burden to establish them. *E.g.*, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

The Democratic Party Intervenors lack organizational standing because they have not plead injury-in-fact. They similarly and lack associational standing to sue on behalf of their members because they have not alleged injury-in-fact to individuals among their membership, because they have not identified an interest germane to their purpose, and because the claim asserted requires the participation of individual members. Moreover, even if they had Article III standing, the Democratic Party Intervenors' case should still be dismissed because they lack statutory standing.

### 1.  Organizational Standing

An organization has standing to sue if it satisfies the same Article III requirements of injury-in-fact, causation, and redressability applicable to individuals. *NAACP v. City of Kyle, Tex.*, 626 F.3d 233, 237 (5th Cir. 2010) (citing *Lujan*, 504 U.S. at 560-61). "[A]n organization may establish injury in fact by showing that it had diverted significant resources to counteract the defendant's conduct; hence, the defendant's conduct significantly and 'perceptibly impaired' the organization's ability to" conduct its routine "'activities—with the consequent drain on the organization's resources[.]'" *Id.* (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). "Not every diversion of resources to counteract [a] defendant's conduct, however, establishes an injury in fact." *Id.* at 238. Rather, any "[s]uch injury must be 'concrete and demonstrable.'" *Id.*

Thus, to establish standing, "an organizational plaintiff must explain how the activities it undertakes in response to the defendant's conduct differ from its 'routine [] activities,'" and must "identify 'specific projects that [it] had to put on hold or otherwise curtail in order to respond to' the defendant's conduct." *Def. Distributed v. United States Dep't of State*, No. 1:15-CV-372-RP, 2018 WL 3614221, at *4 (W.D. Tex. July 27, 2018) (quoting *City of Kyle*, 626 F.3d at 238). *See also, e.g., ACORN v. Fowler*, 178 F.3d 350, 358 (5th Cir. 1999) (holding that organization's expenditures must be "caused by an[] action by" the defendant that the organization "claims is illegal, as opposed to part of the normal, day-to-day operations of the group" to confer standing) (citing *Fair Hous. Council of Suburban Philadelphia v. Montgomery Newspapers*, 141 F.3d 71, 78 & n.5 (3d Cir. 1998)).[3]

The Democratic Party Intervenors do not meet this standard. TDP alleges that

- it "is the statewide organization representing Democratic candidates and voters throughout the State of Texas within the meaning of Section 117 of Texas's Election Code;"[4]

- its "purpose is to elect Democratic Party candidates to public office throughout Texas;" and

- its activities "include[] supporting Democratic Party candidates in national, state, and local elections through fundraising and organizing; protecting the legal rights of voters; and ensuring that all voters have a meaningful ability to cast ballots in Texas."

Dkt. 137, ¶11.

---

[3] *See also, e.g., Advocacy Ctr. v. La. Tech Univ.*, No. CV 18-0934, 2019 WL 1303212, at *4 (W.D. La. Mar. 6, 2019) ("[A]lthough an organization conceivably could have standing if it incurred [] costs [], the organization still must show that it would not have incurred these costs in the absence of defendant's illegal conduct."), *report and recommendation adopted*, 2019 WL 1301983 (W.D. La. Mar. 21, 2019) (citing *Fowler*, 178 F.3d at 357-58).

[4] Texas's Election Code does not contain any "Section 117." *Accord*, TEX. ELEC. CODE § 1.001, *et seq.*

DSCC, for its part, asserts that

- it "is the national senatorial committee of the Democratic Party, as defined by 52 U.S.C. § 30101(14);"

- its mission is "to elect candidates of the Democratic Party to the United States Senate, including in Texas;"

- its activities include "assisting state parties throughout the country, including in Texas;"

- in 2020, it "expects to invest millions in support of the Democratic candidate selected as the nominee to run against Republican Senator John Cornyn;"

- "Texas's conduct directly harms DSCC by frustrating its mission of, and efforts in, electing the Democratic Party candidate to the U.S. Senate in Texas by suppressing the access of eligible Texas citizens to the franchise;"

- it "is aware of Texas's online portal system and will have to expend and divert additional funds and resources on ensuring that eligible citizens are not misled into believing that they have effectively registered to vote, and are in fact registered to vote, as well as to support GOTV, voter persuasion efforts, and other activities in Texas, at the expense of its other efforts to defeat Senator Cornyn, as well as its efforts in other states, to combat the effects of Texas's conduct."[5]

Dkt. 137, ¶12. DCCC makes essentially the same allegations with respect to Congressional (as opposed to Senatorial) races. Dkt. 137, ¶13.

Even if these allegations were true, they do not state that any Democratic Party Intervenor "diverted significant resources to counteract the defendant's conduct" such that any "defendant's conduct significantly and 'perceptibly impaired' the organization's ability to" conduct its routine "'activities—with the consequent

---

[5] It is unclear what is meant by "Texas's online portal system," but for purposes of this motion, Defendants assume the phrase refers to the process for renewing or changing the address on a Texas driver license online.

drain on the organization's resources[.]'" *City of Kyle*, 626 F.3d at 237 (quoting *Havens Realty Corp.*, 455 U.S. at 379). Indeed, TDP does not allege diversion of *any* resources *at all* to combat Defendants' allegedly unlawful conduct. *Cf. id.*

DSCC's and DCCC's cursory allegation of efforts to "combat the effects of Texas's conduct" also fails to establish injury-in-fact. As explained in *City of Kyle*, "[n]ot every diversion of resources to counteract [a] defendant's conduct [] establishes an injury in fact." 626 F.3d at 238 (quoting *Havens Realty Corp.*, 455 U.S. at 379). Rather, any "[s]uch injury must be 'concrete and demonstrable.'" *Id.* And, plainly, DSCC and DCCC do not state that they have "diverted significant resources to counteract the [Defendants'] conduct" such that "the [Defendants'] conduct significantly and 'perceptibly impaired' the organization's ability to" engage in its "routine activities," as required to allege organizational standing. *City of Kyle*, 626 F.3d at 238.

Instead, voter education and outreach are already central to these organizations' "routine activities." *Id.*; Dkt. 137, ¶¶11-13. GOTV and voter-engagement efforts that these entities would engage in *regardless* of Defendants' allegedly unlawful conduct do not amount to "concrete and demonstrable" injury to DSCC or DCCC. *Havens Realty Corp.*, 455 U.S. at 379; *City of Kyle*, 626 F.3d at 238. Put differently, neither DSCC nor DCCC claims that voter outreach efforts fall outside the "normal, day-to-day operations of the group." *Cf. Fowler*, 178 F.3d at 358. None of the Democratic Party Intervenors has alleged injury-in-fact as required to show standing.

9

The "injury-in-fact" element of standing "serves to distinguish a person with a direct stake in the outcome of a litigation—even though small—from a person with a mere interest in the problem." *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 689 n.14 (1973). Because the Democratic Party Intervenors have at most alleged that they are interested in the issues raised in *Stringer I*, this Court should dismiss them from this case for failure to allege injury-in-fact in their own right.

### 2. Associational Standing

Under the doctrine of associational standing, an association may have standing to bring suit on behalf of its members when:

> [1] its members would otherwise have standing to sue in their own right; [2] the interests it seeks to protect are germane to the organization's purpose; and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 191 (5th Cir. 2012) (quoting *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir.2010)) (citation omitted). The Democratic Party Intervenors do not allege facts to establish any of these factors.

As to the first prong, a plaintiff cannot have associational standing unless one of its members would have standing to sue individually. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 536 (5th Cir. 2019). Thus, each intervenor must "identify members who have suffered the requisite harm" for injury-in-fact. *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009); *United Food & Comm. Workers Union Loc. 751 v. Brown*

*Grp., Inc.*, 517 U.S. 544, 555 (1996) (An "association 'can establish standing only as representatives of those of their members who have been injured in fact, and thus could have brought suit in their own right.'") (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976)).

DSCC and DCCC do not allege the existence of specific members—let alone specific members who would have standing in their own right. *See* Dkt. 137. Not having members is fatal to associational standing. *See Hunt*, 432 U.S. at 344 (requiring "indicia of membership in an organization" for associational standing); *City of Olmsted Falls v. FAA*, 292 F.3d 261, 267–68 (D.C. Cir. 2002). TDP does allege that it "has millions of members and constituents from across Texas." Dkt. 137, ¶11. It further states that those members "include[] millions of Texans who are registered with the Texas Department of State's Division of Elections as Democrats, millions of Texans who are drivers who interact with DPS, and many other Texans who regularly support and vote for candidates affiliated with the Democratic Party." Dkt. 137, ¶11.[6]

But TDP's failure to identify any member with specificity is fatal to its associational standing. *See, e.g., City of Kyle*, 626 F.3d at 237 (requiring evidence of "a specific member"); *Ga. Republican Party v. SEC*, 888 F.3d 1198, 1203 (11th Cir. 2018); *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016) (dismissing under Rule 12(b)(1) because plaintiff did not identify a member affected by the challenged regulation).

And even if TDP had identified a specific member, it did not plead "a continuing or threatened future injury" as required to establish standing here. *Cf. Stringer v.*

---

[6] Texas does not have a "Department of State," and will presume for purposes of this Motion that TDP refers to the Texas "Secretary of State."

*Whitley*, 942 F.3d at 721. As the Fifth Circuit explained in *Stringer I*, to establish standing, a plaintiff "must demonstrate a sufficient probability that [they] will use" the challenged "driver's license services again." *Id.* at 722. Where "Plaintiffs do not point to any Plaintiff-specific evidence suggesting that they will become unregistered and eligible to renew their driver's licenses using the DPS System," they "have not established a substantial risk that they will attempt to update their voter registrations using the DPS System and be injured by their inability to do so." *Id.* at 723. "As a result," such "Plaintiffs have not established an injury in fact sufficient to confer standing to pursue the declaratory and injunctive relief that they seek." *Id.*

To be sure, *Stringer v. Whitley* was an appeal from cross-motions for summary judgment after the development of a record. But even at the pleading stage, a litigant must at least *allege* facts which would demonstrate standing if true. *E.g., Lujan*, 504 U.S. at 561. And here, TDP merely alleges having members who "interact with DPS." Thus, even if all their factual allegations were proven, they still could not "establish[] a substantial risk that" any member "will attempt to update their voter registrations using the DPS System and be injured by their inability to do so." *Id.* at 723.

The Democratic Party Intervenors also fail the second prong of the associational standing analysis, as they have not identified any interest germane to their purpose that is to be served by this litigation. While their missions are to elect Democratic candidates, this lawsuit seeks to compel Texas to register voters and update existing registrations absent a written, signed request from the voter. *Compare* Dkt. 137 at 10-11 ("Prayer for Relief") *with* Dkt. 137 ¶¶11-13. Despite the

fact that "[t]he germaneness requirement is 'undemanding' and requires 'mere pertinence' between the litigation at issue and the organization's purpose," at least that pertinence is still required. *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d at 551 n. 2. The records of all voters (regardless of political affiliation) who move between Texas counties and transact with DPS online is not "pertinent" to the Democratic Party Intervenors' specific mission to elect Democratic candidates.

The Democratic Party Intervenors also fail the third prong, because the participation of individual members *is* required to obtain the relief they request. It is not enough to allege the existence of members eligible to transact with DPS online. They still must bring a claim that is "not particular to any individual" and "thus properly resolved in a group context." *Gulf Restoration Network, Inc. v. Salazar,* 683 F.3d 158, 168 (5th Cir. 2012). They cannot do so where, as here, individual voter registrations are at the heart of their challenge. *Cf.*, *e.g.*, *Church of Scientology v. Cazares*, 638 F.2d 1272, 1276-80 (5th Cir. 1981) (individual participation not required where "the claim asserted and the relief requested affect the membership as a whole"); *Familias Unidas v. Briscoe*, 619 F.2d 391, 398 n. 2 (5th Cir. 1980) ("the declaratory relief sought, inuring as it would to the benefit of all members, is ideally suited to allowing 'associational standing.'") (citation omitted).

### 3. Statutory Standing

Even if the Democratic Party Intervenors had Article III standing, they would still lack statutory standing. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014) (explaining statutory standing). Section 1983

provides a cause of action only when *the plaintiff* suffers "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. It does not provide a cause of action to plaintiffs claiming an injury based on the violation of a *third party's* rights. *See Coon v. Ledbetter*, 780 F.2d 1158, 1160 (5th Cir. 1986) ("[L]ike all persons who claim a deprivation of constitutional rights, [plaintiffs] were required to prove some violation of their personal rights."); David P. Currie, *Misunderstanding Standing*, 1981 Sup. Ct. Rev. 41, 45.

Thus, § 1983 follows the general rule that a plaintiff "must assert [her] own legal rights and interests, and cannot rest [her] claim to relief on the legal rights or interests of third parties." *Danos v. Jones*, 652 F.3d 577, 582 (5th Cir. 2011) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)) (alterations original). When "[t]he alleged rights at issue" belong to a third party, rather than the plaintiff, the plaintiff lacks statutory standing, regardless of Article III standing. *Id.*; *see also Conn v. Gabbert*, 526 U.S. 286, 292–93 (1999) (holding that lawyer "clearly had no standing" to bring § 1983 claim for injury suffered as a result of "the alleged infringement of the rights of his client" because a plaintiff "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.")

The Democratic Party Intervenors assert an equal protection claim in the context of voter registration. But, as artificial entities, the TDP, DCCC, and DSCC do not have voting rights. "It goes without saying that political parties, although the principal players in the political process, do not have the right to vote." *Vieth v.*

14

*Pennsylvania*, 188 F. Supp. 2d 532, 546 (M.D. Pa. 2002); *see also Concerned Home Care Providers, Inc. v. Cuomo*, 783 F.3d 77, 91 (2d Cir. 2015) ("But Plaintiffs—five corporations and a not-for-profit trade organization—are not entitled to vote and have no right to equal representation in the legislature.") The Democratic Party Intervenors are necessarily asserting the rights of third parties, and lack statutory standing to sue under § 1983.

## II.    The Democratic Party Intervenors should be dismissed under Rule 12(b)(6) for failure to state a cognizable Equal Protection claim.

Federal Rule of Civil Procedure 12(b)(6) "authorizes a court to dismiss a claim on the basis of a dispositive issue of law." *Neitzke v. William*, 490 U.S. 319, 326 (1989) (citations omitted). "This procedure, operating on the assumption that the factual allegations in the complaint are true, streamlines litigation by dispensing with needless discovery and factfinding." *Id*. at 326-27. Thus, the issue under Rule 12(b)(6) is whether the Complaint alleges "enough facts to state a claim to relief that is plausible on its face," assuming that the allegations are true. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Notably, "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. at 555).

None of the Democratic Party Intervenors alleges a violation of the NVRA. *See* Dkt. 137. Instead, they allege a violation of the Equal Protection Clause. As set forth *supra*, none has standing to pursue such a claim in its own right or as an association

representing its members. But even if standing could be established, the Democratic Party Intervenors' equal protection claim would fail on the merits.

## A.   Democratic Party Intervenors

Texas's handling of online transactions with DPS does not violate the Equal Protection Clause with respect to the Democratic Party Intervenors. An equal protection claim involving voting rights requires allegation of "intentional discrimination against an identifiable political group and an actual discriminatory effect on that group." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 955 (4th Cir. 1992) (citation omitted); *see also, e.g.*, *Veasey v. Abbott*, 830 F.3d 216, 230 (5th Cir. 2016) (en banc) (stating that "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause") (quoting *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977)). The Democratic Party Intervenors have not plausibly alleged intentional or purposeful discrimination in which one class is favored over another.

Statutes providing neutral rules, which might benefit any political party, are not rendered discriminatory by the fact that they benefit one party when applied in particular circumstances. S*ee Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 10 n.10 (1982) (holding that "a statute providing that all such vacancies [in the legislature] be filled by appointment does not have a special impact on any discrete group of voters or candidates" and thus is not discriminatory for equal-protection purposes). Here, the Democratic Party Intervenors do not even *allege* that Texas's handling of online driver license renewal and change of address transactions

disproportionately impacts them. And they certainly do not allege that it is the result of "intentional discrimination" against Democrats. *Cf. Republican Party of N.C. v. Martin*, 980 F.2d at 955.

The Democratic Party Intervenors fail to state an equal protection claim.

## B. Individual Voters

Consideration of the equal protection rights of individual voters would require associational standing, which the Democratic Party Intervenors have not alleged. *See supra*, Part I(B)(2). But even if they had, Texas's handling of online driver license renewal and change of address transactions does not violate any individual's right to equal protection. This is because Texas's written-signature requirement for new voter-registration applications and requests to update voter-registration information—which prevents online voter-registration transactions—applies equally to everyone and does not impose an unconstitutional burden on the right to vote. *See* TEX. ELEC. CODE §§ 13.002(b), 15.021(a), (d); *see also id.* § 20.066(a)(1).

In evaluating an alleged burden on voting rights, the *Anderson/Burdick* test requires the Court to "first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 387 (5th Cir. 2013) (quoting *Anderson*, 460 U.S. at 789). Then, the Court "must identify and evaluate the precise interest put forward by the State as justifications for the burden imposed by its rule." *Id.* (quoting *Anderson*, 460 U.S. at 789). Finally, the Court weighs the "character and magnitude of the asserted in-jury" against the "precise

interests put forward by the State," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* at 387-88 (quoting *Burdick*, 504 U.S. at 434). When a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the state's important regulatory interests are generally sufficient to justify" the restrictions. *Anderson*, 460 U.S. at 788.

As to the "character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments" at issue, Democratic Party Intervenors assert that individuals who choose to use DPS's online system are burdened because—unlike individuals who choose to interact with DPS in person or by mail—online users cannot simply check a box to become registered to vote or change their registration address. *See generally* Dkt. 137. Instead, individuals using DPS's online system must print out a voter-registration form, fill it out, sign it, and mail it, which satisfies Texas's written-signature requirement.

Texans can register to vote in several ways: in person, by mail, or by fax. TEX. ELEC. CODE § 13.002(a). Texas law also permits voter registration in conjunction with a driver's license transaction (either in person or by mail). But because of Texas's written signature requirement, *id.* § 13.002(b), Texas has never permitted online voter registration.

Being treated like everyone else—making a written, signed request to register to vote or update voter-registration information—does not burden any individual's right to equal protection. If an individual desires the simplicity of checking a single

box, they may fill out a paper registration form. Stated differently, providing multiple options for individuals to register to vote is not a violation of the Equal Protection Clause even if the Democratic Party Intervenors consider some options to be less convenient than others.

The interests of the State in requiring written signatures, which necessarily forecloses online registration, include maintaining accurate voting rolls and combatting fraud. It cannot be debated that States have an interest in requiring a signature from voters. *See, e.g.*, 52 U.S.C. § 20504(c). And Texas can use written signatures in cases of fraud, identity theft, and consideration of absentee ballots. *See, e.g. Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833, 1838 (2018) ("It has been estimated that 24 million voter registrations in the United States—about one in eight—are either invalid or significantly inaccurate.") (citation omitted).

The Fifth Circuit has also recognized that preventing voter-registration fraud is a permissible state interest that warrants some limits on voter registration. *Voting for Am.*, 732 F.3d at 394-95. It is not necessary for Defendants to produce specific evidence of fraud to justify preventative measures. *Id.* (citing *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 196 (2008) (plurality op.)); *see Short v. Brown*, 893 F.3d 671, 679 (9th Cir. 2018) (finding "general interest in increasing voter turnout" sufficient to justify experimental use of mail-in ballots in specific counties); *Tripp v. Scholz*, 872 F.3d 857, 866 (7th Cir. 2017) (finding "speculative concern" sufficient to justify ballot-access limitation); *Ohio Democratic Party v. Husted*, 834 F.3d 620, 632 (6th Cir. 2016) (holding that when a regulation is "not unduly burdensome," a State

does not have to "*prove*" that evidence supports its interest; the court may defer to the legislature's findings); *cf. Husted*, 138 S. Ct. at 1847 (cautioning that compliance with the NVRA did not require the State to make "a wise policy judgment" or "have some particular quantum of evidence of a change of residence" before taking steps to verify a voter's address); *Munro v. Socialist Workers Party*, 479 U.S. 189, 195 (1986) ("Legislatures . . . should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively . . . .").

A State may act to prevent potential fraud, as "[a]ny corruption in voter registration affects a state's paramount obligation to ensure the integrity of the voting process and threatens the public's right to democratic government." *Voting for Am.*, 732 F.3d at 394. Balancing individual voter equal-protection rights against the State's interests reveals no unconstitutional burden on the right to vote. The State has provided several options to register to vote, all of which satisfy the State's written-signature requirement. Whether to permit online registration is a quintessentially state-law function, absent a preemptive federal law requiring it. U.S. CONST. art. I, § 4, cl. 1. No such law exists. The Equal Protection Clause does not require what the Democratic Party Intervenors demand, and no individual's right to vote is unconstitutionally burdened by Texas's written-signature requirement for voter registration.

## CONCLUSION & PRAYER

The Democratic Party Intervenors' complaint should be dismissed for lack of jurisdiction and for failure to state a claim on which relief may be granted.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

DARREN L. MCCARTY
Deputy Attorney General for Civil Litigation

THOMAS A. ALBRIGHT
Chief for General Litigation Division

*/s/ Anne Marie Mackin*
ANNE MARIE MACKIN
Texas Bar No. 24078898
CHRISTOPHER D. HILTON
Texas Bar. No. 24087727
Assistant Attorneys General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2798 | FAX: (512) 320-0667
anna.mackin@oag.texas.gov
christopher.hilton@oag.texas.gov

**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I certify that on February 11, 2020, the foregoing instrument was filed electronically via the Court's CM/ECF system causing electronic service upon all counsel of record.

*/s/ Anne Marie Mackin*
ANNE MARIE MACKIN
Assistant Attorney General